```
1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
2                            HOUSTON DIVISION

3
   THUY THI VU, ET AL.,              )
4                                    )
        Plaintiffs,                  )
5                                    )
   v.                                )      NO. H-12-CV-282
6                                    )      June 28, 2012
   W&D APPAREL (JORDAN)              )
7  CORP., ET AL.,                    )
                                     )
8       Defendants.                  )

9

10                                   HEARING
11               BEFORE THE HONORABLE LEE H. ROSENTHAL

12

13

14

15  For the Plaintiffs:      Mr. Mark Burck
                             Mr. Mark R. Lapidus
16                           Ms. Shea M. Henry
                             Burck, Lapidus, Jackson &
17                             Chase, PC
                             5177 Richmond, Suite 850
18                           Houston, Texas 77056

19                           Ms. Naomi Jiyoung Bang
                             South Texas College of Law Human
20                           Trafficking Clinic
                             1303 San Jacinto
21                           Houston, Texas  77007

22                           Ms. Naomi Joyce Bang
                             Mr. Gordon J. Quan
23                           Ms. Andrea Panjwani
                             Lawyers Against Human Trafficking
24                           5850 San Felipe, Suite 601
                             Houston, Texas  77057

25
```

```
 1   For Defendants W&D         Mr. Gerard G. Pecht
     (Jordan) Corp. and        Mr. Eliot Fielding Turner
 2   Well and David Corp.:     Fulbright & Jaworski, LLP
                                1301 McKinney, Suite 5100
 3                              Houston, TX  77010

 4   For Defendants Aramark     Ms. Sara Kropf
     Corporation and           Baker Botts, LLP
 5   Aramark Uniform &         1299 Pennsylvania Ave., NW
     Career Apparel, LLC:      Washington, DC  20004
 6
                                Mr. Dennis P. Duffy
 7                              Baker Botts, LLP
                                910 Louisiana, Suite 3500
 8                              Houston, TX  77002

 9   For Defendant Academy,     Ms. Janet E. Militello
     Ltd. d/b/a Academy        Mr. Christopher Dove
10   Sports + Outdoors:        Locke Lord, LLP
                                600 Travis, Suite 2800
11                              Houston, TX  77002

12                              Mr. Wade Turner
                                Academy Sports + Outdoors
13                              1800 N. Mason Road
                                Katy, TX  77449
14
     For Defendants             Mr. Charles S. Kelley
15   Coalimex VN and           Mayer Brown, LLP
     Van Viet Nguyen:          700 Louisiana, Suite 3400
16                              Houston, TX  77002

17
     Court Reporter:            Bruce Slavin, RPR, CM
18

19

20

21

22

23

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.
```

1          THE COURT:  Good afternoon.  State your appearances

2     and then please be seated.  Everybody else can be seated.

3          MR. BURCK:  My name is Mark Burck, B-u-r-c-k.  I am

4     here as co-counsel for the Plaintiffs.

17:12  5          MS. HENRY:  My name is Shea Henry, also

6     representing the Plaintiffs.

7          MS. PANJWANI:  I'm Andrea Panjwani, co-counsel on

8     behalf of the Plaintiffs.

9          MR. QUAN:  Gordon Quan on behalf of the Plaintiffs.

17:12  10          MS. BANG:  Naomi Jiyoung Bang on behalf of the

11     Plaintiffs.

12          MR. LAPIDUS:  Mark Lapidus for the Plaintiffs.

13          THE COURT:  All right.  Thank you.

14          MS. KROPF:  Sara Kropf on behalf of Aramark

17:12  15     Corporation and Aramark, Inc.

16          MR. DUFFY:  Dennis Duffy on behalf of Aramark

17     Corporation and Aramark Uniform.

18          MR. DOVE:  Chris Dove on behalf of Academy Sports +

19     Outdoors.

17:12  20          MS. MILITELLO:  Janet Militello on behalf of

21     Academy Sports + Outdoors.

22          MR. WADE TURNER:  Wade Turner, general counsel for

23     Academy Sports + Outdoors.

24          MR. ELIOT TURNER:  Eliot Turner on behalf of Well

17:12  25     and David Corp.

1          MR. PECHT:  Gerry Pecht on behalf of Well and David

2     Corp.

3          THE COURT:  Great.  Thank you.

4               A number of issues with some interesting

17:12  5     relationships to some questions pending before the Supreme

6     Court for next year that are open.  I'm a little unclear how

7     we ought to proceed in light of those issues, although the

8     Defendants' position is that there are plenty of bases to

9     get rid of the case without waiting for the Supreme Court to

17:12  10    weigh in on that issue.

11               I think it may be most useful if we first talk

12    about a couple of uncertainties created by the current

13    status of the briefing, get some clarification on that and

14    then go party by party or issue by issue with a little bit

17:12  15    of overlap.

16               So, my first question is the status of the

17    RICO claims.  It didn't play a large role in the Plaintiffs'

18    response to the motions to dismiss, which raises the -- and

19    the Defendants' picking up on that did not mention it, as

17:12  20    much as I could tell, in their replies to the responses.

21    So, my first question is:  Are you walking away from the

22    RICO claims?

23          MR. BURCK:  Yes, ma'am.  The RICO claims have been

24    abandoned.

17:12  25          THE COURT:  Good.  That's very helpful to know.

1          So, to the extent dismissal was sought on the

2     RICO claims, that motion is granted.

3          And, again, by way of -- maybe it's

4     housekeeping; maybe it's not.  The motions to dismiss the

17:12  5     earlier versions of the Complaint are moot because the

6     Second Amended Complaint is the operative pleading and the

7     current motions to dismiss directed to that complaint are

8     the ones under consideration.  So, the Docket Entries 25, 26

9     and 30, the motions to dismiss directed to the earlier

17:12  10    complaints, are also moot.

11          So, the motions that are before me are Docket

12    Entries No. 49, 50, 51 and 52, all of which have been

13    responded to and replies filed, which are the motions to

14    dismiss filed by Academy.  There are two of those divided

17:12  15    into -- One addresses pleadings sufficiency and the other

16    addresses -- assuming it's a sufficient pleading, it still

17    fails because these claims have no validity as a matter of

18    law.

19          At Docket Entry 51 is Well and David's motion

17:12  20    which begins with a challenge to personal jurisdiction, and

21    Docket Entry No. 52 is Aramark's motion.

22          So, just for organizational purposes, I'd like

23    to take the defense that is unique to one party and that's

24    the personal jurisdiction issue raised by Well and David.

17:13  25    Let's have argument on that and then we can go to the claims

1    that are asserted against all of the Defendants and the

2    defenses that are raised by more than one of those

3    defendants.

4              All right.  Mr. Pecht, it's your motion.

17:13   5         MR. PECHT:  Your Honor, Gerry Pecht here on behalf

6    of Well and David.

7              Pointing out just initially that I am here

8    only on behalf of Well and David Corp., making the initial

9    observation that they have not served W&D Apparel (Jordan)

17:13  10    Corp.  To our knowledge, they have not been served.

11              This involves an F-cubed situation with regard

12    to my client, and my client is a foreign client, a Taiwanese

13    company.  These claims are made by foreign plaintiffs for

14    conduct occurring in foreign countries.  This raises,

17:13  15    obviously, serious issues of personal jurisdiction and

16    extraterritorial application of various statutes that are in

17    issue here.

18              So, I have got four arguments.  First, there

19    is no personal jurisdiction over Well and David.  Second,

17:13  20    that the ATS and the TVPRA apply -- neither of them are

21    going to apply to the extraterritorial conduct here.  And I

22    don't know if you want to hear that argument at this point.

23         THE COURT:  Well, tell me your take on how we ought

24    to handle the relationship to what the Supreme Court has

17:13  25    indicated it's going to take up.

1          MR. PECHT:  Well, I think -- with regard to my

2     client and the specific issues with my client and the issues

3     that I am going to raise today, I don't think it's -- I

4     think the Court can go forward and decide these issues.

17:13  5          THE COURT:  All right.

6          MR. PECHT:  One of them, which is that the ATS

7     claims are preempted by the TVPRA -- the Court could go

8     either way on that, and I can explain that to the Court on

9     how you might want to --

17:13  10         THE COURT:  When you say "the Court" are you

11     talking about "the" Court or this court?

12          MR. PECHT:  This court could go either way on it,

13     because, obviously, if the ATS does not have any

14     extraterritorial application or doesn't apply to corporate

17:13  15     entities, then my client is out, because we're a corporate

16     entity and we're extraterritorial.

17          And then, finally, the Plaintiffs common-law

18     claims are barred either by limitations or failure to state

19     a claim or Rule 9, and we can go over those.  The Court

17:13  20     knows well the standards for establishing personal

21     jurisdiction.  We've got a 12(b)(2) motion.  The issues are

22     whether there's general or specific jurisdiction.  The

23     Plaintiff obviously bears the burden of proof and they have

24     to make a prima facie case that jurisdiction exists.

17:13  25          There are federal claims, and the question is

1    whether or not there are minimum contacts with any state in

2    the United States, and there are also common-law claims on

3    those issues of whether there are contacts with the state of

4    Texas.

17:13   5              First, on general jurisdiction, there is no

6    general jurisdiction over Well and David because Plaintiffs

7    have not shown that Well and David has --

8              THE COURT:  I am going to stop you right there and

9    turn to the Plaintiffs.

17:13   10              Is there any basis to assert general

11    jurisdiction or is this clearly only a specific

12    jurisdictional issue?

13              MR. LAPIDUS:  I am going to address both, Your

14    Honor.

17:13   15              THE COURT:  So, both are on the table as far as

16    you're concerned?

17              MR. LAPIDUS:  Yes, ma'am.

18              THE COURT:  Okay.  That was my first question.  Go

19    ahead.

17:13   20              MR. PECHT:  So, Well and David doesn't have

21    continuous and systematic contacts with the forum.  The

22    Court is very familiar with that standard.  The Fifth

23    Circuit has said it is difficult to establish general

24    jurisdiction, and the Court knows that.

17:13   25              And the defendant must have a business

1    presence in the forum, and here the Plaintiffs have not

2    alleged or presented any evidence that there's any presence

3    by Well and David Corp. in the forum.  They haven't alleged

4    or represented the evidence they have an office here, that

17:13    5    they have a bank account here, that they have an address

6    here, they own any property here, that they have leased any

7    property, that they're registered to do business in the

8    state of Texas, or anywhere in the United States for that

9    matter, they pay U.S. taxes.  They have not made an

17:13    10    allegation supporting a presence in either the U.S. or

11    Texas.

12            And the Supreme Court recently announced in

13    *Goodyear v. Brown*:  "A court may assert general jurisdiction

14    over a foreign corporation when the affiliation with the

17:13    15    forum is so continuous and systematic as to render them

16    essentially at home in the forum."  This is not a case where

17    my client is in any way, based upon the allegations or any

18    of the evidence presented, at home in the forum.

19            THE COURT:  Was there any request made to you for

17:13    20    discovery that might lead to a basis for asserting facts to

21    support a general jurisdiction argument?

22            MR. PECHT:  There has not been, Your Honor.  No

23    request for any discovery at all.  And, frankly, the theory

24    on which they're proceeding is the "stream of commerce"

17:13    25    theory, that my client, Well and David, the Taiwanese

1   company -- And, by the way, it's not the company that they

2   claim had the contract with the Vietnamese employees, and

3   it's not the company which is Well and David Apparel

4   (Jordan) and it's not the company that they claim was

17:13   5   involved and engaged in the false imprisonment.  This is the

6   parent company we're talking about, the only company that I

7   am representing here today.

8           And what they allege is that company sells

9   product.  They don't say that -- they don't allege or

17:13   10   present any evidence that we ship the product or that we

11   distribute the product in the United States, but we sell

12   products to U.S. companies and those products find their way

13   into the U.S. stream of commerce.  And the Fifth Circuit has

14   said repeatedly in *Jackson* and *Alpine View* -- and the

17:13   15   Court's very familiar with these cases -- it's simply not

16   enough, it does not establish general jurisdiction, the fact

17   that you put a product in the stream of commerce that finds

18   its way into the United States.  And that's what they have

19   alleged, that there have been sales to Aramark, there have

17:13   20   been sales to Academy as vendors and suppliers of clothing

21   to be imported to the United States.  That's the allegation,

22   "to be imported into the United States."

23           They have attached four exhibits to their

24   response.  These are not part of their allegations; this is

17:13   25   part of their response.  They're not sworn to or

1    authenticated in any way.  But those four exhibits, if the

2    Court looks at them, only go to the stream of commerce

3    issue.  They only go to the fact that these products, this

4    apparel that's put into the stream of commerce, sales are

17:13    5    made overseas to U.S. companies and those products find

6    their way into the United States in the stream of commerce.

7              They have also alleged now only in the

8    response, not in the complaint, that there is travel to the

9    U.S.  They cite for it these four exhibits.  The Court can

17:13    10    look at those four exhibits.  None of them indicate that

11    there is any travel by Well and David Corp. to the United

12    States.  But, even if there was either allegation or

13    evidence of that, *Helicopteros* made it clear that purchases

14    and related trips standing alone are not sufficient for a

17:13    15    state assertion of jurisdiction because, again, it goes to

16    the point that it's not a presence in the forum.  They're

17    not at home in the forum.

18              They cite to this court's decision in

19    *Construcciones*, a very different case, as the Court knows,

17:13    20    on general jurisdiction.  The Washington-registered LLC in

21    that case owned and leased land in Texas.  They received

22    mail at an address in Texas.  They conducted business in

23    Texas through its two members, both of whom were Texas

24    residents.  None of that is present here.

17:13    25              They also have argued the -- central to its

business argument -- This is the argument that when the

nature of a defendant's forum contact is essential to its

business that that can create jurisdiction under certain

circumstances.  Whatever the "central to its business"

17:13   doctrine might mean, it does not mean putting a product into

the stream of commerce because the Fifth Circuit has said

under *Alpine* and under *Jackson* that that is simply

insufficient.

            And the two cases that this court cited in

17:13   *Construcciones* with regard to the "stream of commerce"

argument both establish that a percentage of a company's

sales in a given state are generally irrelevant.  So, the

fact that you put a lot of product or a large percentage of

your product into the stream of commerce going to the United

17:13   States or elsewhere does not establish -- that "stream of

commerce" argument is not sufficient to establish general

jurisdiction.

            I point out that in their pleadings at one

point they say that we have $57 million worth of business in

17:13   the United States.  If you look at the exhibit that they

actually cite to, it's $57 million in the United States and

Europe.  So, that's -- I wanted to point that out.

            That's general jurisdiction.  There is no

specific jurisdiction over Well and David to show --

17:13           THE COURT:  Mr. Pecht, let me back up for a minute.

1    What if it just said the exhibit was consistent with their

2    description of the exhibit?  That is, it said 57 million

3    dollars' worth of business in the United States, putting

4    aside the time period over which that was generated?  Would

17:13   5    that make a difference?

6              MR. PECHT:  Not a difference at all.  The amount of

7    business that you do in the United States -- the amount of

8    sales into commerce that come into the United States makes

9    no difference whatsoever because the Fifth Circuit has said

17:13   10   that the "stream of commerce" argument is simply

11   insufficient to establish a presence -- the question is,

12   really, are you present in the state, in the country -- and

13   it does not constitute a presence in the state or country.

14             So, for specific jurisdiction, the Plaintiff

17:13   15   needs to show that her cause of action arises out of or

16   results from the Defendant's forum-related context.

17   Specific jurisdiction is claim-specific.  So, you look at

18   each claim specifically and you ask the question does that

19   claim arise out of or result from the Defendant's forum-

17:13   20   related context.

21             Here none of the cause of actions relate to or

22   arise out of the contact with the United States or Texas.

23   The issues, the claims, all arise out of facts involving

24   Vietnamese individuals, employment contracts with a

17:13   25   Jordanian company, activities in a factory in Jordan, and

 1   they do not relate to the transmission of products to the

 2   United States.

 3             And it would be different if this was a case

 4   where you had like a defective product that was manufactured

17:13   5   overseas, shipped to the United States, the product was

 6   defective here and the cause of action arose out of that

 7   defective product being in the United States in commerce.

 8             None of these causes of action arise out of

 9   anything that happened in the United States.  The apparels

17:13   10   that came to the United States has nothing to do with the

11   cause of action.  It's too attenuated with that cause of

12   action that occurred overseas in a foreign country among

13   foreign parties.

14             THE COURT:  So, is your motion that it -- to the

17:13   15   extent specific jurisdiction turns on a kind of "but for"

16   argument -- that is, but for the contractual opportunity to

17   sell in the United States this never would have happened --

18   that that's simply insufficient?

19             MR. PECHT:  It doesn't work here.

17:13   20             THE COURT:  All right.

21             MR. PECHT:  With regard to the TVPRA, it does not

22   apply extraterritorial to my client -- extraterritorially to

23   my client.  The Court, I know, is familiar with *Morrison*

24   which is an F-cubed case, foreign shareholder suing foreign

17:13   25   companies with regard to shares that were traded on a

1   foreign exchange.  The Supreme Court said, when the statute

2   gives no clear indication of an extraterritorial

3   application, it has none; and, even when the statute

4   provides for some extraterritorial application, the

17:13   5   presumption against extraterritoriality operates -- limits a

6   provision to its terms.

7              The TVPRA has a provision, Section 5096, which

8   provides for extraterritorial jurisdiction "only for

9   criminal violations and only if the offender is either a

17:13   10   U.S. citizen" -- I'm sorry -- "a U.S. national or a lawful

11   permanent resident" -- we are not, and they concede we are

12   not -- "or the offender is present in the United States."

13   Well and David Corporation is not present in the United

14   States.

17:13   15              So, the restrictions under the statute -- even

16   if a criminal component applied to the civil side of this,

17   the restrictions are such that my client doesn't fall within

18   it.  The statute simply does not apply extra-

19   extraterritorially to my client.

17:13   20              Judge Ellison did conclude that Section 5096

21   applied extraterritorially in *Adhikari v. Daoud*, but he did

22   not have the benefit of *Morrison* and the defendant -- and

23   then the movant in that case was KBR, and they're located

24   right downtown.  They're a very different situation than

17:13   25   what I have here, which is I am representing a client that's

1    based in Taiwan.

2                  With regard to the argument that you can't

3    take claims that are barred by the TVPRA and then reclassify

4    them as ATS claims, that's the one issue -- you know, the

17:13    5    Court could decide it now.  The Court could wait for *Kiobel*

6    on that issue, but the argument is very simple that Congress

7    has created an express cause of action for the Law of

8    Nations violations, the claims they're asserting here.  That

9    cause of action is under the TVPRA.  They have restricted

17:13   10    extraterritorial application to that particular cause of

11    action and the Plaintiffs cannot try to circumvent that by

12    creating a federal tort, common-law tort, under the ATS that

13    doesn't have that restriction on the extraterritorial

14    application.

17:13   15                  And then we rely on the Seventh Circuit's

16    decision in *Enahoro*, which dealt with the TVPA, a very

17    similar statute, in which the court there said it is hard to

18    imagine that the Supreme Court's decision in *Sosa* would --

19    that that court would approve of common-law claims based on

17:13   20    torture and extraterritorial killing when Congress has

21    expressly provided a cause of action for those violations.

22    So, we think that's what this court should follow as well.

23                  Finally, with regard to the state law claims,

24    they're barred by limitations.  They're barred because there

17:13   25    is no claim on which relief can be granted and they're

1    barred also by 9(b).  The limitations for negligence,

2    conspiracy and false imprisonment is two years.  These

3    events occurred in March of 2008.  The lawsuit was brought

4    in January of 2012.  They claim that there is equitable

17:13   5    tolling that should be applied.

6              Equitable tolling is not applicable here for a

7    number of reasons, but, factually, what we have here is

8    Ms. Vu was in Bangkok in March of 2008 and had been in

9    contact with Dr. Nguyen Thang, who was on the board of Boat

17:13   10   People SOS at that time, in March of 2008.

11             And in her congressional testimony, which this

12   court can take judicial notice of, Vu said that while she

13   was in Thailand Boat People SOS assisted her in her daily

14   life and with "legal aid for my refugee status application."

17:13   15   So, she had access to legal aid.  She had access to Nguyen

16   Thang.  She understood what the issues were because she has

17   testified that she understood what the issues were.  And she

18   had two years under the very generous statute of limitations

19   to bring these claims if she wanted to bring them, and there

17:13   20   was nothing barring her or preventing her from doing that.

21             If you look at Exhibit 7 to their response to

22   our motion, it shows that Plaintiffs knew all the facts

23   necessary to bring her claims and that Vu's congressional

24   testimony shows that she could have done so by March --

17:13   25   within two years after March of 2008.

1    The breach of contract claim against my client

2  fails because they say in paragraph 109 that the contract

3  was between W&D Apparel (Jordan) and the Plaintiffs, not my

4  clients.  You can't have a breach of contract claim for a

17:13  5  party that is not a party -- against a party that's not a

6  party to the contract.

7    And with regard to their fraud claim, basic

8  principles of 9(b), the Court knows well it provides that

9  they have to tell us the who, what, when, where, why of the

17:13  10  statements that they claim were fraudulent and they haven't

11  done any of that.

12    So, unless the Court has any questions, that's

13  all I have got.

14    THE COURT:  All right.  Let me hear the response to

17:13  15  your arguments.

16    MR. LAPIDUS:  May I reply, Your Honor?

17    THE COURT:  Yes, please.

18    MR. LAPIDUS:  Judge, my name is Mark Lapidus.  I

19  represent the Plaintiffs in the case.  I am going to address

17:13  20  the issue relating to jurisdiction for Well and David.

21    I will say that it's my understanding that

22  they are attempting to serve W&D in Jordan, that it's a part

23  of -- it's been filed and it's a part of the government

24  process and W&D is -- we're in the process of getting them

17:13  25  served.  It's not that we're not trying.  It's just that it

1    hasn't gone through the system yet.

2              Your Honor, I think that there is sufficient

3    reason for you to leave the case on the docket for

4    jurisdictional purposes for both specific and general.

17:13  5              First of all, we agreed with the Defendants

6    that we would hold this hearing before any discovery was

7    done even before the Rule 26 disclosures were done.  The

8    Rule 26 disclosures would require them to designate persons

9    with knowledge of relevant facts.  They would require them

17:13  10   to disclose or even provide copies of documents that are

11   relevant.

12             Let me talk about some of the things that we

13   do not have, Judge.  If you read the pleadings and you read

14   the complaint that was filed, the Vietnamese residents were

17:13  15   taken to a different country and they were forced to sign a

16   contract without reading it and they signed it by placing

17   their thumbprint on it.  We don't have a copy of that

18   contract.  We're certainly entitled to have it to see who

19   the contract was with and what the terms of the contract

17:13  20   said.

21             Similarly, Your Honor, we do not have a copy

22   of the contract between Well and David or W&D and --

23             THE COURT:  Let me back up.  Does Well and David

24   have a copy of those contracts?

17:13  25             MR. PECHT:  Well and David Corp., I don't know,

1    Your Honor.  I don't know.

2         MR. LAPIDUS:  And that's my point, Judge, is that

3    we need to see some of those to find out who we might have

4    cases against and, frankly, because we dismissed the RICO

17:13  5    claims, who we don't have cases against.

6         THE COURT:  There is no indication in what you have

7    alleged in the description given of the contract that Well

8    and David would have been a party to those contracts, but --

9         MR. LAPIDUS:  I'm sorry, Judge.  I didn't --

17:13  10        THE COURT:  No.  I understand your point.

11        MR. LAPIDUS:  In addition to that, Your Honor, as

12   far as both specific and general go, we don't have a copy of

13   the contract between either Well and David or W&D and

14   Aramark or Well and David, W&D and Academy.  As you know, I

17:13  15   mean, these multinational corporation contracts have

16   provisions about whose law applies and where the law should

17   be applied, what venue should exist.  Is there an indemnity

18   provision that Academy or Aramark has with W&D or Well and

19   David that says 'If you are accused of violating

17:13  20   international norms or statutes and we get sued because of

21   it you will agree to indemnify us for it'?  Certainly,

22   that's evidence that shows they agreed to be haled into the

23   state of Texas like --

24        THE COURT:  Do you have a case that says -- Is

17:13  25   there a case that says that that's sufficient for personal

1    jurisdiction?

2           MR. LAPIDUS:  I don't think, Judge, there is a case

3    that says that that, standing alone, is sufficient, but

4    that's not what the cases talk about.  The cases talk about

17:13   5    selective contacts --

6           THE COURT:  Do you have a case that relies on that

7    factor?

8           MR. LAPIDUS:  I do not, Judge.  I do not.  But,

9    again, it's just one provision, it's one thing that we don't

17:13   10    have that we certainly are entitled to through discovery

11    that shows the relationship between the parties.  What

12    control did Academy have over W&D or Well and David?  What

13    did Aramark have?  What control did they have?  What did the

14    contractual provisions discuss and address concerning those

17:13   15    rights and those obligations?

16           THE COURT:  And how would that pertain to

17    jurisdiction over Well and David?

18           MR. LAPIDUS:  Again, Judge, if there's provisions

19    within those contracts that talk about whose law should

17:13   20    apply if there is a dispute.  If Well and David doesn't

21    perform according to the contract, what rights does Academy

22    or Aramark have to bring them to Texas or bring them to the

23    United States to file suit against them for those?  If Well

24    and David violates international norms or violates standards

17:13   25    and it's part of the contract and they get sued for it....

1    Again, Judge, it's just a factor I think that we should be

2    entitled to discover.

3         THE COURT:  In your agreement on holding off on

4    discovery -- Most of the challenges to the pleadings are

17:13   5    challenges in which discovery would obviously be premature.

6    The unrecognized claim arguments are a perfect example of

7    that.  But I guess, since this is a 12(b)(2) motion, I am a

8    little confused or unclear as to why there would have been

9    no discussion at all about any discovery that might be

17:13   10   appropriate or whether there was a -- it was premature to

11   have argument on a personal jurisdiction challenge when

12   there was an agreement not to have any discovery at all

13   relating to the facts that are relevant to that issue, both

14   specific and general jurisdiction.

17:13   15        So, I guess I am confused as to why the whole

16   discovery issue for a 12(b)(2) motion was treated in the

17   same way as discovery for a 12(b)(6) set of issues.

18        MR. LAPIDUS:  Judge, in hindsight, do I wish that

19   we would have put it in a Rule 11 agreement or not -- we're

17:13   20   not in state court -- but if we would have specifically

21   addressed and discussed that?  Sure, it would be nice to

22   have a letter back and forth between us.  But I think the

23   case law says -- the Fifth Circuit case law says that when

24   we're not conducting an evidentiary hearing our

17:13   25   uncontroverted allegations have to be taken as true, as well

as the information that's in our affidavits and supporting

documentation.  The only documentation we were able to get

was documentation we had obtained from the Internet from

either their vendors or their suppliers and information like

17:13  that.

So, we're just asking some deference from the

Court to allow us to be able to do discovery on, for

instance, "minimum contact" issues.

THE COURT:  Was there a specific request made in

17:13  your briefing on the jurisdiction issues that asked for a

deferral of the ruling pending an opportunity to conduct

discovery?

MR. LAPIDUS:  No, Judge, there's not.

THE COURT:  Okay.

17:13  MR. LAPIDUS:  If we were permitted to obtain

discovery from them, again, we could see these contracts.

The *Helicopteros* case talks about where was the contract

executed and what does the contract say about choice of law

provisions and whether Peruvian law should apply and things

17:13  like that.  Certainly, we should be entitled to see that.

What residents of the state signed the information?

We have provided documentation to the Court

that -- and I want to be specific here with my numbers --

that more than 300 shipments were made by Well and David or

17:13  W&D to the United States from their countries over a

four-year time period.  And at 52 weeks a year for four
years, that's -- I mean, that's less than 200 weeks.  And if
they're shipping more than 350 times, Judge, during that
time period, they're shipping more than once a week.

17:13          And the documentation we provided to you, Your
Honor, talks about states that they ship to, and Texas is
blacked out as one of the states that they ship to.

          Again, we're entitled to discovery on this
information, on the number of times they ship to Texas.  Did
17:13 they send people here to Texas to negotiate the contract?
Did they sign the contract while they were sitting here in
Houston, Texas?  We're entitled to discovery on those kinds
of things, specifically on the "minimum contacts" argument
that they're making.

17:13          THE COURT:  But you nowhere in your brief mention
this.

          MR. LAPIDUS:  No, Judge, it's not mentioned because
our facts have to be taken as true, and the documentation
that we have provided to the Court and the supporting
17:13 documentation shows that information.

          THE COURT:  So, your argument is that the record I
have is sufficient for me to rule on the motion?  That's
what you argued in your brief.

          MR. LAPIDUS:  I think so, Judge.  And, if not, I am
17:13 asking on behalf of my clients that we be permitted to do

 1   discovery, even if on the limited issue of the "minimum

 2   contacts" and the "specific jurisdiction" argument.

 3          The "specific jurisdiction" argument goes to

 4   they entered into these contracts -- Academy and Aramark.

17:13  5   They knew that Well and David -- they had these contracts

 6   with Well and David to make product for them that came into

 7   this country.  And if through the use and implementation of

 8   that contract they are engaging in human trafficking, that

 9   is sufficiently tied to provide specific jurisdiction as

17:13  10   opposed to just general jurisdiction because it relates to

 11   and is employed by the contract itself.

 12          And, again, we don't have that contract.  We

 13   haven't been able to see it.  So, I think we should be

 14   afforded the opportunity to do so.

17:13  15          And, Judge, I think it's important to know

 16   which contracts came first.  Did Aramark and Academy

 17   negotiate these contracts with Well and David and W&D and

 18   then W&D or Well and David go and get these guys from

 19   Vietnam, these workers from Vietnam, and bring them to

17:13  20   Jordan to work or was it vice versa?  I mean, I think that's

 21   very important on, certainly, knowledge of what was going on

 22   and knowledge that could be imputed to Well and David or

 23   W&D.

 24          So, this is, again, the type of information,

17:13  25   Your Honor, that I think you should allow us the opportunity

1    to discover and find.

2              The only -- I have reviewed the cases that

3    they cited, Judge, and of those cases there was only one

4    that did not permit discovery.  Every other court in every

5    other case that was decided there was deposition testimony,

6    there were documents.

7              In the *Alpine v. Atlas* case from the Fifth

8    Circuit -- it was decided out of here --

9         THE COURT:  I suspect they asked for the discovery.

10        MR. LAPIDUS:  They may have, Judge, but they were

11   further along in the process as well when the motions were

12   filed, and they were further along in the process and all of

13   that information had been discovered and exchanged.  In

14   fact, one of the cases had been remanded back to state court

15   and there was discovery done in that instance.

16             It's too premature.  We need to be afforded

17   the opportunity to see this information.

18        THE COURT:  All right.

19        MR. LAPIDUS:  I'm sorry, Judge.  It was 370

20   shipments between July, 2007, and May, 2012.  The

21   documentation we provided to the Court shows that they have

22   partners -- their words, not our words -- with 27 U.S.

23   companies.  Where are these U.S. companies?  How often are

24   they making shipments to these U.S. companies?  What are the

25   contracts with these U.S. companies and what do they say

1   about whether they have agreed to be sued in the United

2   States?  Some of the documentation, Judge, even shows

3   shipments to Katy, Texas, for Academy.

4          That, I think, addresses the arguments that we

17:13   5   have for general and specific.

6          As far as the state law claims go, Judge, I

7   wish I had an argument on the two-year statute of

8   limitations.  I don't have much of an equitable tolling

9   argument on that one.  I think in some of the other cases

17:13   10   the Plaintiffs were prohibited from filing their lawsuits.

11   In this particular case, Judge, we haven't been able to have

12   contact and sit down and go over details with all of them

13   about whether they would have been precluded, but, as far as

14   Ms. Vu is concerned, I can't sit here and tell you with a

17:13   15   straight face that she didn't have that information.

16          Now, there's a four-year statute of

17   limitations on fraud.  We have made our allegations.  We

18   have set forth the conduct that we believe was committed,

19   the false representations that were made and reliance.

17:13   20   Fraud is a four-year statute of limitations and I think,

21   Judge, technically, that one should stay and at least we

22   should be able to do some discovery on what they knew, the

23   information that they knew, the representations that were

24   made, who they were made by and information like that.

17:13   25          THE COURT:  All right.  I have your argument.  I

think I have to grant the motion to dismiss with respect to
the statute of limitation arguments raised on the two-year
claims.

MR. LAPIDUS:  And I think that's right, Judge, but
there's only Well and David on those.

THE COURT:  I understand.

MR. LAPIDUS:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Pecht, do you want to make any reply
argument, particularly on the issue of discovery?

I'm sorry.  Did you have something you wanted
to add?

MS. HENRY:  Your Honor, Mr. Pecht brought up
initially the extraterritorial application of the TVPRA and
the ATS.  I will be addressing that issue on behalf of the
Plaintiffs.

THE COURT:  That's fine.  I think we're just
talking about jurisdiction right now.  Thank you.

MR. PECHT:  The discovery that he is asking for
isn't going to do him any good.  The courts -- and the case,
Judge, that really touches this is the *Freudensprung v.
Offshore Technical Services, Inc.*  It is a Fifth Circuit
case.  It involved a Willbros entity that was located in
Nigeria and it involved a Texas company called OTSI that was
located here in Texas, and the question was whether or not

1    there was personal jurisdiction over the Willbros Nigerian

2    entity.  And the plaintiff said, well, Willbros Nigeria had

3    a contract with OTSI, a Texas company, and that contract was

4    relevant to jurisdiction.  The court said, no, that's not

17:13   5    sufficient.

6           And then they said that that contract

7    contained an arbitration provision for arbitration in Texas.

8    And what the court said was that doesn't make any

9    difference, these contracts don't make any difference,

17:13  10    because, they said, even if WWAI, which is the Willbros

11    entity, may have expected to arbitrate disputes between

12    itself and OTSI in Texas, it does not concomitantly follow

13    that the Willbros entity reasonably anticipated being haled

14    into a Texas court to defend a lawsuit brought by

17:13  15    Freudensprung.

16           THE COURT:  Would the issues be different if there

17    had been a request for discovery or if there had not been

18    this stipulation or if there had been a reference in the

19    brief to a need for additional information?

17:13  20           MR. PECHT:  Well, they made an election, Your

21    Honor.  They could have gone one of two ways.  They could

22    have stood on their pleadings and taken the benefit of the

23    prima facie case argument or they could have asked for an

24    evidentiary hearing and done discovery.

17:13  25           What they did have is they made their election

1    and said, 'We take our allegations as true.  We've

2    established a prima facie case and we briefed it on that,'

3    and, having made the election, they should be held to what

4    they elected to do, but they should not be allowed to have

17:13   5    their cake and eat it.

6              And, so, they elected to go this route and

7    this is the route we have all gone down, and they have

8    elected not to get engaged in discovery and, having done it,

9    they should be bound by it.

17:13   10             And, so, the documents that they're asking for

11   this discovery, it's not going to get them what they want,

12   because the Fifth Circuit has said that there is no contract

13   that they should claim that says that any disputes between

14   the Plaintiffs and Well and David are to be decided in

17:13   15   Texas.  They don't argue that.  They're arguing other

16   contracts between other parties; and *Freudensprung* says

17   that's not sufficient, that doesn't give you jurisdiction.

18             And all of the documentation in the world

19   about Well and David importing or selling product in the

17:13   20   Middle East or in China that is then purchased by U.S.

21   companies over there and shipped to the United States and

22   sold by those U.S. companies in the United States is not

23   going to get them jurisdiction in the United States.  And

24   they can never overcome the "specific jurisdiction" issues

17:13   25   which there is no causal relationship, no "but for"

1    causation between their cause of action and the contact of

2    the United States.

3              So, what he is asking for, really -- He's, in

4    effect, made an election and needs to be held to it and he

17:13    5    has not asked for discovery; and the discovery, even if he

6    had it, wouldn't help him.

7              With regard to no equitable tolling, he's

8    conceded that -- I think the Court has heard that.

9              On the fraud claim, the Court cannot look at

17:13    10    this complaint and find in it anywhere what

11    representations -- the fraudulent statements my client

12    purportedly made.  It's not in there.  It's not broken up by

13    my -- You can't see 'Well and David said this and made this

14    representation and misled this plaintiff on this date and

17:13    15    this time.'  It's not in there.  And 9(b) is meant to be a

16    gatekeeper, a gatekeeper on proceeding in fraud claims, and

17    they haven't satisfied the initial gate --

18         THE COURT:  So, your real problem is that it's

19    globally plead?

17:13    20         MR. PECHT:  It's globally pled and that is simply

21    insufficient.

22              Thank you, Your Honor.

23         THE COURT:  All right.  Thank you.

24              Anything further on the jurisdiction issues?

17:13    25         MR. LAPIDUS:  No, Your Honor.

1          THE COURT:  All right.  Thank you.

2               Let's take up the wealth of other issues in

3     the case, and here I am a little less clear about what makes

4     the most sense about proceeding, but perhaps if we could

17:13  5     take up the whole set of issues relating to the ability to

6     a) make a direct versus an indirect case against the

7     Defendants under the various statutes that have been

8     pleaded.  The whole question of whether entering into a

9     contract with a supplier who then engages in the conduct

17:13  10    that is alleged could expose the American contracting party

11    to statutory liability on any of these joint employer,

12    quasi-independent agent, principal agent kinds of theories.

13    That cuts across a number of the different parties here.

14          MR. DOVE:  Yes, Your Honor.  My name is Chris Dove.

17:13  15    I represent Aramark Academy Sports + Outdoors.

16               And by the most wonderful coincidence, in my

17    discussion with Miss Kropf who represents Aramark, we had

18    thought that the best way to organize our arguments would be

19    for me to handle the issue you have just described from a

17:13  20    factual standpoint and for Miss Kropf to handle the specific

21    causes of action, the claims that have been brought here

22    today.

23          THE COURT:  That's fine.

24          MR. DOVE:  I would like to begin by pointing out

17:13  25    what I think is the most remarkable thing about the

 1    Plaintiffs' case:  that it's factual allegations are
 2    extremely narrow, but its implications are very broad.  This
 3    case is much narrower than the other forced labor cases this
 4    court will find, if you do all the same reading that I have
17:13    5    done -- and, if you will, I feel very sorry for you.
 6                This case alleges that there was fraud in
 7    Vietnam, that this caused workers to come to Jordan, where
 8    they found that the pay and the conditions were not what had
 9    been promised.  They then went on strike.  They were
17:13   10    punished severely for this, at the end of which, six weeks
11    later, they were returned to Vietnam, and that ends the
12    allegations.
13                What is so significant about this to me is
14    they're not alleging that forced labor was the ordinary
17:13   15    course of action.  They're claiming it was a reaction to a
16    one-time labor strike.
17                They are not alleging that forced labor was an
18    ongoing cause of action.  It is a reference to an event that
19    took six weeks in February and March, 2008.
17:13   20                And, most importantly, none of these
21    allegations tie Academy or Aramark to that one-time,
22    six-week-long labor strike.  They don't allege that we lied,
23    that we were the ones shorting their paycheck, that we were
24    the ones who beat them or locked them in the factory or that
17:13   25    even we were the ones who paid for their return.  We don't

1    appear anywhere in those allegations.

2              Any theory that they have against us must

3    necessarily be of a secondary or derivative nature.  They

4    reach for some way to try to blame companies that have

17:13    5    nothing to do with their direct allegations.  They tried to

6    claim agency.  They tried to claim joint employment.  They

7    also tried to make a case under the TVPRA provision where,

8    if you are a knowing participant in a venture that you

9    should have known involved forced labor, you can be liable.

17:13    10    All of these require an extraordinary level of control over

11    the workers or would require a significant level of

12    knowledge and involvement in a venture, in something that we

13    would be participating in, that involved forced labor.

14              How do they try to bridge that gap?  In their

17:13    15    first complaint they did not attempt to do so.  So, they

16    went back and they revised their complaint, and all they

17    came up with at that time was Academy and Aramark's codes of

18    conduct in which we say, firmly, we will not tolerate forced

19    labor and human trafficking.  This, they claim, is evidence

17:13    20    of forced labor and human trafficking.

21              When we pointed this out to the Court in our

22    motion, their response for the first time encompassed a

23    wealth of new materials never previously referenced in,

24    actually, a complaint where they try to reach for other

17:13    25    things.  They claim, 'Well, you have third-party auditors

1    that perform inspections of these facilities and, surely,

2    that means you have taken on the duty to prevent all forced

3    labor.  They point to the fact that our purchase orders are

4    very detailed, that sometimes we require that the goods be

17:13  5    produced in a way where we can take them straight out of the

6    container, put them out on the showroom floor so that people

7    can buy them without any additional work.  And they point to

8    the fact that U.S. Customs requires the manufacturer to keep

9    certain paperwork.

17:13  10           All of these things, all of them, are the

11    ordinary actions of retail importers.  That's why these

12    allegations are so significant and are so dangerous.

13           Did Academy really open itself up to an

14    expensive discovery process and an expensive lawsuit by

17:13  15    firmly declaring it was opposed to forced labor?  Should we

16    have remained silent?  Would that have been better?  Did we

17    expose ourselves to an expensive discovery process by

18    running a retail operation, by asking our vendors to follow

19    Customs regulations?  Does that mean we cannot get out of a

17:13  20    case on Rule 12(b)(6) ever again in the future?

21           THE COURT:  If we were to put aside for the moment

22    the question of whether it's appropriate even to look at the

23    additional materials, given the sequence and the procedural

24    posture in which they were presented -- I have heard similar

17:13  25    arguments raised in the context of trying to assert that a

1    premises owner is liable for the acts of subcontractors

2    committed on or off the premises injuring third parties or

3    various people's employees because the premises owners

4    routinely subject their subcontractors or independent

17:13   5    contractors working on the premises to detailed safety

6    codes, require adherence to them, require them to follow

7    certain paperwork, require them to hold different kinds of

8    meetings with their employees, subject their employees to

9    different kinds of drugs and other tests.  Is that a -- And

17:13   10   the courts say that's not enough to make the independent

11   contractor an agent or the principal of, depending on which

12   end we're looking at, the premises owner not enough to make

13   a joint employer status, things like that.  Is that an

14   analogy to what you're arguing here?

17:13   15          MR. DOVE:  I think it's an excellent analogy.  It

16   had not occurred to me because the facts are actually

17   stronger in that analogy --

18          THE COURT:  Sure.

19          MR. DOVE:  -- for the exercise of liability,

17:13   20   because the main difference I would draw is that this is not

21   Academy inviting a group of Vietnamese workers into its

22   stores to work there.  This is Academy purchasing goods made

23   at a vendor that is kept at arm's length.

24          And the only allegations that would try to

17:13   25   draw Academy or Aramark into this case are precisely the

1    kinds of allegations that could be made against any

2    importer, any retailer anywhere in the world, which is why,

3    if there were two cases I would draw the Court's attention

4    to, in addition to your familiarity with these premises

17:13   5    liability cases, they would be *Doe v. Wal-Mart* and the

6    *Indian Harbor* case.

7           In both cases, to overly simply the courts'

8    reasoning, they say, if all you're alleging is the ordinary

9    activity of a business, you have not pleaded that kind of

17:13   10   heightened activity, that heightened knowledge or means and

11   power to control that would make you liable in both

12   circumstances.  We think that's the right analysis here.

13   Otherwise, we're somewhat flummoxed as to how to proceed.

14   We thought we were being good guys here.

17:13   15          And I think that would be the end of my

16   comments and I would yield to Miss Kropf, unless the Court

17   has any more questions.

18          THE COURT:  Is there any case that has adopted the

19   theory that the Plaintiffs have asserted that you're aware

17:13   20   of?

21          MR. DOVE:  Not one.

22          THE COURT:  Is there any case that has rejected the

23   theory?

24          MR. DOVE:  Let me give a roundabout answer by

17:13   25   saying "No" and then let me tell you -- When I read their

1   response I called in employment lawyers and other lawyers to

2   read it because I thought 'I don't see how this can possibly

3   be the case.'  The employment lawyers read the response and

4   said, 'That's not joint employment.  I have never heard of

17:13   5   it being applied like this.'  They went off and researched

6   and said, 'I can't swear to you that it's never been done

7   before, but I sure have searched Westlaw and found nothing.'

8   I didn't believe it.  I looked, too.  I didn't find

9   anything.  The claim is so extraordinary.  It had never been

17:13   10   raised in this context before, that, if it exists, it's

11   mind-boggling.

12          THE COURT:  The closest analogy that I am

13   personally aware of is the one I described -- that is, when

14   you get these cases involving the people who are styled as

17:13   15   independent contractors or working for independent

16   contractors but are required to follow the premises owner's

17   safety codes, reporting requirements, things like that,

18   whether that approaches the level of managerial control over

19   the details of the work to qualify for employer status or to

17:13   20   create some kind of agency relationship.

21              The case law is resoundingly negative, rejects

22   that position, for some of the same policy arguments that

23   you've raised, that 'We're being a good citizen here.  Why

24   should that subject us to expanded liability for their

17:13   25   ports?

1          But it's -- I'm not aware of any closer

2     analogy and wondered if you were.  And I am going to ask the

3     Plaintiffs the same question.

4          MR. DOVE:  No.  I am aware of no similar analogy at

17:13   5     all.

6               Thank you.

7          THE COURT:  All right.  Thank you.

8               Is the best way to proceed to have a response

9     to these arguments?

17:13  10          MR. BURCK:  Probably, Your Honor.

11          THE COURT:  All right.  Let's have it.

12          MR. BURCK:  May it please the Court.  Your Honor,

13     Mark Burck here on behalf of the Plaintiffs.  And what I am

14     going to do is respond to the arguments about the factual

17:13  15     allegations in the Plaintiffs' Second Amended Complaint and

16     why they are sufficient enough to get us to the next stage

17     of this litigation, which would be on discovery.

18               I don't want to tell the Court a whole bunch

19     of standards that the Court already knows, but I do want to

17:13  20     remind everyone that the facts as alleged in our Second

21     Amended Complaint, since this is a 12(b)(6) motion, are

22     assumed to be true.

23          THE COURT:  The non-conclusory factual allegations.

24          MR. BURCK:  Thank you.

17:13  25               As the Court herself has recognized as

1    recently as the *Abecassis* case, detailed factual allegations

2    are not required.  Facts that allow the court to draw a

3    reasonable inference is all that is required.

4              THE COURT:  I am not going to argue.  It sounds

17:13    5    like it was brilliantly stated.

6              MR. BURCK:  It was brilliantly written.

7                    In the other cases, Judge, a valid complaint

8    is one that raises a reasonable expectation that discovery

9    will reveal evidence of the illegal conduct.  Okay?

17:13   10                    Now, here's what I want to talk about, Judge,

11    and it kind of goes to Academy and Aramark; so, I am going

12    to group them together, and if there's a distinction or if

13    you believe there is a distinction, ask me and I will let

14    you know.  But both Academy and Aramark had actual knowledge

17:13   15    of what was going on, and I say that because --

16              THE COURT:  Are you being precise as to when that

17    knowledge arose or is that irrelevant for your argument?

18              MR. BURCK:  I can be precise.  Academy knew and

19    Aramark knew on March 12th and March 13th of 2008 and they

17:13   20    knew because Dr. Thang of Boat People SOS sent a letter to

21    both companies and told them what was going on.  It's

22    alleged in our complaint.  The letter itself -- both letters

23    are attached as exhibits us to our response.  The letters

24    themselves are addressed in the complaint on Page 21.

17:13   25              THE COURT:  Yes.  I have got the letters.

1          MR. BURCK:  Okay.  So, my point, Judge, is -- 'You

2     know, we're trying to be the good guys' is what I just heard

3     a minute ago.  Well, good guys who have been put on actual

4     notice of human trafficking, slavery and forced labor would

17:13  5     probably do something about it.  We don't have anything in

6     any of the responses from any of the documents that have

7     been filed that they did anything.

8          THE COURT:  But that doesn't go -- I mean, that

9     addresses some of the policy implications of the position

17:13  10    you're taking, but that doesn't go to whether entering into

11    a contract with a supplier is sufficient to trigger the kind

12    of agency or joint employer status that you have raised.

13         MR. BURCK:  Yes, ma'am.  The reason I went with the

14    actual knowledge first is because I think it's a much

17:13  15    stronger argument that they had actual knowledge of what was

16    going on and decided not to do anything about it.

17         Let me address the issue that you just asked

18    about.  I am going to address the factual allegations and

19    the factual issues and Ms. Bang is going to address the

17:13  20    legal arguments about it.

21         THE COURT:  All right.

22         MR. BURCK:  Here's what the facts are, Judge.  The

23    facts are that Academy and Aramark both have these contracts

24    with these independent third-party auditors.  I think that's

17:13  25    what you're talking about.  They both have on their web

1    sites corporate policies and procedures that tout the fact

2    that they use these independent third-party auditors.

3         THE COURT:  They use them for lots of things,

4    though, don't they?

17:13    5         MR. BURCK:  Oh, yes, ma'am.  There's no doubt about

6    it.  In fact --

7         THE COURT:  It's pretty standard, isn't it?

8         MR. BURCK:  I'm sorry?

9         THE COURT:  It's pretty standard, isn't it?

17:13   10         MR. BURCK:  I think it is standard, Judge, but

11    let's look at the --

12         THE COURT:  Isn't it standard in every

13    manufacturing supplier contract that there is a -- not every

14    one -- and I don't mean to expand the record indefinitely --

17:13   15    but the fact that if -- I am a company and I enter into a

16    contract here in the United States with a vendor supply

17    company down the street to supply my need for tablecloths.

18    Okay?  And I really want those tablecloths to meet

19    specifications; so, I put into the contract that I have a

17:13   20    right to send an audit team in there to inspect to make sure

21    that --

22         MR. BURCK:  Absolutely.

23         THE COURT:  --  these are made of the right fabric,

24    they're the right size, the stitching is proper, all the

17:13   25    other bells and whistles.  Are you saying that that subjects

1    me to liability for the conditions in that manufacturing

2    facility?

3         MR. BURCK:  What I am saying is it subjects you to

4    liability if there's something going on in there that you

17:13    5    could or should have known about but didn't bother to

6    follow up.

7         THE COURT:  Well, let's say I walk in one day and

8    somebody is smoking marijuana in the corner.  Let's say I

9    walk in some day and I see evidence of -- I see a racial

17:13    10    exchange, somebody is using racially charge epithets or I

11    see -- There are any number of possibilities.  Let's say I

12    see a -- there is a puddle of water on the floor and, before

13    I get around to saying anything about it, somebody slips and

14    is gravely injured.  I mean, am I liable for all of those

17:13    15    things because I am a joint employer or because I am some

16    sort of agent or even principal?  That's a pretty broad --

17         MR. BURCK:  May I ask you a question?

18         THE COURT:  Sure.

19         MR. BURCK:  Who is the person that went over there?

17:13    20    Is it the auditor or is it the actual company?

21         THE COURT:  It's the auditor.

22         MR. BURCK:  Okay.  I think in that situation, as in

23    this situation, these companies, Aramark and Academy, hire

24    these auditors to be their eyes and ears, because --

17:13    25         THE COURT:  For every purpose?

1          MR. BURCK:  Yes, ma'am.

2          THE COURT:  So, that for anything that happens in

3    that plant I am liable because I have an auditor who could

4    have seen it?

17:13  5          MR. BURCK:  Who should have seen it and should have

6    reported it.

7          THE COURT:  Boy.  No company will ever hire an

8    auditor again, which I think is their argument.  But that's

9    amazing.  That means that, if an auditor is onboard and was

17:13 10    in a position to have seen something untoward, the company

11    that hired the auditor is liable for everything the auditor

12    could have reported but didn't?  Is that really what you're

13    arguing?

14          MR. BURCK:  No.  Should have reported.  Saw it, has

17:13 15    the information.

16          THE COURT:  Fine.  Same question.  That's your

17    argument?

18          MR. BURCK:  Yes, ma'am.  What's interesting in this

19    case is --

17:13 20          THE COURT:  Does the Restatement of Torts go that

21    far?

22          MR. BURCK:  No.  What's interesting in this case,

23    Judge --

24          THE COURT:  Then, what's your authority?

17:13 25          MR. BURCK:  -- the Academy auditors were collecting

1   information as minute as how long these workers were working

2   every day, what they were being paid, what the output

3   production per worker was.

4         THE COURT:  What's your authority for the legal

17:13  5   proposition that that subjects the company that hired the

6   auditor to liability for everything that the auditor should

7   have reported?  And we're setting aside for the moment the

8   legal obligation of the auditor to report to anybody beyond

9   the company that hired him.

17:13  10         MR. BURCK:  Ms. Bang will address the legal

11   arguments, Your Honor.  I am still talking about the facts.

12         THE COURT:  All right.

13         MR. BURCK:  Thanks.

14           And the reason I bring that up, Judge, is

17:13  15   because the standard against Academy and Aramark is either

16   what they knew or should have known under the TVPRA; and

17   it's our belief, based on the facts as alleged, that they

18   certainly knew or should have known what was going on and

19   the facts and the abuse that my clients --

17:13  20         THE COURT:  Because the auditor knew or should have

21   known it?

22         MR. BURCK:  Yes, ma'am.  Academy is quick to point

23   out in their reply that even though they hired these

24   auditors they, really, never even see the information that

17:13  25   the auditors gathered.  And, so, it kind of begs the

1    question why do they have these corporate policies and why

2    do they tout on their web site that they're in compliance

3    with all of these social norms if they don't bother to

4    either follow up, enforce it or follow their own policies?

17:13    5    I mean, it sounds to me like they're trying to use it as a

6    shield for liability.

7            If they had these corporate policies -- which

8    are good and I'm not suggesting they get rid of them -- but,

9    if they had these corporate policies, what good is it if

17:13    10    they don't follow up and what good is it if they don't

11    enforce their own policies and follow up on their own

12    conduct?

13            THE COURT:  All right.  Thank you.

14            MR. BURCK:  Your Honor, the last thing I would like

17:13    15    to address, if you don't mind, is some of the specific

16    factual allegations that are made in the Plaintiffs' Second

17    Amended Complaint.  There are factual allegations that begin

18    on Page 17 and continue through Page 21 that specifically

19    give rise to plausible claims as alleged by the Second

17:13    20    Amended Complaint, that is:

21            My client's passports were confiscated.  My

22    clients were misled to go to this job in Jordan that didn't

23    turn out to be anything like they thought it was going to

24    be.  They didn't get paid as much.  They were required to

17:13    25    work 18-hour days.  Their food was restricted.  Their living

1   conditions were not as promised.  And when you take those

2   facts and apply them to the Second Amended Complaint, as

3   Judge Ellison wrote in the *Adhikari* case -- "Whether these

4   allegations if proven will lead to a plaintiff's verdict is

17:13   5   irrelevant at this stage.  Under *Iqbal* all that is required

6   at this pleading stage is that the claims made by the

7   Plaintiffs are plausible, not that they show probability of

8   success."

9           THE COURT:  Right.

17:13   10           MR. BURCK:  "By providing significant, though not

11   indisputable, factual support for their allegations of

12   trafficking, Plaintiffs meet that burden."

13               Judge, our burden in this case at this stage

14   is to simply allege facts that give rise to plausible causes

17:13   15   of action, and we have done that.

16           THE COURT:  All right.  Thank you.

17           MR. BURCK:  Thank you, Your Honor.

18           THE COURT:  I think it's most useful now for me to

19   hear about the law and then we can hear a response on that.

17:13   20           MS. BANG:  Good afternoon, Your Honor.  The issue

21   that I wanted to address today, since it's been the subject

22   of some discussion in the motions that we received, is the

23   joint employer issue.  And we're asking the Court to apply

24   the economic reality theory that's been enunciated by the

17:13   25   *Pilgrim* court here in our own Fifth Circuit.

1        THE COURT:  Has anybody done it in this context?

2        MS. BANG:  Your Honor, the *Pilgrim* case we think is

3    a good analogy.

4            And just to give it a little background, I

17:13  5    know there are these different theories and there has been a

6    lot of discussion about the *Wal-Mart* case.  In that case I'd

7    like to say that it uses a completely different analysis

8    using -- it's completely distinguishable from the one in

9    Texas.  We're here in Texas.  They're in California and they

17:13  10   use a completely different analysis to which, obviously, led

11   to a different result.  We're asking Your Honor to apply the

12   economic reality test here in this case.

13       THE COURT:  Just setting aside the application of

14   it to this context for a moment, this is not a Texas cause

17:13  15   of action.

16       MS. BANG:  Yes.

17       THE COURT:  There are some common law claims, but

18   we're focusing on the statutory claims right know.

19       MS. BANG:  Yes, Your Honor.  And I understand that

17:13  20   a lot of the cases do depend, even at the Supreme Court

21   level, on -- the *Silk* case and the *Bartels* case -- that

22   there are stemming from FLSA.  And I think, actually, that

23   helps us because, if you look at the legislative history of

24   the FLSA and workmen's compensation and the NLRA and some of

17:13  25   the other federal statutes upon which this type of analysis

1    is applied, it is analogous to what's in our case because

2    that --

3            THE COURT:  But the economic realities test focuses

4    on -- one of the primary factors is the ability of one party

17:13  5    to control the specific ways in which the work is done.

6            MS. BANG:  Yes, Your Honor.

7            THE COURT:  And that gets us back to the same

8    issue.  Is the type of evidence that you have submitted of

9    control sufficient to support any kind of joint employer or

17:13  10   principal agency relationship under the case law that you

11   have pointed to?

12           MS. BANG:  If I may, under both analysis -- Let's

13   first start maybe with the *Pilgrim* analysis with the

14   different factors you can compare and then I'll move on to

17:13  15   the Texas common law of joint employment and clear, which I

16   also believe we have satisfied in this.

17           THE COURT:  Have you seen that applied in anything

18   like this fact pattern?

19           MS. BANG:  If I could address it just a little bit

17:13  20   later after I get to this.

21           THE COURT:  All right.  That's fine.

22           MS. BANG:  In the *Pilgrim* case the Fifth Circuit

23   has said, really, the analysis is dependent on the economic

24   realities of the work relationship.  It involves a balancing

17:13  25   of many different factors, and there is a focus on the

1   dependency of the worker and how they -- the whole process

2   is vis-à-vis the worker, how dependent are they on the

3   employer.  And in this case we believe that the facts set

4   forth in the complaint show that the worker was highly

17:13   5   dependent not only for their livelihood in this case but for

6   their lives.

7   Certain factors of the *Pilgrim* court used was

8   who set the prices, who was able to set the -- maintain the

9   right to enforce or declare the contract void.

17:13   10   We believe that discovery will show that there

11   really wasn't arm's length negotiation.  We believe that

12   discovery, if the Court permits it later on, will show that

13   they weren't really independent contractors; they were more

14   like dependent contractors, in which case these workers were

17:13   15   totally at the mercy of the corporation.

16   In the *Indian Harbor* case there were many

17   factors and I understand that there are all these factors

18   that show control of the employer.  But I believe, even

19   looking at Academy's Smart Guide or looking at some of the

17:13   20   vendor policies, there is a high level of control on the

21   very minute details from hundreds of dollars if you don't

22   ship it the right way, another $75 if you don't fold it the

23   right way.  The minutia of control over every aspect of the

24   production we believe shows a high level of control of the

17:13   25   company.

1           In Southeast Asia there are thousands and

2    hundreds of subcontractors that would love to have the job

3    of W&D and Wells and David.  They're fungible.  If they did

4    not exist we would not have this case, but we need the

17:13   5    Aramarks and Academies in order to make this happen.  So,

6    the worker is highly dependent on these two corporations.

7           And also turning to -- if you don't want to

8    accept the economic realities test, which we submit is more

9    expansive than what's really out there, we would even -- we

17:13   10   would ask the Court to turn to Texas law, and even in Texas

11   law they're pretty expansive using the common-law analysis.

12   When an employee's work simultaneously benefits two

13   employers they're both liable.  The employer may serve two

14   masters even if they're not related in any way.

17:13   15          So, in this case, even if there's not any

16   partnership --

17          THE COURT:  But there has to be a lot of other

18   criteria satisfied before that can occur.

19          MS. BANG:  Well, we believe that we do fit -- we do

17:13   20   fulfill many on the list, Your Honor.  There are -- even in

21   the *Pilgrim* case, Your Honor, I mean, there was who set the

22   prices.  We believe that Aramark and Academy knew by

23   imposing these price ceilings and these deadlines that it

24   would lead to forced labor.

17:13   25          If you have a soccer ball uniform and you say,

1    'Okay.  You produce this for five dollars' and you know the

2    raw materials, which is a fixed fee, is $4.50, you have

3    50 cents left over.  Something has got to give.  If that's

4    your profit and that's your work, it's going to be the

5    workers that suffer.

6         So, we think that Aramark and Academy and

7    other corporations, although that's not an issue today, they

8    know when they set these price ceilings and these deadlines

9    and turnaround times that something has got to give, and in

10   this case it's the forced labor that's happened.

11        So, both the economic reality theory, in terms

12   of the joint employer under the *Pilgrim* case, as well as

13   common law, supports our theory that they were joint

14   employers.  They are responsible for what happened.

15        And I just wanted to address the issue again

16   that in the footnote by Aramark that they did mention, well,

17   these cases are not really relevant here because they are

18   tied to federal statutes and have nothing to do with this

19   case.  The legislative history for a lot of these statutes

20   which were enacted in the 1930s were made to address the

21   evils of society, including child labor, the low wages, the

22   long hours, and we submit that that's exactly the situation

23   here.  It's completely relevant to apply it to this case.

24        The Fifth Circuit even said in the *Pilgrim*

25   case that "Employers should not escape liability by

1    deliberately structuring a permanent and exploitative

2    economic relationship with workers for that purpose."

3              So, we submit that -- we would ask Your Honor

4    to apply the Fifth Circuit law here and find them to be

17:13   5    joint employers.

6              THE COURT:  All right.  Thank you.

7              If you want to respond.

8         MR. DOVE:  Very briefly, Your Honor.

9              Your Honor, I thought that a few of the

17:13  10    comments that were made deserved a brief response.

11              First, Mr. Burck claimed that we received an

12    actual notice.  What he is referring to is the fact that

13    Boat People sent an unsolicited letter to us toward the end

14    of the labor strike that said nothing about Academy's

17:13  15    involvement, that they have no evidence we ever received.

16    We certainly don't know anything about it.  And it's unclear

17    to me how that would provide actual notice, considering that

18    it was sent at the end of the labor strike.

19              When you compare that to their other evidence

17:13  20    that they have put on -- for instance, Exhibit 7 to

21    Aramark's -- to their response to Aramark's motion, it seems

22    quite clear that they never thought Academy or Aramark did

23    anything until, apparently, the eve of filing this lawsuit.

24    They don't allege anything against us.  They never thought

17:13  25    that we had any involvement, certainly that we were not a

1   principal or an employer.

2          Mr. Burck said that we never see the

3   information gathered by our auditors.  I have no idea where

4   he got that.  From our pleadings, that is not true.

17:13   5          What is true is that they have no evidence

6   that our auditors ever told us of any wrongdoing.

7          THE COURT:  Well, they haven't alleged any.

8          MR. DOVE:  They haven't alleged it.  True.

9          He wants to compare the case to *Adhikari*, and

17:13   10   I could understand why he would want to do that as an

11   advocate.

12          The distinction here is fairly significant.

13          In *Adhikari* the allegations were a much

14   greater knowledge and a much greater amount of control.  The

17:13   15   claim was here come the workers back from this horrible

16   situation.  They are reporting to the defendant, 'Oh, my

17   gosh.  I got sent somewhere I was never told I was supposed

18   to go,' and they reported it directly, that, also, there

19   were reports of these specific allegations that were given.

17:13   20          None of that is true here.  The allegations of

21   our knowledge are scant or zero.

22          The other claim that was in *Adhikari* was that

23   they controlled, minutely, the work that was done by these

24   workers.  Here, there is no allegation that we controlled

17:13   25   the work.  Even if you take all of their allegations, even

1    the implausible ones, they claim we controlled the product

2    we received, not wages, hours, conditions, withholding tax,

3    where they sleep, what they eat.  Nothing.  We had no

4    control over that whatsoever.  This case is not like

17:13   5    *Adhikari*.

6             Ms. Bang continues to press the "joint

7    employment" theory, and I would just remind the Court I

8    still cannot understand how it could possibly apply in this

9    case.  Did the worker start working for Academy when it

17:13   10   worked on something with one labor, stop working for Academy

11   when it moved over to another table and started working on

12   something for Aramark --

13            THE COURT:  They were lots of joint employers,

14   apparently.

17:13   15            MR. DOVE:  The entire American importing public,

16   apparently, is a joint employer of every foreign worker

17   everywhere.  It sounds absurd, because I don't know how to

18   stop it before it gets absurd.  Everybody is exposed.

19            And, finally, Ms. Bang candidly conceded that

17:13   20   the reason why they're asserting this theory is they want to

21   put pressure on Academy and Aramark to go to different

22   vendors that apparently they think are better, having failed

23   to prove any reason why there's anything wrong with the one

24   we use.

17:13   25            I would just comment:  Surely, the way to

1  persuade a corporation is not to sue them for human rights

2  violations without evidence.

3          Those are the end of my comments.  Thank you.

4          THE COURT:  All right.

17:13  5          Anything further on this set of issues before

6  we move to your part of it?

7          MR. BURCK:  Your Honor, may I just --

8          THE COURT:  Sure.

9          MR. BURCK:  Two quick points.  Do you want me to go

17:13  10  up there?

11          THE COURT:  It doesn't matter.  Wherever we can

12  hear you.  Pull the mic up closer to you.  Thank you.

13          MR. BURCK:  You certainly have the letters that

14  were written to Academy and Aramark here.

17:13  15          THE COURT:  I do.

16          MR. BURCK:  They talk about what's going on and

17  what has happened and what is happening.  They're very

18  specific as to what's going on.

19          The only other comment I want to make, Judge,

17:13  20  is that in Academy's reply, on Page 4, where they're talking

21  about the Customs compliance and all the information that

22  the vendor gathers and what the vendor does with it -- and I

23  will quote -- "These documents are kept by the vendor.

24  Academy never sees them unless and until U.S. Customs

17:13  25  performs an audit."  That's where I got it from, Judge.

1    Academy never sees that.  That's their words.

2                    Thank you.

3              MR. DOVE:  He is referring to the manufacturer's

4    records of the sourcing of items, not our audit reports,

17:13    5    which is what he said earlier.

6              THE COURT:  Do you disagree with that?

7              MR. BURCK:  Yes, I do, Your Honor.

8              THE COURT:  On what basis?

9              MR. BURCK:  The Customs compliance reports are the

17:13   10    reports that are kept by the auditor about who works on

11    what, how long do they work on it, where does the fabric

12    come from, who cuts it, who sewed it, what label went into

13    it, what box did it go in.  That's the information that they

14    have access to that they never bothered to look at unless

17:13   15    there's a Customs problem.

16              THE COURT:  Did you want to point me to where in

17    the record I can get clarity on that?

18              MR. DOVE:  If you choose to look at their exhibit,

19    the PowerPoint presentation they draw that from, it does not

17:13   20    say anything of the sort.  All it says is "You,

21    manufacturer, need to keep these records because if Customs

22    does an audit, Customs, not the third-party auditors that we

23    hired to go and check for human rights violations" -- "if

24    Customs were to do an audit they will turn to us and say,

17:13   25    'You must provide these documents.'  We will turn to you and

1    say 'Provide the documents.'  We don't keep them.  And if

2    you don't provide the documents we have it in our contract

3    that we can deduct the costs of any Customs confusion from

4    the next order."  That's all it says.  That's all the

17:13   5    PowerPoint says and I don't understand where Mr. Burck is

6    getting this interpretation.

7            THE COURT:  All right.  Thank you.  It's helpful.

8                All right.  Go ahead, please.

9            MS. KROPF:  Good afternoon, Your Honor.

17:13  10                Your Honor, there are two federal statutes

11    that are at issue on TVPRA and the Alien Tort Statute.  I am

12    happy to handle them in either order you'd like, but I

13    thought I would start with the TVPRA.

14            THE COURT:  That's fine.

17:13  15            MS. KROPF:  Your Honor, the Plaintiffs are moving

16    under 1595(a) which allows for civil liability.  It allows

17    for civil liability, though, only when the defendant

18    participated in a venture which that person knew or should

19    have known engaged in some wrongdoing, and the Plaintiff

17:13  20    simply has not met that standard here.  There are two

21    primary reasons.

22                The first is that the statute requires this

23    participation in a venture.  Congress chose its words

24    carefully.  It didn't just say if you receive some goods

17:13  25    from a supplier overseas you're personally liable.  It added

1    more.  It said you have to participate in a venture.

2              Unfortunately, Congress didn't add as much as

3    we would have liked.  It doesn't define "participation" and

4    it doesn't define "venture" for the purposes of the civil

17:13  5    liability provision in the TVPRA.

6              However, the Fifth Circuit has defined

7    "participation" for aiding and abetting, at least, in the

8    criminal context and defines it as "an affirmative act to

9    aid the venture"; and there's no showing here by the

17:13  10   Plaintiffs, no allegation, that Aramark did anything to aid

11   a supposed venture by the factories overseas.

12             Now, the *Adhikari* case is probably the closest

13   case, and we all admit that the facts there are probably the

14   closest of any case.  It's a case against a company.  It's a

17:13  15   case under the TVPRA.  But the facts there alleged in the

16   complaint -- not attached to an opposition many months later

17   but included in the complaint -- were not only that KBR had

18   a contract but that KBR took, quote-unquote, a concrete act

19   to assist that venture, and that's entirely different from

17:13  20   what happened here.

21             Now, the Plaintiffs allege lots of wrongdoing

22   in Jordan and they have talked a lot about Academy and

23   Aramark's compliance policies.  And we take those policies

24   very seriously, and those policies are exactly to do what

17:13  25   Your Honor suggested, which is to prevent these type of

1   things, and they're trying to turn that around on us.

2          What happened in *Adhikari* is very different

3   from what is alleged here, and we submit that it makes that

4   case distinguishable, and the TVPRA cannot be applied here

5   and those counts should be dismissed.

6          The second reason that the Plaintiffs'

7   allegations under the TVPRA failed is because they haven't

8   reached the "knew or should have known" standard.  I was a

9   little confused, I admit, by Plaintiffs' argument about

10  whether or not they're relying on "knew or should have

11  known".

12          THE COURT:  I think both, depending on what the

13  auditor knew or should have known.

14          MS. KROPF:  Fair enough.

15          As far as knowledge, let's look at the

16  complaint, and the complaint says only this:  "Academy and

17  Aramark were on notice of the treatment of the workers."

18  That's it.  It doesn't say what treatment they were on

19  notice of.  Were they on notice of how big the room was?

20  Whether or not they were sitting or standing?  What they

21  were wearing?  Nothing.  All it says is that we were on

22  notice of the treatment.

23          It doesn't say when that notice happened

24  precisely, which is important here.  It seems odd to be

25  arguing about a couple of days or maybe a couple of weeks,

1   but it's critical here.  The complaint alleges that we

2   received notice in March of 2008.  The complaint also

3   allegations that all of this wrongdoing, all of this bad

4   conduct, this short-lived period, ended on March 29th.

5   So, the complaint gives no fair notice and no

6   allegation that we received notice anywhere close to the

7   beginning, the end, the middle.  And it could be read that

8   we received notice on the very last day.  It could be read

9   they say we received notice the day before.

10   We called the factory.  We said, 'Stop it.

11   Get them out of there' and they sent them home.  That is not

12   enough to meet the TVPRA and it's not enough what's alleged

13   in the complaint.

14   Now, the -- Oh.  What is also alleged in the

15   complaint gets to their "should have known theory", which is

16   our compliance policies.

17   I think Your Honor has already discussed those

18   and asked some questions in some detail.  But the compliance

19   policies themselves -- They don't attach Aramark's

20   compliance policies.  As I read them, they attach our

21   auditors' own compliance policies to the auditors'

22   employees.  But even assuming those are our policies -- they

23   look like good policies to me -- that doesn't create a

24   "should have known" standard of knowledge.  All that means

25   is that Academy or Aramark engaged in the best practices

1    possible to try to prevent this kind of conduct, and to

2    expect a company to have those policies and then to invite

3    this kind of liability simply by having those policies makes

4    no sense.

17:13    5              Now, we might be in a different situation if

6    they had alleged that our auditors went there, saw these

7    folks locked up --

8              THE COURT:  And reported them?

9              MS. KROPF:  I'm sorry?

17:13   10              THE COURT:  And reported what they saw?

11              MS. KROPF:  And reported what they saw.  If that

12    were the case here, if that is what was fairly alleged, we

13    might be in a different situation, but, as Your Honor knows,

14    that is not what is alleged.  All that's alleged is that we

17:13   15    had auditors, auditors conducted audits at some point, not

16    during this short six-week period that we are discussing

17    here.  There is just no allegation of it.  So, we don't

18    believe it reaches that "should have known" standard.

19              Now, of course, the elephant in the room is

17:13   20    the letter.  That, Your Honor, as you well know, was not

21    included in their complaint, it was not referred to in their

22    complaint and there is really no explanation for why it

23    wasn't.  It was written by a party.  It's not as though the

24    Plaintiffs didn't have it, it was recently discovered or

17:13   25    what have you.

1          So, even if Your Honor is going to consider

2    it -- which we believe you should not because it wasn't

3    included or referenced -- that does not meet the standard of

4    knowledge of "knew or should have known".

17:13    5          Your Honor, the letter, when I first read it,

6    I kind of stopped and reread it and reread it a few times.

7    It was written to Aramark.  It was written about some of the

8    wrongdoing, although, interestingly, not the most serious of

9    wrongdoings.  Nowhere does the letter say, 'Hey, Aramark.

17:13    10   Your workers have been locked up for a month.'  That makes

11   absolutely no sense.

12         Putting that aside, this is a letter written

13   to the CEO of a major multinational corporation from some

14   group that has no prior relationship with the company

17:13    15   alleging things happening in Jordan, and the idea that that

16   standing alone could constitute actual knowledge of a

17   trafficking scheme that Aramark and Academy were supposedly

18   a part of simply doesn't make sense.  If that were true, any

19   interest group could write a letter to any corporation

17:13    20   placing them on notice of whatever is happening, whatever

21   they believe it is, and that's just not how corporate

22   America works.

23         The other thing to consider is the timing.

24   The letter to Aramark is dated March 12 and the affidavit

17:13    25   authenticating it says it was sent by regular mail.  So, it

1    was sent.  I am sure it took a few days to get there.  I am

2    sure it took many days to get through the corporate

3    processing.  So, who knows when Aramark actually knew, when

4    someone there actually sat down and read it and looked at

17:13    5    it.

6              So, just that letter standing alone does not

7    get them to actual knowledge, even if you are going to

8    consider it, which we do not believe you should.

9              As far as the TVPRA, Your Honor, that's all I

17:13    10    have unless you have questions.

11         THE COURT:  No.  I think I am following so far.

12              Perhaps we should now turn to Plaintiffs and

13    get their responsive arguments on the TVPRA so we have those

14    issues before us.

17:13    15         MS. HENRY:  May it please the Court.  My name is

16    Shea Henry and I'll be addressing the TVPRA as it applies to

17    the Plaintiffs and why both Aramark, Academy and Well and

18    David are potential defendants and the correct named

19    defendants as provided by the statute.

17:13    20              I'd first like to draw the Court's attention

21    to the standard which was articulated in defense counsel's

22    argument about 1595, the civil remedy and the TVPRA.

23              She particularly ignored the parenthetical

24    "or" which follows "participation in a venture".  And I

17:13    25    think the statutory language is the key to understanding the

1    entire TVPRA issue and it reads that "Any victim may bring a

2    civil action against the perpetrator (or whoever knowingly

3    benefits financially or by receiving anything of value from

4    participation in a venture which that person...should have

17:13    5    known has engaged in an act is a violation of this

6    chapter)..."  Those words, in and of themselves, encompass

7    the entire chapter of the TVPRA which sets forth the

8    criminal predicates for civil liability.

9            And, so, the standard is, yes, "should have

17:13    10   known", and she went into an in-depth discussion of that,

11   but it's anyone who receives anything of value.  And it's

12   Plaintiffs' position that they have properly alleged in the

13   Second Amended Complaint that Aramark, Academy and Well and

14   David all received something of value as set forth in the

17:13    15   statute, whether it be apparel that came to the United

16   States or whether it be a financial benefit, but the

17   standard as provided by the statute is receiving anything of

18   value.  It does not even have to be financial.

19           THE COURT:  So, it's a very low threshold?

17:13    20           MS. HENRY:  Exactly.

21           Second, I'd like to address the facts in the

22   *Adhikari* case.

23           Defense counsel spent some time talking about

24   the knowledge and the conduct that KBR had as it pertained

17:13    25   to the TVPRA forced labor.  Plaintiffs have alleged in their

1      complaint on several occasions that that is exactly what

2      Academy and Aramark and Well and David did as either joint

3      employers or even having a contractual relationship where

4      there was knowledge or some sort of "should have known" or

17:13  5      even saying, 'Look.  I know I am getting something from you,

6      whether it be apparel, whether it be some sort of financial

7      benefit.'  That's the threshold for the civil remedy.  And

8      then that civil remedy opens up the door for the other

9      criminal predicate act set forth in 1589 and 1590 of the

17:13  10     TVPRA.  And the complaint specifically quotes that language

11     of "forced labor" and it is exactly the situation we have

12     here and same in the *Adhikari* case.

13             The *Adhikari* case, which Judge Ellison also

14     addresses in his opinion, it was -- yes, it was pre-*Morrison*

17:13  15     which they spent some time discussing, but it also was pre-

16     2008 amendment of the TVPRA, and the 2008 amendment of the

17     statute expanded civil liability, opened the door to even

18     further extraterritorial application, and the statute is now

19     more expansive.  As more research was done, as the

17:13  20     Department of Labor put more reports forth, Congress

21     intended to broaden the scope of the statute, and that's

22     exactly what happened in 2008.

23             It's the Plaintiffs' position that the TVPRA

24     specifically provides that a victim of this trafficking

17:13  25     previously in 2005 could only bring an act against the

1    trafficker.  Now, in 2008 and as the statute still stands, a

2    victim like the Plaintiffs in this case who were subjected

3    to forced labor, whether it be for a few days, whether it be

4    for six weeks, forced labor is forced labor as defined by

17:13   5    1589 and that's exactly what happened here.

6                Now, in 2008, when the statute was amended, it

7    opened the door for the Plaintiffs to be able to bring a

8    cause of action against anyone who financially benefits or

9    receives something of value in any violation of this

17:13   10    chapter.  The entire Chapter 77 and the Plaintiffs allege

11    1589, 1593 --

12                THE COURT:  If I buy a cheap shirt am I exposed?

13                MS. HENRY:  No, Your Honor, because you are not

14    actively pursuing the means by which that shirt is made.

17:13   15                THE COURT:  I do a lot of shopping for cheap

16    shirts.  I go to Academy.  I mean, I don't, but for the

17    purpose of this question.  I mean, that's a very broad

18    approach.

19                MS. HENRY:  Absolutely.  And I am sure we all

17:13   20    engage in some sort of retail --

21                THE COURT:  Indirect beneficiaries of the

22    inexpensive apparel that the process produces.

23                MS. HENRY:  Absolutely.

24                THE COURT:  You're not arguing that that's enough.

17:13   25                MS. HENRY:  No, Your Honor.  I am simply arguing

1     that the civil remedy as set forth by the statute sets

2     forth -- it's an "or" test.  It's not an "and".  You can

3     either actively participate or if you know what's going on

4     when you should know.  As a third-party person going to a

17:13  5     retail store, we don't know how that --

6         THE COURT:  We read a lot of stuff.  We read about

7     terrible conditions throughout the supply network.  How

8     could you say we don't know?  We may not know particulars,

9     but there is perhaps a broad -- If the standard is "should

17:13 10     have known", you could argue that there's enough information

11     in the news media that would put many of us on notice, if

12     not all of us on notice, that many of the products that we

13     are producing are the result of practices that we would find

14     abhorrent.  What do you do with that?

17:13 15         MS. HENRY:  That may be the case of what happens on

16     a day-to-day basis, but that is not the case of what the

17     legal statutory remedy is.

18         THE COURT:  But that's the very argument that is

19     used in some cases, to assert that there is knowledge; that

17:13 20     is, that corporations that enter into contracts have

21     knowledge of the conditions used to carry out those

22     contracts because the news media provides that.

23         MS. HENRY:  And if that were the case, which is not

24     the case in the case before the Court, then --

17:13 25         THE COURT:  Because there was no news coverage of

1     the conditions in Jordanian plants used to fill contracts

2     for clothing destined for American sport shops?

3          MS. HENRY:  It was higher than a media standard

4     even.  It was published by the Department of Labor.  It was

5     a part of the trafficking report that we all -- our Congress

6     people who represent us put that together so that

7     corporations like Aramark and Academy may have that at their

8     fingertips.

9          THE COURT:  Okay.  So, if it's in there, that's

10    enough?

11         MS. HENRY:  Yes, Your Honor.  And there are several

12    cases that apply civil law to the criminal predicate, all of

13    the subsections of the TVPRA, to impute the liability.

14         THE COURT:  I have your argument.

15         MS. HENRY:  Would Your Honor like me to address the

16    extraterritorial issue now?

17         THE COURT:  Sure.

18         MS. HENRY:  Mr. Pecht spent some time in his

19    argument talking about his statutory interpretation and the

20    language of the TVPRA and 1596.  I'd like to first address

21    the *Morrison* case.

22            The *Morrison* case was --

23         THE COURT:  I am familiar with the facts and the

24    procedural status.

25         MS. HENRY:  The holding in *Morrison*, if anything,

1   supports Plaintiffs' argument that there is a clear

2   congressional intent in the TVPRA to apply

3   extraterritorially.  1596, which is the new part in 2008, it

4   specifically uses that word "extraterritorial" and then it

5   references a few subsections, one of them being 1589 and

6   1590 which are the basis for our forced labor.  Those two

7   subsections are the criminal predicate for civil liability.

8           Defendants are contending that simply because

9   1596 doesn't address 1595 that there is no extraterritorial

10  application to the civil causes of action, and case after

11  case have shown that's just not how it works.  The statute

12  must be read in its entirety.

13          And if you look at the language of 1596 the

14  introductory clause says "in addition to other

15  jurisdictions".  1595 provides that jurisdiction by using

16  the words "in United States District Court," "any victim."

17  "Any victim" is pretty broad.  That could be overseas.  It

18  could be in the United States.  It could be anywhere.

19          And, so, 1595, standing alone, looking at the

20  language of the statute, creates extraterritorial effect.

21  Also 1596.  There is no way to look at the statute without

22  seeing that it has an extraterritorial effect.

23          So, *Morrison* will embrace that holding and say

24  that there does have to be a clear congressional intent, and

25  the TVPRA has that intent in the very language of the

1    statute for criminal and civil acts because it is the

2    criminal acts that create the predicate for the civil

3    remedies which *Plaintiffs* are seeking.

4              And, also, the TVPRA and the ATS can both

5    proceed simultaneously.  Well and David argues that one

6    preempts the other or one occupies the field and, in doing

7    so, they have relied on the *Enahoro* case.

8              The facts in that case are different than the

9    facts here.  The facts as alleged in the *Enahoro* case

10   wouldn't even satisfy the ATS because there was no prolonged

11   detention, and in order to bring a claim under the ATS you

12   have to violate some sort of international norm.  There

13   wasn't that there.  So, we can't apply it to these facts in

14   analyzing substantively whether or not the two federal

15   statutes can continue.

16              And, also, several federal district court

17   cases have shed light on the *Enahoro* case, specifically

18   *Chavez v. Chavez*.  It's a Tennessee district court case.

19   Plaintiffs' allegations very similar to our case.  Forced

20   labor, ATS and TVPRA proceed simultaneously.

21              Similarly, in *Adhikari* Judge Ellison even

22   specifically noted in that case the facts give plausible

23   causes of action to both of these statutes.  'Let's conduct

24   some discovery.  If we need to change one at one point, then

25   that's the time to do it, not now.'

1            And, additionally, there is New York district

2    court cases that allow them to proceed together.

3            So, we have the Second Circuit, the Seventh

4    Circuit.

17:13    5            And then Well and David also tries to

6    distinguish our reasoning in the *Magnifico* case, that we

7    provided the reasoning for that in our response brief, and I

8    will just briefly tell the Court that the distinguishment

9    that Well and David tries to make doesn't make a difference.

17:13    10   It doesn't change the fact that both statutes can proceed,

11   because all Well and David says is, well, that's a different

12   case because the plaintiffs were in the United States in

13   that case, but the analysis, the substantive analysis, about

14   the statutes, the remedies that Congress intended for both

17:13    15   statutes, that's exactly the same, and we would urge this

16   court to adopt that same reasoning to allow both causes of

17   action -- TVPRA and ATS -- to proceed simultaneously.

18            The Plaintiffs are not attempting to recast.

19   There's two different statutes.  They both provide for

17:13    20   separate civil remedies and we're bringing our claims

21   against both of those statutes separately.

22            THE COURT:  All right.  Thank you.  It was very

23   helpful.

24            Anything else on this set of issues?

17:13    25            Go ahead, Mr. Pecht.

1          MR. PECHT:  Your Honor, very briefly on the TVPRA

2     as applies to my client, my foreign client.

3               If you look at 1595 --

4          THE COURT:  Your client has a somewhat different

17:13    5     position.

6          MR. PECHT:  Yeah.  We're a foreign corporation.

7     We're not U.S.  But if you look at 1595 there is no mention

8     of extraterritoriality at all.  That's the civil provision.

9     If Congress wanted to, it knows how to make it

17:13   10     extraterritorial, and *Morrison* said, when it doesn't, it

11     doesn't and you can't read it into the statute.

12               1596 does have an extraterritorial

13     provision -- this is the criminal side of it -- if the

14     alleged offender is a national of the United States or an

17:13   15     alien unlawfully admitted for permanent residence in the

16     United States or an alleged offender is present in the

17     United States, neither one of which applies to my client.

18               And the Fifth Circuit has said in the *Medical

19     Center Pharmacy v. Mukasey* case, where Congress includes

17:13   20     particular language in one section of the statute but omits

21     it in another section of the same act, it is generally

22     presumed that Congress acts intentionally and purposely in

23     the disparate inclusion or exclusion.  So, they have

24     included it in one section, they have excluded it in

17:13   25     another, indicating that, with regard to the civil action,

1    it has no extraterritorial application; and, if you do apply

2    the extraterritorial standards that they use, it doesn't fit

3    my client for criminal actions.

4         MS. KROPF:  Your Honor, just a few comments in

17:13   5    response to what Ms. Henry said.

6              First, she said that *Adhikari* was relying on

7    the version of the TVPRA before the amendment.  That's

8    simply not true.  The case was cited in 2009.  In Footnote 1

9    they cite the statute that we're relying on today.

17:13   10             The second is Ms. Henry's argument that, if a

11   country is on this list that they attach, it somehow meets

12   the "should have known" standard and we shouldn't have done

13   business with them.  That would include we couldn't do

14   business, I guess, with any factory in Brazil, China, India,

17:13   15   Mexico, Colombia, Philippines, Guatemala, et cetera.  That

16   is simply not the case.

17             This is just a list by country.  There's no

18   indication in this list that this factory had any -- that

19   the Department of Labor thought there were any problems

17:13   20   there and that they engaged in any trafficking.

21             So, relying on that standard does not meet the

22   "should have known" standard in the TVPRA.

23             And the final point, Your Honor, is that

24   Ms. Henry said that I did not cite or quote the entire

17:13   25   statute, yet when she talked about it she conveniently left

1    out the word "participation".  I think that's exactly what

2    Your Honor was getting at.  The reason that a buyer of a

3    cheap shirt is not liable if that shirt happened to have

4    been made by forced labor is because the statute says

17:13    5    "participation".  It doesn't say you just got something of

6    value, because, frankly, as Your Honor pointed out, it

7    probably would be all of us, unfortunately.

8              The statute is very clear.  It included the

9    word "participation" and we can't read that out of the

17:13    10   statute to simply read "anything of value from a venture

11   that used forced labor".

12             Unless Your Honor has further questions about

13   that, I will turn to the Alien Tort Statute.

14             THE COURT:  All right.  Let me just make sure that

17:13    15   Miss Henry doesn't want to add anything at this point before

16   we leave the --

17             MS. HENRY:  The Department of Labor report that

18   they do on trafficking, it's not simply -- it doesn't simply

19   list countries.  It lists them in the type of alleged human

17:13    20   rights violations that have occurred, whether it be --

21             THE COURT:  But not in factory-specific sites.

22             MS. HENRY:  By the --

23             THE COURT:  But that still covers a lot of ground,

24   possibly.

17:13    25             MS. HENRY:  They create a chart that says 'In

1    Jordan we have had reports of human rights violations for

2    apparel or for garments.'  That creates some sort of "should

3    have known" standard.

4         THE COURT:  A report of some violations of human

17:13   5    rights in a sector, in a country?  Is that -- I just want to

6    make sure I have your argument.  And I will look at the

7    exhibit, obviously.

8         MS. HENRY:  If that corporation, that person or

9    whoever it may be is obtaining those exact services from

17:13   10   that country.

11        THE COURT:  So, if I bought a shirt -- Well, I

12   guess I am a little puzzled, then -- and the "participation"

13   point may be the answer to this question -- but if I buy a

14   shirt that's made in Brazil and Brazil is on the list for

17:13   15   reports of human rights violations from the manufacturer of

16   apparel in Brazil, does that mean that I should have known

17   that the shirt I bought was manufactured by people working

18   under conditions that amount to forced labor?

19        MS. HENRY:  If you are actively participating --

17:13   20        THE COURT:  Participation is different from

21   knowledge.  Participation can produce knowledge, but you can

22   have knowledge without participating.  And what you just

23   argued is that that list gives knowledge.  So, I guess my

24   question is:  Is that enough?

17:13   25        MS. HENRY:  Yes.  That list gives knowledge and the

1    policy behind that list is to put people on notice like the

2    corporations.

3            THE COURT:  So, everybody who is buying a shirt

4    from Brazil, if Brazil is listed as a source of human rights

17:13    5    violations reported in some instances in the apparel

6    manufacturers in that country, that should suffice?

7            MS. HENRY:  Not entirely, but it should trigger

8    some sort of due diligence action.

9            THE COURT:  Okay.  I think I have your argument.

17:13    10    Thank you.

11                Anything furnish on that point?

12            MS. KROPF:  No, Your Honor.

13                Your Honor, turning to the Alien Tort Statute:

14                Your Honor, the Alien Tort Statute, as you

17:13    15    know, allows for jurisdiction over a relatively modest set

16    of actions.  *Sosa* by the Supreme Court was very clear that

17    it should be used sparingly, the court should act as

18    vigilant doorkeepers to keep out claims, and they should act

19    in great caution for allowing these claims to proceed.

17:13    20                And we have several arguments under the Alien

21    Tort Statute.  One of them, of course, is the

22    extraterritorial application, which I don't think we need to

23    address here given that it has been very ably briefed in the

24    Supreme Court.

17:13    25                Their primary argument, Your Honor, is that

1    there simply is no way to hold Aramark or Academy liable

2    under the Alien Tort Statute.  The case from the Fifth

3    Circuit that addresses it most clearly is the *Carmichael*

4    case.  It's a 1988 case.  And in that case the Fifth Circuit

17:13    5    held that for an Alien Tort Statute claim there has to be a

6    causal connection between the defendant and the wrongdoer.

7    The Plaintiffs simply haven't alleged any facts showing that

8    causal connection between either Aramark or Academy and the

9    actual wrongdoing.

17:13    10    In that case a British national sued Price

11    Waterhouse Coopers claiming that PWC was responsible when

12    the Saudi government locked him up.

13    Now, the facts of that case were interesting

14    in that what happened was he owed or his company PWC money

17:13    15    and he was locked up and he asked PWC to sign a release of

16    that debt and they refused to do so for a while and, so, he

17    was held for a while.

18    However, the Fifth Circuit was very clear in

19    dismissing the case -- or in affirming the dismissal that

17:13    20    the company, quote, "played no part in the incarceration"

21    and, in fact, didn't even know about it when it first

22    started, which is precisely what Plaintiffs' allegations are

23    here.  They certainly don't allege that Academy or Aramark

24    knew about the incarceration when it began.  They simply

17:13    25    allege that we may have known at some point right at the

1    very end.

2              So, we believe *Carmichael* is dispositive here,

3    given that they haven't alleged any causal connection and

4    the Alien Tort claim should be dismissed.

17:13    5              The other cases that we cite, the *Licea*, which

6    is a dry dock case -- it was a default judgment -- and the

7    *Bao Ge* case, which is a soccer ball case -- we believe those

8    both inform the Court about the kinds of allegations that

9    would survive a motion to dismiss and the kind that

17:13    10   wouldn't.

11              *Licea*, for example, is a forced labor scheme,

12   and in that case the participation of the company, the

13   company that was being held liable there, was far afield

14   from the minimal allegations here.  In that case the company

17:13    15   had actually hosted members of the Cuban security apparatus.

16   The company had helped make sure the workers didn't escape

17   by keeping the workers on site in a secured area and by

18   hiring security personnel.  That case is very different from

19   the minimal allegations here.  There is simply is no way to

17:13    20   hold either Aramark or Academy liable for anything under the

21   Alien Tort Statute under that line of cases.

22              Now, the Plaintiff also relies on a theory, I

23   believe, of secondary liability.  They don't go with aiding

24   and abetting.  They are trying for conspiracy.  The only one

17:13    25   they point to is agency.  What gets confusing about agency,

1    Your Honor, is that you held in *Abecassis* -- is that the

2    right way to say it?

3            THE COURT:  That's as close as I have ever come.

4            MS. KROPF:  -- that *Abecassis* says that the

17:13    5    relevant standard under the Alien Tort Statute for secondary

6    liability is international law.  So, all the parties spent a

7    lot of time briefing what we were comfortable with, which is

8    Texas law, and I believe Your Honor has held that that's not

9    going to be the right standard; it's going to be

17:13   10    international law.

11            We looked a little bit into what international

12    law would be for agency.  It was not easy to find.  But, for

13    example, in *Doe v. Nestle* the court there held that a

14    contract itself didn't equate to agency.

17:13   15            And, also, the International Law Commission,

16    which has issued some standards that seek to codify

17    customary international law -- there is a chapter in those

18    standards that is talking about -- It's the closest analogy

19    we could find.  It's talking about what conduct would be

17:13   20    attributed to a state; and since, obviously, international

21    law is usually conduct of the state rather than private

22    corporations, this is the closest we could find.

23            I think that that information is very

24    instructive.  It's in Chapter 2, Article 8, and it's

17:13   25    entitled "Conduct Directed or Controlled by the State".  It

talks about how "the conduct shall be considered the conduct

of the state if that person" -- meaning the third party to

the state -- "is acting on the instructions of or under the

direction and control of the state in carrying out the

17:13   conduct.  The state must have directed or controlled the

specific operation that's at issue."  And there is not

agency under the International Law Commission standards if

the conduct was peripheral to the operation or escaped from

the state's direction and control.

17:13   So, in some ways it's not too far afield from

what Texas law would be.  The primary issue, under at least

this version of international law -- which I will rely on

today because it was the best we could find -- is control,

and there simply are no allegations of control here.

17:13   I was struck by two things.  I was struck when

Mr. Lapidus said he needed the contracts to determine how

much control there was, because in their opposition against

Aramark they made statements like "The factory operated

under," quote, "the control and strict orders from Aramark."

17:13   They don't have a citation for it.

THE COURT:  I think that refers to the policies

that -- the compliance policies.  Is that correct?

MR. LAPIDUS:  It is, Judge.

THE COURT:  All right.  And nothing more, just so

17:13   we're clear.  What's on the web site primarily and the

1    documents that you presented in your response?

2           MR. LAPIDUS:  That's true, Judge.

3           THE COURT:  All right.

4           MS. KROPF:  Well, they also say that Aramark

17:13   5    imposed, quote, "strict price and time requirements on the

6    factory," and that also is not cited to anything, and there

7    is no allegation or anything, even to what they attach as

8    their opposition to support that.

9                 They say that "Aramark", quote, "controls the

17:13  10    working conditions of the factory that would," quote, "set

11    the material terms and conditions of Plaintiffs'

12    employment."

13           THE COURT:  Again, I think that's the reference to

14    the compliance policies, although the compliance policies

17:13  15    don't set caps on price or quantity, do they?

16           MR. LAPIDUS:  I don't think so, Judge.

17           THE COURT:  And what was the source of that?

18           MR. LAPIDUS:  That part of the brief is the control

19    that -- at least, the allegation that's contained in the

17:13  20    complaint that should get us past the motion --

21           THE COURT:  But did the complaint have a specific

22    allegation of the caps placed on numbers and price?  And, if

23    so, what was the section, just so I have it handy?

24           MS. HENRY:  Yes, Your Honor.  Our reference point

17:13  25    for that and putting it into the allegations of the

1    opposition is from the UL-STR auditors standards and their

2    connection with the LESLi and how it's published on their

3    web site.

4              THE COURT:  Is it in the complaint?

17:13    5        MS. HENRY:  Yes, Your Honor.

6              THE COURT:  Can you cite me -- Just so I have it

7    handy, if you could just cite me the section, that would be

8    useful.

9              MS. HENRY:  Yes, Your Honor.  On Pages 21 and 22 at

17:13   10   Exhibit -- No.  Excuse me.  At Page 14 of the complaint and

11   Exhibit C specifically names UL-STR as the auditor.

12             THE COURT:  All right.

13             MS. KROPF:  However, Your Honor, nothing in the

14   record and no allegations -- Even if you're looking at -- I

17:13   15   guess what they're looking at is our auditor standards --

16   set any price or time requirements for anything --

17   "anything" -- that shows control here.  That is their

18   obligation, really, whether looking under Texas law or

19   international law.

17:13   20             THE COURT:  Just for clarity, the auditor standard

21   sets the price and time limit?  Is that what you're saying?

22             MS. HENRY:  The auditor relies on the labor

23   standard time requirements which the auditor publishes on

24   their web site.

17:13   25             THE COURT:  So, it's -- Let me get this straight.

1    So, Aramark or Academy hires the auditor.  The auditor

2    publishes the criteria that it's going to use, and those

3    criteria, in turn, refer to a labor standard?

4              MS. HENRY:  As to Aramark, yes.  As to Academy, no.

17:13  5    Academy specifically publishes quantity, time, exact data,

6    and those are all attached to the opposition which are

7    referenced in the complaint.

8              THE COURT:  Okay.  At Page 14 where you cited?

9              MS. HENRY:  As to Academy, Your Honor, it is

17:13  10   Pages 15 and 16.

11             THE COURT:  Thank you.  That's helpful.

12                  All right.  Go ahead.

13             MS. KROPF:  Your Honor, I think even if you take

14   everything the Plaintiffs have said as true and when you

17:13  15   actually look and actually read the exhibits they simply

16   doesn't support the contention that there was control here.

17   Under Texas law there has to be control over the day-to-day

18   operations, and there is nothing here that alleges that at

19   all against either Academy or Aramark.

17:13  20                  Your Honor, the remainder of my argument goes

21   to the specifics of the claims under the Alien Tort

22   Statute -- prolonged detention, trafficking and slavery.  I

23   am happy to stand on my papers on those, unless you'd like

24   to hear argument.

17:13  25             THE COURT:  I think your papers do a good job of

1   addressing those.  These are the broad issues.

2        MS. KROPF:  Thank you, Your Honor.  I have no

3   further comment, unless you have questions.

4        THE COURT:  No.  I think this is helpful.

17:13  5        Is the best way to proceed now to hear

6   Academy's version of these and then hear from the

7   Plaintiffs?

8        MR. DOVE:  We don't have anything to add to that,

9   Your Honor.

17:13  10       THE COURT:  All right.  Did you want to respond to

11  the description of your -- I guess, the reference that they

12  make to your standards for price caps and numbers?

13       MR. DOVE:  It's my understanding that the argument

14  they were making with regard to price caps really relates to

17:13  15  Aramark.  I didn't see it as a response to us.

16       The way that they framed it with regard to us

17  was purely, 'Well, look at the things that you specify in

18  the goods.  You want them delivered in a certain way and you

19  want the tag put in a certain place.  So, therefore, you

17:13  20  must have day-to-day control over the lives of these

21  workers,' which I don't think makes any sense at all.

22       Certainly, there is nothing in our auditing

23  standards that has anything about that.  There is no way to

24  take anything that they attached to their response to our

17:13  25  motion to read that we somehow force our vendors into forced

1  labor by setting prices so low.  There's no evidence of

2  that.  There's not even an allegation of that.

3           And I don't think there is any more to add.

4           THE COURT:  All right.  Thank you.

17:13  5           Go ahead, please.

6           MS. PANJWANI:  I will also be brief.

7           THE COURT:  I think we need the microphone.

8           MS. PANJWANI:  Okay.  Good afternoon, Your Honor.

9           THE COURT:  Good afternoon.

17:13  10          MS. PANJWANI:  I will also be brief.  We also rest

11  on our papers with respect to extraterritoriality, corporate

12  liability, bloc nations.

13          What I would just like to clarify:  I know our

14  complaints could have been more artfully crafted, but the

17:13  15  core claim is actually one of labor trafficking or forced

16  labor, however you want to characterize it.  The false

17  imprisonment, the batteries, those are indications, those

18  are hallmarks, of forced labor.  It's why the forced labor

19  and labor trafficking is a universally condemned

17:13  20  international norm.  I think many courts have recognized it,

21  including here in the Fifth Circuit.  And, so, I do want to

22  provide that clarification.

23          THE COURT:  All right.

24          MS. PANJWANI:  I won't list every international

17:13  25  treaty in our State Department, but it's all in the papers.

1    So, that's that clarification.

2             And with respect to how do we enforce

3    violations of these international norms, the international

4    norm defines the prospective conduct and it's historically

17:13    5    been our domestic laws that defines how we go about

6    enforcing it, and that is why we believe our "joint

7    employer" theory is relevant here.

8             THE COURT:  Wait.  I'm not linking those dots.

9    Perhaps you could help me.

17:13    10             MS. PANJWANI:  Counsel indicated that we have to

11    show causation under international standards and that the

12    international standard, you know, is -- there is some

13    analogy to local law, but, historically, the enforcement has

14    been under domestic law.  I have standing authority to the

17:13    15    contrary.  I wanted to point that out.

16             THE COURT:  All right.

17             MS. PANJWANI:  I will defer to my colleagues in

18    terms of the factual indications of control.

19             Thank you.

17:13    20             THE COURT:  All right.  Thank you.

21             Anything additional that any party wants to

22    add?

23             MS. KROPF:  No, Your Honor.

24             MR. DOVE:  No, Your Honor.

17:13    25             MR. BURCK:  Your Honor, if I may just be brief for

```
 1    one minute.

 2              THE COURT:  Sure.

 3              MR. BURCK:  You have obviously heard a lot of

 4    discussion, mostly from that table over there, about what

 5    kind of proof we have and what kind of evidence we have.

 6    We're not at that stage of the litigation.  We're at the

 7    stage of the litigation where all we're required to do is to

 8    allege facts that can create a plausible cause of action.

 9              We have a 42-page complaint.  It's not to be

10    looked at piecemeal.  It's not to be looked at one paragraph

11    at a time.  It's to be looked at in its entirety and as a

12    whole.  The documents that we have provided in our response

13    are specifically addressed in the complaint, maybe not by

14    name, but by the exact name they're referenced.  They're in

15    a footnote.  They're somewhere in the complaint.

16              THE COURT:  Is it appropriate for me to look at

17    them in assessing a 12(b)(6) argument --

18              MR. BURCK:  Yes, ma'am.

19              THE COURT:  -- if they haven't been specifically --

20    There is a narrow category of documents that can be

21    considered under 12(b)(6) if there are matters outside the

22    pleadings.

23              MR. BURCK:  And my understanding of that, Judge, is

24    if they are specifically referenced in the pleading --

25              THE COURT:  And usually attached to the -- either
```

17:13 (lines 5, 10, 15, 20, 25)

1    attached to the complaint or to the defendant's motion to

2    dismiss, not often attached to the plaintiff's opposition to

3    the defendant's motion to dismiss.  This is a little bit

4    different.

17:13    5          MR. BURCK:  I understand.  But that's why we

6    referenced them in the complaint.  We didn't add them just

7    because, literally, as you have seen, then our complaint

8    would be four notebooks thick because that's what our

9    response, with the documents, ended up being and that's why

17:13    10    we specifically referenced them, which gave them an

11    opportunity to go find them.

12              So, I think what this court is allowed to do

13    is to take notice of those documents that are attached to

14    the response because they are specifically cited in the

17:13    15    complaint and are central to the causes of action that we

16    allege.

17              Thank you, Your Honor.

18          THE COURT:  Thank you.

19              Yes, ma'am.

17:13    20          MS. BANG:  I just wanted to clarify one issue that

21    I saw some discussion with regard to the price ceiling and

22    being the different exhibit.  What we were referring to is

23    that Academy's Smart Guide.  It's the monetary penalties for

24    certain violations, not proceeding a certain way, and that

17:13    25    is not the only indicia of control that we are alleging.  We

1    are combining that with the economic reality test.  And when

2    you look at the other factors showing dependency of the

3    workers, theirs unskilled nature, the fact that the contract

4    was unilaterally negotiated, we assume that the discovery

17:13    5    will show that, in that respect, there is control asserted

6    by both Academy and Aramark.

7              I would just add as one final issue, Your

8    Honor -- and I know that the defense has strenuously asked

9    you not to allow us to amend, but I would submit the

17:13    10    following reasons for the Court to indulge us in this

11    request.

12              First, it is contrary to the spirit of the

13    Federal Rules of Civil Procedure --

14              THE COURT:  Not after three times.

17:13    15              MS. BANG:  -- mere technicalities --

16              THE COURT:  Okay.  Mere technicalities, yes, of

17    course.

18              MS. BANG:  And I know you think it's three times.

19    It really is substantively only once with respect to Academy

17:13    20    and Aramark, and it was with consent, and this time we would

21    be asking for leave of court to do so.  There is no --

22              THE COURT:  It's a fair point.

23              MS. BANG:  I'm sorry?

24              THE COURT:  It's a fair point.

17:13    25              MS. BANG:  Also, there is no due process issue for

1    the Defendants.  The terms were raised in our complaint.  We

2    also gave them notice in our opposition.  There is no

3    prejudice to the Defendants.  They could have further

4    opportunity to proceed and address these issues if they'd

17:13    5    like to.  And we have to amend the complaint, anyway, to

6    remove RICO.  So, if you could indulge us in that.

7              And we have one final point to be addressed by

8    Mr. Quan.

9              THE COURT:  All right.  Thank you.

17:13   10              MR. QUAN:  Good afternoon, Your Honor.  Gordon

11    Quan.

12              In Defendant's response there was an

13    allegation made of a possible conflict of interest.  I am

14    here today as a member of Lawyers Against Human Trafficking,

17:13   15    not in my capacity with Foster Quan.  I wanted to clarify

16    that to the Court, Your Honor; that our firm no longer

17    represents Academy but for two old cases that were

18    previously handled by Tindall & Foster before our merger.

19    They allege that, if I had known of this conduct, I condoned

17:13   20    that conduct.  Obviously, Your Honor, had I known --

21              THE COURT:  By "that conduct" you mean a conflict?

22              MR. QUAN:  The trafficking, Your Honor.

23              THE COURT:  Okay.  All right.

24              MR. QUAN:  So, I just wanted to go on record, Your

17:13   25    Honor, that I am not here on Foster Quan's behalf but as a

1   member of Lawyers Against Human Trafficking.

2            Thank you, Your Honor.

3            THE COURT:  All right.  Thank you.

4            MS. KROPF:  Your Honor, may I be heard briefly on

17:13   5   one issue?

6            THE COURT:  Sure.

7            MS. KROPF:  Your Honor, on the amendment point,

8   they did amend substantively once, I agree, but they amended

9   after they saw every one of our arguments in our motion to

17:13   10  dismiss.  They had every opportunity to fix it, every

11  opportunity to add all of the exhibits they now attached to

12  their reply, and they haven't offered you any reason by

13  which, if they're allowed to amend, they have new facts or

14  new allegations to include.

17:13   15           THE COURT:  Other than the ones they have rehearsed

16  in their opposition.

17           MS. KROPF:  Yes.  But they haven't offered anything

18  factual that would really change the view here.  And our

19  view is, Your Honor, that even if you took everything in

17:13   20  those exhibits and put them into the complaint -- which they

21  are not there, nor are they specifically referenced -- you

22  would come to the same conclusion; it should be dismissed.

23           THE COURT:  Then, isn't the more efficient way for

24  me to proceed to consider all of those, because I would have

17:13   25  to do so in deciding whether it would be futile for them to

1    replead?

2            MS. KROPF:  As far as Aramark goes, that would be

3    our preference.  I don't want to speak for the other

4    parties.

17:13   5            THE COURT:  All right.

6            MR. DOVE:  We proposed that course of action in our

7    reply.

8            THE COURT:  You did.

9            MR. PECHT:  Your Honor, with regard to Well and

17:13  10   David --

11           THE COURT:  You're a little bit of a different

12   position because you have got a 12(b)(2).  I know that.

13           MS. KROPF:  Thank you, Your Honor.

14           THE COURT:  All right.  Anything else?

17:13  15           I do have one final question.  How many people

16   watching are summer associates?  You saw some very good

17   advocates.  You were very fortunate to hear some of the

18   issues in the way in which they were presented.

19           I hope you're having a good summer.

17:13  20           Thank you very much.

21                   COURT REPORTER'S CERTIFICATE
                I, BRUCE SLAVIN, certify that the foregoing is a
22   correct transcript from the record of proceedings in the
     above-entitled matter, to the best of my ability.
23

24                           *s/Bruce Slavin*
                         BRUCE SLAVIN, RPR, CM
25

## $

**$4.50** [1] - 52:2
**$57** [2] - 12:19, 12:21
**$75** [1] - 50:22

## '

**'Hey** [1] - 63:9
**'If** [1] - 20:19
**'In** [1] - 75:25
**'Look** [1] - 66:5
**'Oh** [1] - 54:16
**'Okay** [1] - 52:1
**'Provide** [1] - 58:1
**'Stop** [1] - 61:10
**'We** [1] - 30:1
**'We're** [1] - 38:23
**'Well** [3] - 31:13, 34:25, 85:17
**'You** [2] - 41:1, 57:25

## 1

**1** [1] - 74:8
**109** [1] - 18:2
**11** [1] - 22:19
**12** [1] - 63:24
**12(b)(2** [3] - 7:21, 22:7, 22:16
**12(b)(2)** [1] - 93:12
**12(b)(6** [5] - 22:17, 35:20, 39:21, 88:17, 88:21
**1299** [1] - 2:5
**12th** [1] - 40:19
**1301** [1] - 2:2
**1303** [1] - 1:20
**13th** [1] - 40:19
**14** [2] - 83:10, 84:8
**15** [1] - 84:10
**1589** [4] - 66:9, 67:5, 67:11, 70:5
**1590** [2] - 66:9, 70:6
**1593** [1] - 67:11
**1595** [6] - 64:22, 70:9, 70:15, 70:19, 73:3, 73:7
**1595(a** [1] - 58:16
**1596** [6] - 69:20, 70:3, 70:9, 70:13, 70:21, 73:12
**16** [1] - 84:10
**17** [1] - 46:18
**18-hour** [1] - 46:25
**1800** [1] - 2:13
**1930s** [1] - 52:20
**1988** [1] - 78:4

## 2

**2** [1] - 80:24
**200** [1] - 24:2
**20004** [1] - 2:5
**2005** [1] - 66:25
**2007** [1] - 26:20
**2008** [13] - 17:3, 17:8, 17:10, 17:25, 33:19, 40:19, 61:2, 66:16, 66:22, 67:1, 67:6, 70:3
**2009** [1] - 74:8
**2012** [3] - 1:6, 17:4, 26:20
**21** [3] - 40:24, 46:18, 83:9
**22** [1] - 83:9
**25** [1] - 5:8
**26** [3] - 5:8, 19:7, 19:8
**27** [1] - 26:22
**28** [1] - 1:6
**2800** [1] - 2:10
**29th** [1] - 61:4

## 3

**30** [1] - 5:9
**300** [1] - 23:24
**3400** [1] - 2:15
**350** [1] - 24:3
**3500** [1] - 2:7
**370** [1] - 26:19

## 4

**4** [1] - 56:20
**42-page** [1] - 88:9
**49** [1] - 5:12

## 5

**50** [2] - 5:12, 52:3
**5096** [2] - 15:7, 15:20
**51** [2] - 5:12, 5:19
**5100** [1] - 2:2
**5177** [1] - 1:17
**52** [3] - 5:12, 5:21, 24:1
**57** [1] - 13:2
**5850** [1] - 1:24

## 6

**600** [1] - 2:10
**601** [1] - 1:24

## 7

**7** [2] - 17:21, 53:20
**700** [1] - 2:15
**77** [1] - 67:10

**77002** [3] - 2:8, 2:11, 2:16
**77007** [1] - 1:21
**77010** [1] - 2:3
**77056** [1] - 1:18
**77057** [1] - 1:24
**77449** [1] - 2:13

## 8

**8** [1] - 80:24
**850** [1] - 1:17

## 9

**9** [1] - 7:19
**9(b** [2] - 1:8, 31:15
**9(b)** [1] - 17:1
**910** [1] - 2:7

## A

**abandoned** [1] - 4:24
**Abecassis** [4] - 40:1, 80:1, 80:4
**abetting** [2] - 59:7, 79:24
**abhorrent** [1] - 68:14
**ability** [3] - 32:5, 49:4, 93:22
**able** [7] - 23:2, 23:7, 25:13, 27:11, 27:22, 50:8, 67:7
**ably** [1] - 77:23
**above-entitled** [1] - 93:22
**absolutely** [4] - 42:22, 63:11, 67:19, 67:23
**absurd** [2] - 55:17, 55:18
**abuse** [1] - 45:19
**Academies** [1] - 51:5
**Academy** [60] - 2:9, 2:9, 2:12, 3:18, 3:21, 3:23, 5:14, 10:20, 20:14, 20:18, 21:12, 21:21, 25:4, 25:16, 27:3, 32:15, 33:21, 34:17, 35:13, 36:21, 36:22, 36:25, 40:11, 40:14, 40:18, 41:23, 43:23, 44:25, 45:15, 45:22, 51:22, 52:6, 53:22, 55:9, 55:10, 55:21, 56:14, 56:24, 57:1, 59:22, 60:16, 61:25, 63:17, 64:17, 65:13, 66:2, 67:16, 69:7, 78:1, 78:8, 78:23, 79:20, 84:1, 84:4, 84:5, 84:9,

84:19, 90:6, 90:19, 91:17
**Academy's** [5] - 50:19, 53:14, 56:20, 85:6, 89:23
**accept** [1] - 51:8
**access** [3] - 17:15, 57:14
**according** [1] - 21:21
**account** [1] - 9:5
**accused** [1] - 20:19
**act** [8] - 59:8, 59:18, 65:5, 66:9, 66:25, 73:21, 77:17, 77:18
**acting** [1] - 81:3
**action** [25] - 13:15, 14:6, 14:8, 14:11, 14:12, 16:7, 16:9, 16:11, 16:21, 31:1, 32:21, 33:15, 33:18, 47:15, 48:15, 65:2, 67:8, 70:10, 71:23, 72:17, 73:25, 77:8, 88:8, 89:15, 93:6
**actions** [4] - 13:21, 35:11, 74:3, 77:16
**actively** [3] - 67:14, 68:3, 76:19
**activities** [1] - 13:25
**activity** [2] - 37:9, 37:10
**acts** [4] - 36:1, 71:1, 71:2, 73:22
**actual** [10] - 40:14, 41:3, 41:14, 41:15, 43:20, 53:12, 53:17, 63:16, 64:7, 78:9
**add** [9] - 28:12, 59:2, 75:15, 85:8, 86:3, 87:22, 89:6, 90:7, 92:11
**added** [1] - 58:25
**addition** [3] - 20:11, 37:4, 70:14
**additional** [4] - 29:19, 35:7, 35:23, 87:21
**additionally** [1] - 72:1
**address** [20] - 8:13, 9:5, 11:22, 18:19, 21:14, 41:17, 41:18, 41:19, 45:10, 46:15, 47:21, 49:19, 52:15, 52:20, 65:21, 69:15, 69:20, 70:9, 77:23, 91:4
**addressed** [4] - 22:21, 40:24, 88:13, 91:7
**addresses** [6] - 5:15, 5:16, 27:4, 41:9, 66:14, 78:3

**addressing** [3] - 28:15, 64:16, 85:1
**adherence** [1] - 36:6
**Adhikari** [13] - 15:21, 47:3, 54:9, 54:13, 54:22, 55:5, 59:12, 60:2, 65:22, 66:12, 66:13, 71:21, 74:6
**admit** [2] - 59:13, 60:9
**admitted** [1] - 73:15
**adopt** [1] - 72:16
**adopted** [1] - 37:18
**advocate** [1] - 54:11
**advocates** [1] - 93:17
**affidavit** [1] - 63:24
**affidavits** [1] - 23:1
**affiliation** [1] - 9:14
**affirming** [1] - 78:19
**afforded** [2] - 25:14, 26:16
**afield** [2] - 79:13, 81:10
**afternoon** [6] - 3:1, 47:20, 58:9, 86:8, 86:9, 91:10
**agency** [7] - 34:6, 38:20, 41:12, 49:10, 79:25, 80:12, 80:14, 81:7
**agent** [4] - 32:12, 36:11, 43:16
**ago** [1] - 41:3
**agree** [2] - 20:21, 92:8
**agreed** [3] - 19:5, 20:22, 27:1
**agreement** [3] - 22:3, 22:12, 22:19
**ahead** [5] - 8:19, 58:8, 72:25, 84:12, 86:5
**aid** [4] - 17:14, 17:15, 59:9, 59:10
**aided** [1] - 2:25
**aiding** [2] - 59:7, 79:23
**AL** [2] - 1:3, 1:7
**alien** [1] - 73:15
**Alien** [11] - 58:11, 75:13, 77:13, 77:14, 77:20, 78:2, 78:5, 79:4, 79:21, 80:5, 84:21
**allegation** [12] - 9:10, 10:21, 11:12, 54:24, 59:10, 61:6, 62:17, 82:7, 82:19, 82:22, 86:2, 91:13
**allegations** [36] - 9:17, 10:24, 22:25, 27:17, 30:1, 33:1, 33:12, 33:21, 34:1, 34:5,

35:12, 36:24, 37:1, 39:15, 39:23, 40:1, 41:18, 46:16, 46:17, 47:4, 47:11, 54:13, 54:19, 54:20, 54:25, 60:7, 61:3, 71:19, 78:22, 79:8, 79:14, 79:19, 81:14, 82:25, 83:14, 92:14

**allege** [12] - 10:8, 10:9, 33:22, 47:14, 53:24, 59:21, 67:10, 78:23, 78:25, 88:8, 89:16, 91:19

**alleged** [28] - 9:2, 9:3, 10:19, 11:7, 20:7, 32:10, 39:20, 40:22, 45:17, 46:19, 54:7, 54:8, 59:15, 60:3, 61:12, 61:14, 62:6, 62:12, 62:14, 65:12, 65:25, 71:9, 73:14, 73:16, 75:19, 78:7, 79:3

**alleges** [3] - 33:6, 61:1, 84:18

**alleging** [5] - 33:14, 33:17, 37:8, 63:15, 89:25

**allow** [6] - 23:7, 25:25, 40:2, 72:2, 72:16, 90:9

**allowed** [3] - 30:4, 89:12, 92:13

**allowing** [1] - 77:19

**allows** [3] - 58:16, 77:15

**alone** [5] - 11:14, 21:3, 63:16, 64:6, 70:19

**Alpine** [3] - 10:14, 12:7, 26:7

**amazing** [1] - 44:9

**amend** [4] - 90:9, 91:5, 92:8, 92:13

**Amended** [7] - 5:6, 39:15, 39:21, 46:17, 46:20, 47:2, 65:13

**amended** [2] - 67:6, 92:8

**amendment** [4] - 66:16, 74:7, 92:7

**America** [1] - 63:22

**American** [3] - 32:10, 55:15, 69:2

**amount** [4] - 13:6, 13:7, 54:14, 76:18

**analogous** [1] - 49:1

**analogy** [9] - 36:14, 36:15, 36:17, 38:12, 39:2, 39:4, 48:3,

80:18, 87:13

**analysis** [10] - 37:12, 48:7, 48:10, 48:25, 49:12, 49:13, 49:23, 51:11, 72:13

**analyzing** [1] - 71:14

**and''** [1] - 68:2

**andrea** [1] - 1:23

**Andrea** [1] - 3:7

**announced** [1] - 9:12

**answer** [2] - 37:24, 76:13

**anticipated** [1] - 29:13

**anyway** [1] - 91:5

**apparatus** [1] - 79:15

**Apparel** [4] - 2:5, 6:9, 10:3, 18:3

**apparel** [7] - 11:4, 65:15, 66:6, 67:22, 76:2, 76:16, 77:5

**APPAREL** [1] - 1:6

**apparels** [1] - 14:9

**appear** [1] - 34:1

**appearances** [1] - 3:1

**applicable** [1] - 17:6

**application** [13] - 6:16, 7:14, 15:3, 15:4, 16:10, 16:14, 17:14, 28:14, 48:13, 66:18, 70:10, 74:1, 77:22

**applied** [8] - 15:16, 15:21, 17:5, 20:17, 38:5, 49:1, 49:17, 60:4

**applies** [4] - 20:16, 64:16, 73:2, 73:17

**apply** [17] - 6:20, 6:21, 7:14, 14:22, 15:18, 21:20, 23:19, 47:2, 47:23, 48:11, 52:23, 53:4, 55:8, 69:12, 70:2, 71:13, 74:1

**approach** [1] - 67:18

**approaches** [1] - 38:18

**appropriate** [3] - 22:10, 35:22, 88:16

**approve** [1] - 16:19

**Aramark** [57] - 2:4, 2:5, 3:14, 3:15, 3:16, 3:17, 10:19, 20:14, 20:18, 21:13, 21:22, 25:4, 25:16, 32:15, 32:17, 33:21, 36:25, 40:11, 40:14, 40:19, 41:23, 43:23, 45:15, 51:22, 52:6, 52:16, 53:22, 55:12, 55:21, 56:14, 59:10, 60:17, 61:25, 63:7, 63:9,

63:17, 63:24, 64:3, 64:17, 65:13, 66:2, 69:7, 78:1, 78:8, 78:23, 79:20, 81:18, 81:19, 82:4, 82:9, 84:1, 84:4, 84:19, 85:15, 90:6, 90:20, 93:2

**Aramark's** [6] - 5:21, 34:17, 53:21, 59:23, 61:19

**Aramarks** [1] - 51:5

**arbitrate** [1] - 29:11

**arbitration** [2] - 29:7

**area** [1] - 79:17

**argue** [3] - 30:15, 40:4, 68:10

**argued** [7] - 11:25, 24:23, 76:23

**argues** [1] - 71:5

**arguing** [6] - 30:15, 36:14, 44:13, 60:25, 67:24, 67:25

**argument** [39] - 5:25, 6:22, 9:21, 12:1, 12:11, 12:16, 13:10, 14:16, 16:2, 16:6, 22:11, 24:13, 24:21, 25:2, 25:3, 27:7, 27:9, 27:25, 28:10, 29:23, 40:17, 41:15, 44:8, 44:17, 60:9, 64:22, 68:18, 69:14, 69:19, 70:1, 74:10, 76:6, 77:9, 77:25, 84:20, 84:24, 85:13, 88:17

**arguments** [15] - 6:18, 18:15, 22:6, 27:4, 28:2, 32:18, 35:25, 38:22, 39:9, 39:14, 41:20, 45:11, 64:13, 77:20, 92:9

**arise** [4] - 13:19, 13:22, 13:23, 14:8

**arises** [1] - 13:15

**arm's** [2] - 36:23, 50:11

**arose** [2] - 14:6, 40:17

**artfully** [1] - 86:14

**Article** [1] - 80:24

**articulated** [1] - 64:21

**Asia** [1] - 51:1

**aside** [5] - 13:4, 35:21, 45:7, 48:13, 63:12

**aspect** [1] - 50:23

**assert** [4] - 8:10, 9:13, 35:25, 68:19

**asserted** [3] - 6:1, 37:19, 90:5

**asserting** [3] - 9:20, 16:8, 55:20

**assertion** [1] - 11:15

**assessing** [1] - 88:17

**assist** [1] - 59:19

**assisted** [1] - 17:13

**associates** [1] - 93:16

**assume** [1] - 90:4

**assumed** [1] - 39:22

**assuming** [2] - 5:16, 61:22

**Atlas** [1] - 26:7

**ATS** [11] - 6:20, 7:6, 7:13, 16:4, 16:12, 28:15, 71:4, 71:10, 71:11, 71:20, 72:17

**attach** [4] - 61:19, 61:20, 74:11, 82:7

**attached** [10] - 10:23, 40:23, 59:16, 84:6, 85:24, 88:25, 89:1, 89:2, 89:13, 92:11

**attempt** [1] - 34:15

**attempting** [2] - 18:22, 72:18

**attention** [2] - 37:3, 64:20

**attenuated** [1] - 14:11

**attributed** [1] - 80:20

**audit** [5] - 42:20, 56:25, 57:4, 57:22, 57:24

**auditing** [1] - 85:22

**auditor** [20] - 43:20, 43:21, 44:3, 44:8, 44:9, 44:11, 45:6, 45:8, 45:20, 57:10, 60:13, 83:11, 83:15, 83:20, 83:22, 83:23, 84:1

**auditors** [14] - 34:25, 41:24, 42:2, 43:24, 44:25, 45:24, 45:25, 54:3, 54:6, 57:22, 62:6, 62:15, 83:1

**auditors'** [2] - 61:21

**audits** [1] - 62:15

**authenticated** [1] - 11:1

**authenticating** [1] - 63:25

**authority** [3] - 44:24, 45:4, 87:14

**Ave** [1] - 2:5

**aware** [4] - 37:19, 38:13, 39:1, 39:4

**asserting** [3] - 9:20, 16:8, 55:20

**B**

**B-u-r-c-k** [1] - 3:3

**background** [1] - 48:4

**bad** [1] - 61:3

**Baker** [2] - 2:4, 2:7

**balancing** [1] - 49:24

**ball** [2] - 51:25, 79:7

**BANG** [15] - 3:10, 47:20, 48:2, 48:16, 48:19, 49:6, 49:12, 49:19, 49:22, 51:19, 89:20, 90:15, 90:18, 90:23, 90:25

**bang** [3] - 41:19, 45:10, 55:6

**Bang** [4] - 1:19, 1:22, 3:10, 55:19

**Bangkok** [1] - 17:8

**bank** [1] - 9:5

**Bao** [1] - 79:7

**barred** [5] - 7:18, 16:3, 16:24, 17:1

**barring** [1] - 17:20

**Bartels** [1] - 48:21

**based** [4] - 9:17, 16:1, 16:19, 45:17

**bases** [1] - 4:8

**basic** [1] - 18:7

**basis** [5] - 8:10, 9:20, 57:8, 68:16, 70:6

**batteries** [1] - 86:17

**bears** [1] - 7:23

**beat** [1] - 33:24

**BEFORE** [1] - 1:11

**began** [1] - 78:24

**begin** [2] - 32:24, 46:17

**beginning** [1] - 61:7

**begins** [1] - 5:20

**begs** [1] - 45:25

**behalf** [15] - 3:8, 3:9, 3:10, 3:14, 3:16, 3:18, 3:20, 3:24, 4:1, 6:5, 6:8, 24:25, 28:15, 39:13, 91:25

**behind** [1] - 77:1

**belief** [1] - 45:17

**bells** [1] - 42:25

**beneficiaries** [1] - 67:21

**benefit** [4] - 15:22, 29:22, 65:16, 66:7

**benefits** [5] - 51:12, 65:3, 67:8

**best** [6] - 32:18, 39:8, 61:25, 81:13, 85:5, 93:22

**better** [2] - 35:16, 55:22

**between** [12] - 18:3, 19:22, 20:13, 21:11, 22:22, 26:20, 29:11,

30:13, 30:16, 31:1,
78:6, 78:8
**beyond** [1] - 45:8
**big** [1] - 60:19
**bit** [5] - 4:14, 49:19,
80:11, 89:3, 93:11
**blacked** [1] - 24:7
**blame** [1] - 34:4
**bloc** [1] - 86:12
**board** [1] - 17:9
**Boat** [4] - 17:9, 17:13,
40:20, 53:13
**boggling** [1] - 38:11
**bother** [2] - 43:5, 46:3
**bothered** [1] - 57:14
**Botts** [2] - 2:4, 2:7
**bought** [2] - 76:11,
76:17
**bound** [1] - 30:9
**box** [1] - 57:13
**boy** [1] - 44:7
**Brazil** [4] - 74:14,
76:14, 76:16, 77:4
**breach** [2] - 18:1, 18:4
**bridge** [1] - 34:14
**brief** [9] - 24:15,
24:23, 29:19, 53:10,
72:7, 82:18, 86:6,
86:10, 87:25
**briefed** [2] - 30:2,
77:23
**briefing** [3] - 4:13,
23:10, 80:7
**briefly** [4] - 53:8, 72:8,
73:1, 92:4
**brilliantly** [2] - 40:5,
40:6
**bring** [11] - 17:19,
17:23, 21:22, 25:19,
45:14, 65:1, 66:25,
67:7, 71:11
**bringing** [1] - 72:20
**British** [1] - 78:10
**broad** [6] - 33:2,
43:16, 67:17, 68:9,
70:17, 85:1
**broaden** [1] - 66:21
**broken** [1] - 31:12
**brought** [4] - 17:3,
28:13, 29:14, 32:21
**Brown** [1] - 2:15
**brown** [1] - 9:13
**BRUCE** [2] - 93:21,
93:24
**Bruce** [1] - 2:17
**bunch** [1] - 39:18
**Burck** [7] - 1:15, 1:16,
3:3, 39:13, 53:11,
54:2, 58:5
**BURCK** [41] - 3:3,

4:23, 39:10, 39:12,
39:24, 40:6, 40:18,
41:1, 41:13, 41:22,
42:5, 42:8, 42:10,
42:22, 43:3, 43:17,
43:19, 43:22, 44:1,
44:5, 44:14, 44:18,
44:22, 44:25, 45:10,
45:13, 45:22, 46:14,
47:10, 47:17, 56:7,
56:9, 56:13, 56:16,
57:7, 57:9, 87:25,
88:3, 88:18, 88:23,
89:5
**burden** [3] - 7:23,
47:12, 47:13
**business** [12] - 8:25,
9:7, 11:22, 12:1,
12:3, 12:4, 12:19,
13:3, 13:7, 37:9,
74:13, 74:14
**buy** [3] - 35:7, 67:12,
76:13
**buyer** [1] - 75:2
**buying** [1] - 77:3

## C

**cake** [1] - 30:5
**California** [1] - 48:9
**candidly** [1] - 55:19
**cannot** [5] - 16:11,
31:9, 35:19, 55:8,
60:4
**capacity** [1] - 91:15
**caps** [4] - 82:15,
82:22, 85:12, 85:14
**Career** [1] - 2:5
**carefully** [1] - 58:24
**Carmichael** [2] - 78:3,
79:2
**carry** [1] - 68:21
**carrying** [1] - 81:4
**case** [112] - 4:9, 7:24,
9:16, 11:19, 11:21,
14:3, 14:24, 15:23,
18:19, 19:3, 20:24,
20:25, 21:2, 21:6,
22:23, 23:17, 26:5,
26:7, 27:11, 28:20,
28:23, 29:23, 30:2,
32:3, 32:6, 33:1,
33:3, 33:6, 34:7,
35:20, 36:25, 37:6,
37:18, 37:22, 38:3,
38:21, 40:1, 44:19,
44:22, 47:3, 47:13,
48:2, 48:6, 48:12,
48:21, 49:1, 49:10,
49:22, 50:3, 50:5,
50:14, 50:16, 51:4,

51:15, 51:21, 52:10,
52:12, 52:19, 52:23,
52:25, 54:9, 55:4,
55:9, 59:12, 59:13,
59:14, 59:15, 60:4,
62:12, 65:22, 66:12,
66:13, 67:2, 68:15,
68:16, 68:23, 68:24,
69:21, 69:22, 70:10,
70:11, 71:7, 71:8,
71:9, 71:17, 71:18,
71:19, 71:22, 72:6,
72:12, 72:13, 73:19,
74:8, 74:16, 78:2,
78:4, 78:10, 78:13,
78:19, 79:6, 79:7,
79:12, 79:14, 79:18
**cases** [25] - 10:15,
12:9, 20:4, 20:5,
21:4, 26:2, 26:3,
26:14, 27:9, 33:3,
37:3, 37:5, 37:7,
38:14, 40:7, 48:20,
52:17, 68:19, 69:12,
71:17, 72:2, 79:5,
79:21, 91:17
**category** [1] - 88:20
**causal** [4] - 30:25,
78:6, 78:8, 79:3
**causation** [2] - 31:1,
87:11
**caused** [1] - 33:7
**causes** [7] - 14:8,
32:21, 47:14, 70:10,
71:23, 72:16, 89:15
**caution** [1] - 77:19
**ceiling** [1] - 89:21
**ceilings** [2] - 51:23,
52:8
**Center** [1] - 73:19
**central** [3] - 11:25,
12:4, 89:15
**cents** [1] - 52:3
**CEO** [1] - 63:13
**certain** [8] - 12:3,
35:9, 36:7, 50:7,
85:18, 85:19, 89:24
**Civil** [1] - 90:13
**civil** [19] - 15:16,
58:16, 58:17, 59:4,
64:22, 65:2, 65:8,
66:7, 66:8, 66:17,
68:1, 69:12, 70:7,
70:10, 71:1, 71:2,
72:20, 73:8, 73:25
**CERTIFICATE** [1] -
93:21
**certify** [1] - 93:21
**cetera** [1] - 74:15
**challenge** [2] - 5:20,
22:11
**challenges** [2] - 22:4,
22:5

**change** [3] - 71:24,
72:10, 92:18
**chapter** [3] - 65:7,
67:10, 80:17
**Chapter** [2] - 67:10,
80:24
**chapter)..** [1] - 65:6
**characterize** [1] -
86:16
**charge** [1] - 43:10
**Charles** [1] - 2:14
**chart** [1] - 75:25
**Chase** [1] - 1:17
**Chavez** [2] - 71:18
**cheap** [3] - 67:12,
67:15, 75:3
**check** [1] - 57:23
**child** [1] - 52:21
**China** [2] - 30:20,
74:14
**choice** [1] - 23:18
**choose** [1] - 57:18
**chose** [1] - 58:23
**Chris** [2] - 3:18, 32:14
**Christopher** [1] - 2:9
**Circuit** [20] - 8:23,
10:13, 12:6, 13:9,
22:23, 26:8, 28:22,
30:12, 47:25, 49:22,
52:24, 53:4, 59:6,
72:3, 72:4, 73:18,
78:3, 78:4, 78:18,
86:21
**Circuit's** [1] - 16:15
**circumstances** [2] -
12:4, 37:12
**circumvent** [1] - 16:11
**citation** [1] - 81:20
**cite** [8] - 11:9, 11:18,
12:21, 74:9, 74:24,
79:5, 83:6, 83:7
**cited** [6] - 12:9, 26:3,
74:8, 82:6, 84:8,
89:14
**citizen** [2] - 15:10,
38:23
**Civil** [1] - 90:13
**civil** [19] - 19:18,
20:21, 21:10, 23:20,
25:21, 45:18, 53:16,
53:25, 56:13, 78:23,
85:22
**claim** [27] - 7:19, 10:2,
10:4, 13:17, 13:18,
13:19, 16:25, 17:4,
18:1, 18:4, 18:7,
18:10, 22:6, 30:13,
31:9, 34:6, 34:19,

34:25, 38:9, 54:15,
54:22, 55:1, 71:11,
78:5, 79:4, 86:15
**claim-specific** [1] -
13:17
**claimed** [1] - 53:11
**claiming** [2] - 33:15,
78:11
**claims** [32] - 4:17,
4:22, 4:23, 5:2, 5:17,
5:25, 6:13, 7:7, 7:18,
7:25, 8:2, 13:23,
16:3, 16:4, 16:8,
16:19, 16:23, 17:19,
17:23, 20:5, 27:6,
28:3, 31:16, 32:21,
46:19, 47:6, 48:17,
48:18, 72:20, 77:18,
77:19, 84:21
**clarification** [3] - 4:13,
86:22, 87:1
**clarify** [3] - 86:13,
89:20, 91:15
**clarity** [2] - 57:17,
83:20
**clause** [1] - 70:14
**clear** [11] - 11:13,
15:2, 32:3, 49:15,
53:22, 70:1, 70:24,
75:8, 77:16, 78:18,
81:25
**clearly** [2] - 8:11, 78:3
**client** [20] - 6:12, 7:2,
7:15, 9:17, 9:25,
14:22, 14:23, 15:17,
15:19, 15:25, 18:1,
31:11, 73:2, 73:4,
73:17, 74:3
**client's** [1] - 46:21
**clients** [4] - 18:4,
24:25, 45:19, 46:22
**Clinic** [1] - 1:20
**close** [2] - 61:6, 80:3
**closer** [2] - 39:1,
56:12
**closest** [5] - 38:12,
59:12, 59:14, 80:18,
80:22
**clothing** [2] - 10:20,
69:2
**CM** [2] - 2:17, 93:24
**co** [2] - 3:4, 3:7
**co-counsel** [2] - 3:4,
3:7
**Coalimex** [2] - 2:15
**codes** [3] - 34:17,
36:6, 38:17
**codify** [1] - 80:16
**coincidence** [1] -
32:16

**colleagues** [1] - 87:17
**collecting** [1] - 44:25
**College** [1] - 1:19
**Colombia** [1] - 74:15
**combining** [1] - 90:1
**comfortable** [1] - 80:7
**comment** [3] - 55:25, 56:19, 85:3
**comments** [4] - 37:16, 53:10, 56:3, 74:4
**commerce** [13] - 9:24, 10:13, 10:17, 11:2, 11:4, 11:6, 12:6, 12:10, 12:14, 12:16, 13:8, 13:10, 14:7
**Commission** [2] - 80:15, 81:7
**committed** [2] - 27:18, 36:2
**common** [8] - 7:17, 8:2, 16:12, 16:19, 48:17, 49:15, 51:11, 52:13
**common-law** [5] - 7:17, 8:2, 16:12, 16:19, 51:11
**companies** [12] - 10:12, 11:5, 14:25, 26:23, 26:24, 26:25, 30:21, 30:22, 34:4, 40:21, 43:23
**company** [28] - 6:13, 10:1, 10:3, 10:4, 10:6, 10:8, 13:25, 28:24, 29:3, 42:15, 42:17, 43:20, 44:7, 44:10, 45:5, 45:9, 50:25, 59:14, 62:2, 63:14, 78:14, 78:20, 79:12, 79:13, 79:14, 79:16
**company's** [1] - 12:11
**compare** [3] - 49:14, 53:19, 54:9
**compensation** [1] - 48:24
**Complaint** [8] - 5:5, 5:6, 39:15, 39:21, 46:17, 46:20, 47:2, 65:13
**complaint** [39] - 5:7, 11:8, 19:14, 31:10, 34:15, 34:16, 34:24, 40:7, 40:22, 40:24, 50:4, 59:16, 59:17, 60:16, 61:1, 61:2, 61:5, 61:13, 61:15, 62:21, 62:22, 66:1, 66:10, 82:20, 82:21, 83:4, 83:10, 84:7,

88:9, 88:13, 88:15, 89:1, 89:6, 89:7, 89:15, 91:1, 91:5, 92:20
**complaints** [2] - 5:10, 86:14
**completely** [4] - 48:7, 48:8, 48:10, 52:23
**compliance** [11] - 46:2, 56:21, 57:9, 59:23, 61:16, 61:18, 61:20, 61:21, 81:22, 82:14
**component** [1] - 15:16
**computer** [1] - 2:25
**computer-aided** [1] - 2:25
**concede** [1] - 15:11
**conceded** [2] - 31:8, 55:19
**concerned** [2] - 8:16, 27:14
**concerning** [1] - 21:14
**conclude** [1] - 15:20
**conclusion** [1] - 92:22
**conclusory** [1] - 39:23
**concomitantly** [1] - 29:12
**concrete** [1] - 59:18
**condemned** [1] - 86:19
**conditions** [10] - 33:8, 43:1, 47:11, 55:2, 68:7, 68:21, 69:1, 76:18, 82:10, 82:11
**condoned** [1] - 91:19
**conduct** [22] - 6:14, 6:21, 23:11, 27:18, 32:9, 34:18, 40:9, 46:12, 61:4, 62:1, 65:24, 71:23, 80:19, 80:21, 81:1, 81:5, 81:8, 87:4, 91:19, 91:20, 91:21
**Conduct** [1] - 80:25
**conducted** [2] - 11:22, 62:15
**conducting** [1] - 22:24
**confiscated** [1] - 46:21
**conflict** [2] - 91:13, 91:21
**confused** [3] - 22:8, 22:15, 60:9
**confusing** [1] - 79:25
**confusion** [1] - 58:3
**Congress** [9] - 16:6, 16:20, 59:2, 66:20, 69:5, 72:14, 73:9, 73:19, 73:22

**congress** [1] - 58:23
**congressional** [4] - 17:11, 17:23, 70:2, 70:24
**connection** [4] - 78:6, 78:8, 79:3, 83:2
**consent** [1] - 90:20
**consider** [4] - 63:1, 63:23, 64:8, 92:24
**consideration** [1] - 5:8
**considered** [2] - 81:1, 88:21
**considering** [1] - 53:17
**consistent** [1] - 13:1
**conspiracy** [2] - 17:2, 79:24
**constitute** [2] - 13:13, 63:16
**Construcciones** [2] - 11:19, 12:10
**contact** [6] - 12:2, 13:22, 17:9, 23:8, 27:12, 31:1
**contacts** [6] - 8:1, 8:3, 8:21, 21:5, 24:13, 25:2
**contained** [2] - 29:7, 82:19
**container** [1] - 35:6
**contending** [1] - 70:8
**contention** [1] - 84:16
**context** [7] - 13:16, 13:20, 35:25, 38:10, 48:1, 48:14, 59:8
**continue** [2] - 46:18, 71:15
**continues** [1] - 55:6
**continuous** [2] - 8:21, 9:15
**contract** [35] - 10:2, 18:1, 18:2, 18:4, 18:6, 19:16, 19:18, 19:19, 19:22, 20:7, 20:13, 21:21, 21:25, 23:17, 23:18, 24:10, 24:11, 25:8, 25:11, 25:12, 29:3, 29:6, 30:12, 32:9, 41:11, 42:13, 42:16, 42:19, 50:9, 58:2, 59:18, 80:14, 90:3
**contracting** [1] - 32:10
**contractor** [1] - 36:11
**contractors** [5] - 36:5, 38:15, 38:16, 50:13, 50:14
**contracts** [18] - 13:24,

19:24, 20:8, 20:15, 21:19, 23:16, 25:4, 25:5, 25:16, 25:17, 26:25, 29:9, 30:16, 41:23, 68:20, 68:22, 69:1, 81:16
**contractual** [3] - 14:16, 21:14, 66:3
**contrary** [2] - 87:15, 90:12
**control** [27] - 21:12, 21:13, 34:10, 37:11, 38:18, 49:5, 49:9, 50:18, 50:20, 50:23, 50:24, 54:14, 55:4, 81:4, 81:9, 81:13, 81:14, 81:17, 81:19, 82:18, 83:17, 84:16, 84:17, 85:20, 87:18, 89:25, 90:5
**Controlled** [1] - 80:25
**controlled** [4] - 54:23, 54:24, 55:1, 81:5
**controls** [1] - 82:9
**conveniently** [1] - 74:25
**Coopers** [1] - 78:11
**copies** [1] - 19:10
**copy** [4] - 19:17, 19:21, 19:24, 20:12
**core** [1] - 86:15
**corner** [1] - 43:8
**CORP** [1] - 1:7
**Corp** [9] - 2:1, 2:2, 3:25, 4:2, 6:8, 6:10, 9:3, 11:11, 19:25
**corporate** [9] - 7:14, 7:15, 42:1, 46:1, 46:7, 46:9, 63:21, 64:2, 86:11
**corporation** [8] - 9:14, 20:15, 50:15, 56:1, 63:13, 63:19, 73:6, 76:8
**Corporation** [4] - 2:4, 3:15, 3:17, 15:13
**corporations** [6] - 51:6, 52:7, 68:20, 69:7, 77:2, 80:22
**correct** [3] - 64:18, 81:22, 93:22
**costs** [1] - 58:3
**counsel** [5] - 3:4, 3:7, 3:22, 65:23, 87:10
**counsel's** [1] - 64:21
**countries** [3] - 6:14, 23:25, 75:19
**country** [10] - 13:12, 13:13, 14:12, 19:15, 25:7, 74:11, 74:17,

76:5, 76:10, 77:6
**counts** [1] - 60:5
**couple** [3] - 4:12, 60:25
**course** [5] - 33:15, 62:19, 77:21, 90:17, 93:6
**Court** [48] - 2:17, 4:6, 4:9, 6:24, 7:4, 7:7, 7:8, 7:10, 7:11, 7:19, 8:22, 8:24, 9:12, 11:2, 11:9, 11:19, 14:23, 15:1, 16:5, 18:8, 18:12, 23:7, 23:22, 24:19, 26:21, 31:8, 31:9, 34:21, 37:16, 39:12, 39:18, 39:19, 39:25, 47:23, 48:20, 50:12, 51:10, 55:7, 64:15, 68:24, 70:16, 72:8, 77:16, 77:24, 79:8, 90:10, 91:16
**court** [26] - 7:11, 7:12, 9:13, 12:9, 16:17, 16:19, 16:22, 17:12, 22:20, 26:4, 26:14, 29:4, 29:8, 29:14, 33:4, 40:2, 47:25, 50:7, 71:16, 71:18, 72:2, 72:16, 77:17, 80:13, 89:12, 90:21
**Court's** [4] - 10:15, 16:18, 37:3, 64:20
**court's** [1] - 11:18
**courts** [3] - 28:20, 36:10, 86:20
**courts'** [1] - 37:7
**coverage** [1] - 68:25
**covers** [1] - 75:23
**crafted** [1] - 86:14
**create** [6] - 12:3, 38:20, 61:23, 71:2, 75:25, 88:8
**created** [2] - 4:12, 16:7
**creates** [2] - 70:20, 76:2
**creating** [1] - 16:12
**criminal** [11] - 15:9, 15:16, 59:8, 65:8, 66:9, 69:12, 70:7, 71:1, 71:2, 73:13, 74:3
**criteria** [3] - 51:18, 84:2, 84:3
**critical** [1] - 61:1
**Cuban** [1] - 79:15
**cubed** [2] - 6:11, 14:24

**current** [2] - 4:12, 5:7
**customary** [1] - 80:17
**Customs** [10] - 35:8, 35:19, 56:21, 56:24, 57:9, 57:15, 57:21, 57:22, 57:24, 58:3
**cuts** [2] - 32:13, 57:12

## D

**d/b/a** [1] - 2:9
**daily** [1] - 17:13
**dangerous** [1] - 35:12
**Daoud** [1] - 15:21
**data** [1] - 84:5
**date** [1] - 31:14
**dated** [1] - 63:24
**David** [47] - 2:2, 3:25, 4:1, 5:24, 6:6, 6:8, 6:19, 8:6, 8:7, 8:20, 9:3, 9:25, 10:3, 11:11, 12:24, 15:13, 18:20, 19:22, 19:23, 19:25, 20:8, 20:13, 20:14, 20:19, 21:12, 21:17, 21:20, 21:24, 23:24, 25:5, 25:6, 25:17, 25:18, 25:22, 28:5, 30:14, 30:19, 31:13, 51:3, 64:18, 65:14, 66:2, 71:5, 72:5, 72:9, 72:11, 93:10
**David's** [1] - 5:19
**day-to-day** [3] - 68:16, 84:17, 85:20
**days** [5] - 46:25, 60:25, 64:1, 64:2, 67:3
**DC** [1] - 2:5
**deadlines** [2] - 51:23, 52:8
**dealt** [1] - 16:16
**debt** [1] - 78:16
**decide** [2] - 7:4, 16:5
**decided** [4] - 26:5, 26:8, 30:14, 41:16
**deciding** [1] - 92:25
**decision** [3] - 11:18, 16:16, 16:18
**declare** [1] - 50:9
**declaring** [1] - 35:15
**deduct** [1] - 58:3
**default** [1] - 79:6
**defective** [3] - 14:4, 14:6, 14:7
**defend** [1] - 29:14
**Defendant** [1] - 2:9
**defendant** [5] - 8:25, 15:22, 54:16, 58:17,

78:6
**defendant's** [3] - 12:2, 89:1, 89:3
**Defendant's** [3] - 13:16, 13:19, 91:12
**Defendants** [9] - 1:8, 2:1, 2:4, 2:14, 6:1, 19:5, 32:7, 91:1, 91:3
**defendants** [4] - 6:3, 64:18, 64:19, 70:8
**Defendants'** [2] - 4:8, 4:19
**defense** [4] - 5:23, 64:21, 65:23, 90:8
**defenses** [1] - 6:2
**defer** [1] - 87:17
**deference** [1] - 23:6
**deferral** [1] - 23:11
**define** [2] - 59:3, 59:4
**defined** [2] - 59:6, 67:4
**defines** [3] - 59:8, 87:4, 87:5
**deliberately** [1] - 53:1
**delivered** [1] - 85:18
**Dennis** [2] - 2:6, 3:16
**Department** [5] - 66:20, 69:4, 74:19, 75:17, 86:25
**dependency** [2] - 50:1, 90:2
**dependent** [5] - 49:23, 50:2, 50:5, 50:14, 51:6
**deposition** [1] - 26:5
**depth** [1] - 65:10
**derivative** [1] - 34:3
**described** [2] - 32:19, 38:13
**description** [3] - 13:2, 20:7, 85:11
**deserved** [1] - 53:10
**designate** [1] - 19:8
**destined** [1] - 69:2
**detail** [1] - 61:18
**detailed** [3] - 35:4, 36:5, 40:1
**details** [3] - 27:12, 38:19, 50:21
**detention** [2] - 71:11, 84:22
**determine** [1] - 81:16
**difference** [7] - 13:5, 13:6, 13:9, 29:9, 36:20, 72:9
**different** [28] - 11:19, 14:3, 15:24, 19:15, 29:16, 32:13, 36:7, 36:9, 48:5, 48:7,

48:10, 48:11, 49:14, 49:25, 55:21, 59:19, 60:2, 62:5, 62:13, 71:8, 72:11, 72:19, 73:4, 76:20, 79:18, 89:4, 89:22, 93:11
**difficult** [1] - 8:23
**diligence** [1] - 77:8
**direct** [2] - 32:6, 34:5
**directed** [3] - 5:7, 5:9, 81:5
**Directed** [1] - 80:25
**direction** [2] - 81:4, 81:9
**directly** [1] - 54:18
**disagree** [1] - 57:6
**disclose** [1] - 19:10
**disclosures** [2] - 19:7, 19:8
**discover** [2] - 22:2, 26:1
**discovered** [2] - 26:13, 62:24
**discovery** [36] - 9:20, 9:23, 19:6, 21:10, 22:4, 22:5, 22:9, 22:12, 22:16, 22:17, 23:7, 23:12, 23:16, 24:8, 24:12, 25:1, 26:4, 26:9, 26:15, 27:22, 28:10, 28:19, 29:17, 29:24, 30:8, 30:11, 31:5, 35:14, 35:17, 39:17, 40:8, 50:10, 50:12, 71:24, 90:4
**discuss** [1] - 21:14
**discussed** [2] - 22:21, 61:17
**discussing** [2] - 62:16, 66:15
**discussion** [7] - 22:9, 32:17, 47:22, 48:6, 65:10, 88:4, 89:21
**dismiss** [10] - 4:18, 5:4, 5:7, 5:9, 5:14, 28:1, 79:9, 89:2, 89:3, 92:10
**dismissal** [2] - 5:1, 78:19
**dismissed** [4] - 20:4, 60:5, 79:4, 92:22
**dismissing** [1] - 78:19
**disparate** [1] - 73:23
**dispositive** [1] - 79:2
**dispute** [1] - 21:20
**disputes** [2] - 29:11, 30:13
**distinction** [3] - 40:12, 40:13, 54:12

**distinguish** [1] - 72:6
**distinguishable** [2] - 48:8, 60:4
**distinguishment** [1] - 72:8
**distribute** [1] - 10:11
**District** [1] - 70:16
**DISTRICT** [2] - 1:1, 1:1
**district** [3] - 71:16, 71:18, 72:1
**divided** [1] - 5:14
**DIVISION** [1] - 1:2
**dock** [1] - 79:6
**docket** [1] - 19:3
**Docket** [5] - 5:8, 5:11, 5:19, 5:21
**doctrine** [1] - 12:5
**documentation** [5] - 23:2, 23:3, 23:22, 24:5, 24:18, 24:20, 26:21, 27:2, 30:18
**documents** [13] - 19:10, 26:6, 30:10, 41:6, 56:23, 57:25, 58:1, 58:2, 82:1, 88:12, 88:20, 89:9, 89:13
**Doe** [2] - 37:5, 80:13
**dollars** [1] - 50:21
**dollars'** [2] - 13:3, 52:1
**domestic** [2] - 87:5, 87:14
**done** [15] - 17:24, 18:11, 19:7, 26:15, 29:24, 30:8, 33:5, 38:6, 47:15, 48:1, 49:5, 54:23, 66:19, 74:12
**door** [3] - 66:8, 66:17, 67:7
**doorkeepers** [1] - 77:18
**dots** [1] - 87:8
**doubt** [1] - 42:5
**Dove** [3] - 2:9, 3:18, 32:14
**DOVE** [17] - 3:18, 32:14, 32:24, 36:15, 36:19, 37:21, 37:24, 39:4, 53:8, 54:8, 55:15, 57:3, 57:18, 85:8, 85:13, 87:24, 93:6
**down** [4] - 27:12, 30:7, 42:17, 64:4
**downtown** [1] - 15:24
**Dr** [2] - 17:9, 40:20
**draw** [6] - 36:20,

36:25, 37:3, 40:2, 57:19, 64:20
**drugs** [1] - 36:9
**dry** [1] - 79:6
**due** [2] - 77:8, 90:25
**Duffy** [2] - 2:6, 3:16
**DUFFY** [1] - 3:16
**during** [2] - 24:3, 62:16
**duty** [1] - 35:2

## E

**ears** [1] - 43:24
**East** [1] - 30:20
**easy** [1] - 80:12
**eat** [2] - 30:5, 55:3
**economic** [8] - 47:24, 48:12, 49:3, 49:23, 51:8, 52:11, 53:2, 90:1
**effect** [3] - 31:4, 70:20, 70:22
**efficient** [1] - 92:23
**either** [17] - 7:8, 7:12, 7:18, 9:10, 11:12, 15:9, 20:13, 23:4, 45:15, 46:4, 58:12, 66:2, 68:3, 78:8, 79:20, 84:19, 88:25
**elected** [3] - 30:4, 30:6, 30:8
**election** [4] - 29:20, 29:25, 30:3, 31:4
**elephant** [1] - 62:19
**ELIOT** [1] - 3:24
**Eliot** [2] - 2:1, 3:24
**Ellison** [4] - 15:20, 47:3, 66:13, 71:21
**elsewhere** [1] - 12:15
**embrace** [1] - 70:23
**employed** [1] - 25:11
**employee's** [1] - 51:12
**employees** [5] - 10:2, 36:3, 36:8, 61:22
**employer** [14] - 32:11, 36:13, 38:19, 41:12, 43:15, 47:23, 49:9, 50:3, 50:18, 51:13, 52:12, 54:1, 55:16, 87:7
**employers** [5] - 51:13, 52:14, 53:5, 55:13, 66:3
**Employers** [1] - 52:25
**employment** [8] - 13:24, 34:6, 38:1, 38:3, 38:4, 49:15, 55:7, 82:12
**enacted** [1] - 52:20

**Enahoro** [4] - 16:16, 71:7, 71:9, 71:17
**encompass** [1] - 65:6
**encompassed** [1] - 34:22
**end** [8] - 33:10, 36:12, 37:15, 53:13, 53:18, 56:3, 61:7, 79:1
**ended** [2] - 61:4, 89:9
**ends** [1] - 33:11
**enforce** [4] - 46:4, 46:11, 50:9, 87:2
**enforcement** [1] - 87:13
**enforcing** [1] - 87:6
**engage** [1] - 67:20
**engaged** [6] - 10:5, 30:8, 58:19, 61:25, 65:5, 74:20
**engages** [1] - 32:9
**engaging** [1] - 25:8
**enter** [2] - 42:15, 68:20
**entered** [1] - 25:4
**entering** [2] - 32:8, 41:10
**entire** [5] - 55:15, 65:1, 65:7, 67:10, 74:24
**entirely** [2] - 59:19, 77:7
**entirety** [2] - 70:12, 88:11
**entities** [1] - 7:15
**entitled** [8] - 19:18, 21:10, 22:2, 23:20, 24:8, 24:12, 80:25, 93:22
**entity** [5] - 7:16, 28:23, 29:2, 29:11, 29:13
**Entries** [2] - 5:8, 5:12
**Entry** [2] - 5:19, 5:21
**enunciated** [1] - 47:24
**epithets** [1] - 43:10
**equate** [1] - 80:14
**equitable** [4] - 17:4, 17:6, 27:8, 31:7
**escape** [2] - 52:25, 79:16
**escaped** [1] - 81:8
**essential** [1] - 12:2
**essentially** [1] - 9:16
**establish** [6] - 8:23, 10:16, 12:11, 12:15, 12:16, 13:11
**established** [1] - 30:2
**establishing** [1] - 7:20
**et** [1] - 74:15
**ET** [2] - 1:3, 1:7

**Europe** [1] - 12:22
**eve** [1] - 53:23
**event** [1] - 33:18
**events** [1] - 17:3
**everywhere** [1] - 55:17
**evidence** [16] - 9:2, 9:4, 9:18, 10:10, 11:13, 20:22, 34:19, 40:9, 43:9, 49:8, 53:15, 53:19, 54:5, 56:2, 86:1, 88:5
**evidentiary** [2] - 22:24, 29:24
**evils** [1] - 52:21
**exact** [2] - 76:9, 84:5, 88:14
**exactly** [5] - 52:22, 59:24, 65:20, 66:1, 66:11, 66:22, 67:5, 72:15, 75:1
**example** [3] - 22:6, 79:11, 80:13
**excellent** [1] - 36:15
**exchange** [2] - 15:1, 43:10
**exchanged** [1] - 26:13
**excluded** [1] - 73:24
**exclusion** [1] - 73:23
**excuse** [1] - 83:10
**executed** [1] - 23:18
**exercise** [1] - 36:19
**exhibit** [6] - 12:20, 13:1, 13:2, 57:18, 76:7, 89:22
**Exhibit** [4] - 17:21, 53:20, 83:10, 83:11
**exhibits** [8] - 10:23, 11:1, 11:9, 11:10, 40:23, 84:15, 92:11, 92:20
**exist** [2] - 20:17, 51:4
**exists** [2] - 7:24, 38:10
**expand** [1] - 42:14
**expanded** [2] - 38:24, 66:17
**expansive** [3] - 51:9, 51:11, 66:19
**expect** [1] - 62:2
**expectation** [1] - 40:8
**expected** [1] - 29:11
**expensive** [3] - 35:14, 35:17
**explain** [1] - 7:8
**explanation** [1] - 62:22
**exploitative** [1] - 53:1
**expose** [2] - 32:10, 35:17
**exposed** [2] - 55:18,

67:12
**express** [1] - 16:7
**expressly** [1] - 16:21
**extent** [2] - 5:1, 14:15
**extra** [1] - 15:18
**extraordinary** [2] - 34:10, 38:9
**extraterritorial** [23] - 6:16, 6:21, 7:14, 7:16, 14:22, 15:2, 15:4, 15:8, 16:10, 16:13, 16:20, 28:14, 66:18, 69:16, 70:4, 70:9, 70:20, 70:22, 73:10, 73:12, 74:1, 74:2, 77:22
**extraterritoriality** [3] - 15:5, 73:8, 86:11
**extraterritorially** [4] - 14:22, 15:19, 15:21, 70:3
**extremely** [1] - 33:2
**eyes** [1] - 43:24

# F

**F-cubed** [2] - 6:11, 14:24
**fabric** [2] - 42:23, 57:11
**face** [1] - 27:15
**facie** [3] - 7:24, 29:23, 30:2
**facilities** [1] - 35:1
**facility** [1] - 43:2
**fact** [41] - 10:16, 11:3, 12:13, 26:14, 35:3, 35:8, 42:1, 42:6, 42:15, 49:18, 53:12, 72:10, 78:21, 90:3
**factor** [2] - 21:7, 22:1
**factories** [1] - 59:11
**factors** [7] - 49:4, 49:14, 49:25, 50:7, 50:17, 90:2
**factory** [9] - 13:25, 33:24, 61:10, 74:14, 74:18, 75:21, 81:18, 82:6, 82:10
**factory-specific** [1] - 75:21
**facts** [30] - 9:20, 13:23, 17:22, 19:9, 22:13, 24:18, 36:16, 39:20, 40:2, 41:22, 41:23, 45:11, 45:17, 45:19, 47:2, 47:14, 50:3, 59:13, 59:15, 65:21, 69:23, 71:8, 71:9, 71:13, 71:22,

78:7, 78:13, 88:8, 92:13
**factual** [12] - 32:20, 33:1, 39:14, 39:23, 40:1, 41:18, 41:19, 46:16, 46:17, 47:11, 87:18, 92:18
**factually** [1] - 17:7
**failed** [2] - 55:22, 60:7
**fails** [2] - 5:17, 18:2
**failure** [1] - 7:18
**fair** [4] - 60:14, 61:5, 90:22, 90:24
**fairly** [2] - 54:12, 62:12
**fall** [1] - 15:17
**false** [4] - 10:5, 17:2, 27:19, 86:16
**familiar** [4] - 8:22, 10:15, 14:23, 69:23
**familiarity** [1] - 37:4
**far** [8] - 8:15, 20:12, 27:6, 27:13, 44:21, 60:15, 64:9, 64:11, 79:13, 81:10, 93:2
**February** [1] - 33:19
**Federal** [1] - 90:13
**federal** [7] - 7:25, 16:12, 48:25, 52:18, 58:10, 71:14, 71:16
**fee** [1] - 52:2
**Felipe** [1] - 1:24
**few** [6] - 53:9, 63:6, 64:1, 67:3, 70:5, 74:4
**field** [1] - 71:6
**Fielding** [1] - 2:1
**Fifth** [18] - 8:22, 10:13, 12:6, 13:9, 22:23, 26:7, 28:22, 30:12, 47:25, 49:22, 52:24, 53:4, 59:6, 73:18, 78:2, 78:4, 78:18, 86:21
**file** [1] - 21:23
**filed** [6] - 5:13, 5:14, 18:23, 19:14, 26:12, 41:7
**filing** [2] - 27:10, 53:23
**fill** [1] - 69:1
**final** [4] - 74:23, 90:7, 91:7, 93:15
**finally** [3] - 7:17, 16:23, 55:19
**financial** [3] - 65:16, 65:18, 66:6
**financially** [2] - 65:3, 67:8
**fine** [5] - 28:17, 32:23,

44:16, 49:21, 58:14
**fingertips** [1] - 69:8
**firm** [1] - 91:16
**firmly** [2] - 34:18, 35:15
**first** [20] - 4:11, 4:16, 4:21, 6:18, 8:5, 8:18, 19:5, 25:16, 34:15, 34:22, 41:14, 49:13, 53:11, 58:22, 63:5, 64:20, 69:20, 74:6, 78:21, 90:12
**fit** [2] - 51:19, 74:2
**five** [1] - 52:1
**fix** [1] - 92:10
**fixed** [1] - 52:2
**floor** [2] - 35:6, 43:12
**FLSA** [2] - 48:22, 48:24
**flummoxed** [1] - 37:13
**focus** [1] - 49:25
**focuses** [1] - 49:3
**focusing** [1] - 48:18
**fold** [1] - 50:22
**folks** [1] - 62:7
**follow** [10] - 16:22, 29:12, 35:18, 36:6, 38:16, 43:6, 46:4, 46:10, 46:11
**following** [2] - 64:11, 90:10
**follows** [1] - 64:24
**food** [1] - 46:25
**Footnote** [1] - 74:8
**footnote** [2] - 52:16, 88:15
**FOR** [1] - 1:1
**force** [1] - 85:25
**forced** [28] - 19:15, 33:3, 33:14, 33:17, 34:9, 34:13, 34:18, 34:20, 35:2, 35:15, 41:4, 51:24, 52:10, 65:25, 66:11, 67:3, 67:4, 70:6, 71:19, 75:4, 75:11, 76:18, 79:11, 85:25, 86:15, 86:18
**foregoing** [1] - 93:21
**foreign** [12] - 6:12, 6:13, 6:14, 9:14, 14:12, 14:13, 14:24, 15:1, 55:16, 73:2, 73:6
**forth** [9] - 22:22, 27:18, 50:4, 65:7, 65:14, 66:9, 66:20, 68:1, 68:2
**fortunate** [1] - 93:17
**forum** [11] - 8:21, 9:1,

9:3, 9:15, 9:16, 9:18, 11:16, 11:17, 12:2, 13:16, 13:19
**forum-related** [1] - 13:16
**forward** [1] - 7:4
**Foster** [3] - 91:15, 91:18, 91:25
**four** [10] - 6:18, 10:23, 11:1, 11:9, 11:10, 24:1, 27:16, 27:20, 89:8
**four-year** [3] - 24:1, 27:16, 27:20
**framed** [1] - 85:16
**frankly** [3] - 9:23, 20:4, 75:6
**fraud** [6] - 18:7, 27:17, 27:20, 31:9, 31:16, 33:6
**fraudulent** [2] - 18:10, 31:11
**Freudensprung** [3] - 28:21, 29:15, 30:16
**Fulbright** [1] - 2:2
**fulfill** [1] - 51:20
**fungible** [1] - 51:3
**furnish** [1] - 77:11
**futile** [1] - 92:25
**future** [1] - 35:20

## G

**gap** [1] - 34:14
**garments** [1] - 76:2
**gate** [1] - 31:17
**gatekeeper** [1] - 31:16
**gathered** [2] - 45:25, 54:3
**gathers** [1] - 56:22
**Ge** [1] - 79:7
**general** [17] - 3:22, 7:22, 8:5, 8:6, 8:10, 8:23, 9:13, 9:21, 10:16, 11:20, 12:16, 12:23, 19:4, 20:12, 22:14, 25:10, 27:5
**generally** [2] - 12:12, 73:21
**generated** [1] - 13:4
**generous** [1] - 17:18
**Gerard** [1] - 2:1
**Gerry** [2] - 4:1, 6:5
**given** [6] - 12:12, 20:7, 35:23, 54:19, 77:23, 79:3
**globally** [1] - 31:19, 31:20
**goods** [4] - 35:4, 36:22, 58:24, 85:18

**Goodyear** [1] - 9:13
**Gordon** [3] - 1:22, 3:9, 91:10
**gosh** [1] - 54:17
**government** [2] - 18:23, 78:12
**grant** [1] - 28:1
**granted** [2] - 5:2, 16:25
**gravely** [1] - 43:14
**great** [2] - 4:3, 77:19
**greater** [1] - 54:14
**ground** [1] - 75:23
**group** [4] - 36:21, 40:12, 63:14, 63:19
**Guatemala** [1] - 74:15
**guess** [7] - 22:7, 22:15, 74:14, 76:12, 76:23, 83:15, 85:11
**Guide** [2] - 50:19, 89:23
**guys** [3] - 25:18, 37:14, 41:3
**guys'** [1] - 41:2

## H

**H-12-CV-282** [1] - 1:5
**haled** [2] - 20:22, 29:13
**hallmarks** [1] - 86:18
**handle** [4] - 6:24, 32:19, 32:20, 58:12
**handled** [1] - 91:18
**handy** [2] - 82:23, 83:7
**happy** [2] - 58:12, 84:23
**Harbor** [2] - 37:6, 50:16
**hard** [1] - 16:17
**hear** [9] - 6:22, 18:14, 47:19, 56:12, 84:24, 85:5, 85:6, 93:17
**heard** [6] - 31:8, 35:24, 38:4, 41:2, 88:3, 92:4
**hearing** [3] - 19:6, 22:24, 29:24
**HEARING** [1] - 1:10
**heightened** [2] - 37:10
**held** [8] - 30:3, 31:4, 78:5, 78:17, 79:13, 80:1, 80:8, 80:13
**Helicopteros** [2] - 11:13, 23:17
**help** [2] - 31:6, 87:9
**helped** [1] - 79:16
**helpful** [5] - 4:25, 58:7, 72:23, 84:11,

85:4
**helps** [1] - 48:23
**HENRY** [28] - 3:5, 28:13, 64:15, 65:20, 67:13, 67:19, 67:23, 67:25, 68:15, 68:23, 69:3, 69:11, 69:15, 69:18, 69:25, 75:17, 75:22, 75:25, 76:8, 76:19, 76:25, 77:7, 82:24, 83:5, 83:9, 83:22, 84:4, 84:9
**Henry** [6] - 1:16, 3:5, 64:16, 74:5, 74:24, 75:15
**Henry's** [1] - 74:10
**herself** [1] - 39:25
**high** [2] - 50:20, 50:24
**higher** [1] - 69:3
**highly** [2] - 50:4, 51:6
**hindsight** [2] - 22:18
**hire** [2] - 43:23, 44:7
**hired** [5] - 44:11, 45:5, 45:9, 45:23, 57:23
**hires** [1] - 84:1
**hiring** [1] - 79:18
**historically** [2] - 87:4, 87:13
**history** [2] - 48:23, 52:19
**hold** [4] - 19:6, 36:7, 78:1, 79:20
**holding** [3] - 22:3, 69:25, 70:23
**home** [4] - 9:16, 9:18, 11:17, 61:11
**Honor** [85] - 6:5, 8:14, 9:22, 18:16, 19:2, 19:21, 20:1, 20:11, 24:6, 25:25, 28:7, 28:13, 29:21, 31:22, 31:25, 32:14, 39:10, 39:12, 45:11, 46:14, 47:17, 47:20, 48:2, 48:11, 48:19, 49:6, 51:20, 51:21, 53:3, 53:8, 53:9, 56:7, 57:7, 58:9, 58:10, 58:15, 59:25, 61:17, 62:13, 62:20, 63:1, 63:5, 64:9, 67:13, 67:25, 69:11, 69:15, 73:1, 74:4, 74:23, 75:2, 75:6, 75:12, 77:12, 77:13, 77:14, 77:25, 80:1, 80:8, 82:24, 83:5, 83:9, 83:13, 84:9, 84:13, 84:20, 85:2, 85:9, 86:8, 87:23, 87:24,

87:25, 89:17, 90:8, 91:10, 91:16, 91:20, 91:22, 91:25, 92:2, 92:4, 92:7, 92:19, 93:9, 93:13
**HONORABLE** [1] - 1:11
**hope** [1] - 93:19
**horrible** [1] - 54:15
**hosted** [1] - 79:15
**hours** [2] - 52:22, 55:2
**housekeeping** [1] - 5:4
**HOUSTON** [1] - 1:2
**Houston** [8] - 1:18, 1:21, 1:24, 2:3, 2:8, 2:11, 2:16, 24:12
**human** [1] - 25:8, 34:19, 34:20, 41:4, 56:1, 57:23, 75:19, 76:1, 76:4, 76:15, 77:4
**Human** [4] - 1:19, 1:23, 91:14, 92:1
**hundreds** [2] - 50:21, 51:2

## I

**idea** [2] - 54:3, 63:15
**ignored** [1] - 64:23
**illegal** [1] - 40:9
**imagine** [1] - 16:18
**implausible** [1] - 55:1
**implementation** [1] - 25:7
**implications** [2] - 33:2, 41:9
**important** [3] - 25:15, 25:21, 60:24
**importantly** [1] - 33:20
**imported** [2] - 10:21, 10:22
**importer** [1] - 37:2
**importers** [1] - 35:11
**importing** [2] - 30:19, 55:15
**imposed** [1] - 82:5
**imposing** [1] - 51:23
**imprisonment** [3] - 10:5, 17:2, 86:17
**impute** [1] - 69:13
**imputed** [1] - 25:22
**IN** [1] - 1:1
**in-depth** [1] - 65:10
**Inc** [2] - 3:15, 28:22
**incarceration** [2] - 78:20, 78:24
**include** [2] - 74:13, 92:14

**included** [5] - 59:17, 62:21, 63:3, 73:24, 75:8
**includes** [1] - 73:19
**including** [2] - 52:21, 86:21
**inclusion** [1] - 73:23
**indefinitely** [1] - 42:14
**indemnify** [1] - 20:21
**indemnity** [1] - 20:17
**independent** [8] - 32:12, 36:4, 36:10, 38:15, 41:24, 42:2, 50:13
**India** [1] - 74:14
**Indian** [2] - 37:6, 50:16
**indicate** [1] - 11:10
**indicated** [2] - 6:25, 87:10
**indicating** [1] - 73:25
**indication** [3] - 15:2, 20:6, 74:18
**indications** [2] - 86:17, 87:18
**indicia** [1] - 89:25
**indirect** [2] - 32:6, 67:21
**indisputable** [1] - 47:11
**individuals** [1] - 13:24
**indulge** [2] - 90:10, 91:6
**inexpensive** [1] - 67:22
**inference** [1] - 40:3
**inform** [1] - 79:8
**information** [20] - 23:1, 23:4, 23:21, 24:9, 24:20, 25:24, 26:13, 26:17, 27:15, 27:23, 27:24, 29:19, 44:15, 45:1, 45:24, 54:3, 56:21, 57:13, 68:10, 80:23
**initial** [2] - 6:8, 31:17
**injured** [1] - 43:14
**injuring** [1] - 36:2
**inspect** [1] - 42:20
**inspections** [1] - 35:1
**instance** [3] - 23:8, 26:15, 53:20
**instances** [1] - 77:5
**instructions** [1] - 81:3
**instructive** [1] - 80:24
**insufficient** [4] - 12:8, 13:11, 14:18, 31:21
**intended** [2] - 66:21, 72:14
**intent** [3] - 70:2,

70:24, 70:25
**intentionally** [1] - 73:22
**interest** [2] - 63:19, 91:13
**interesting** [4] - 4:4, 44:18, 44:22, 78:13
**interestingly** [1] - 63:8
**International** [2] - 80:15, 81:7
**international** [16] - 20:20, 21:24, 71:12, 80:6, 80:10, 80:11, 80:17, 80:20, 81:12, 83:19, 86:20, 86:24, 87:3, 87:11, 87:12
**Internet** [1] - 23:3
**interpretation** [2] - 58:6, 69:19
**introductory** [1] - 70:14
**invite** [1] - 62:2
**inviting** [1] - 36:21
**involved** [5] - 10:5, 28:23, 28:24, 34:9, 34:13
**involvement** [3] - 34:12, 53:15, 53:25
**involves** [2] - 6:11, 49:24
**involving** [2] - 13:23, 38:14
**Iqbal** [1] - 47:5
**irrelevant** [3] - 12:12, 40:17, 47:5
**issue** [31] - 4:10, 4:14, 5:24, 6:17, 8:12, 11:3, 16:4, 16:6, 18:20, 22:13, 22:16, 25:1, 28:10, 28:15, 32:19, 41:17, 47:20, 47:23, 49:8, 52:7, 52:15, 58:11, 65:1, 69:16, 81:6, 81:11, 89:20, 90:7, 90:25, 92:5
**issued** [1] - 80:16
**issues** [26] - 4:4, 4:7, 6:15, 7:2, 7:4, 7:21, 8:3, 13:23, 17:16, 17:17, 22:17, 23:8, 23:10, 29:16, 30:24, 31:24, 32:2, 32:5, 41:19, 56:5, 64:14, 72:24, 85:1, 91:4, 93:18
**it'** [1] - 20:21
**it...** [1] - 21:25
**items** [1] - 57:4
**itself** [5] - 25:11,

29:12, 35:13, 40:22, 80:14

## J

**Jacinto** [1] - 1:20
**Jackson** [3] - 1:16, 10:14, 12:7
**janet** [1] - 3:20
**Janet** [1] - 2:9
**January** [1] - 17:4
**Jaworski** [1] - 2:2
**Jiyoung** [2] - 1:19, 3:10
**job** [3] - 46:22, 51:2, 84:25
**joint** [17] - 32:11, 34:6, 36:13, 38:4, 41:12, 43:15, 47:23, 49:9, 49:15, 52:12, 52:13, 53:5, 55:6, 55:13, 55:16, 66:2, 87:6
**Jordan** [12] - 2:1, 6:9, 10:4, 13:25, 18:3, 18:22, 25:20, 33:7, 46:22, 59:22, 63:15, 76:1
**JORDAN** [1] - 1:6
**Jordanian** [2] - 13:25, 69:1
**Joyce** [1] - 1:22
**Judge** [38] - 15:20, 19:13, 20:2, 20:9, 21:2, 21:8, 21:18, 22:1, 23:13, 24:3, 24:17, 24:24, 25:15, 26:3, 26:10, 26:19, 27:2, 27:6, 27:11, 27:21, 28:4, 28:21, 40:7, 40:10, 41:1, 41:22, 42:10, 44:23, 45:14, 47:3, 56:19, 56:25, 66:13, 71:21, 81:23, 82:2, 82:16, 88:23
**judge** [3] - 18:18, 22:18, 47:13
**judgment** [1] - 79:6
**judicial** [1] - 17:12
**July** [1] - 26:20
**June** [1] - 1:6
**jurisdiction** [43] - 5:20, 5:24, 6:15, 6:19, 7:21, 7:22, 7:24, 8:5, 8:6, 8:11, 8:24, 9:13, 9:21, 10:16, 11:15, 11:20, 12:3, 12:17, 12:23, 12:24, 13:14, 13:17, 14:15, 15:8, 18:20,

21:1, 21:17, 22:11, 22:14, 23:10, 25:2, 25:3, 25:9, 25:10, 28:18, 29:1, 29:4, 30:17, 30:23, 30:24, 31:24, 70:15, 77:15
**jurisdictional** [2] - 8:12, 19:4
**jurisdictions"** [1] - 70:15

## K

**Katy** [2] - 2:13, 27:3
**KBR** [4] - 15:23, 59:17, 59:18, 65:24
**keep** [4] - 35:8, 57:21, 58:1, 77:18
**keeping** [1] - 79:17
**Kelley** [1] - 2:14
**kept** [3] - 36:23, 56:23, 57:10
**key** [1] - 64:25
**killing** [1] - 16:20
**kind** [13] - 14:15, 37:9, 38:20, 40:11, 41:11, 45:25, 49:9, 62:1, 62:3, 63:6, 79:9, 88:5
**kinds** [6] - 24:12, 32:12, 36:7, 36:9, 37:1, 79:8
**Kiobel** [1] - 16:5
**knowing** [1] - 34:8
**knowingly** [1] - 65:2
**knowledge** [26] - 6:10, 19:9, 25:21, 25:22, 34:12, 37:10, 40:14, 40:17, 41:14, 41:15, 54:14, 54:21, 60:15, 61:24, 63:4, 63:16, 64:7, 65:24, 66:4, 68:19, 68:21, 76:21, 76:22, 76:23, 76:25
**known** [22] - 34:9, 43:5, 45:16, 45:18, 45:21, 58:19, 60:8, 60:13, 61:15, 61:24, 62:18, 65:5, 65:10, 66:4, 68:10, 74:12, 74:22, 76:3, 76:16, 78:25, 91:19, 91:20
**known"** [2] - 60:11, 63:4
**knows** [8] - 7:20, 8:24, 11:19, 18:8, 39:19, 58:16, 81:7, 81:9
**KROPF** [19] - 3:14, 58:9, 58:15, 60:14, 62:9, 62:11, 74:4,

77:12, 80:4, 82:4, 83:13, 84:13, 85:2, 87:23, 92:4, 92:7, 92:17, 93:2, 93:13
**Kropf** [5] - 2:4, 3:14, 32:17, 32:20, 37:16

## L

**label** [1] - 57:12
**Labor** [4] - 66:20, 69:4, 74:19, 75:17
**labor** [36] - 33:3, 33:14, 33:16, 33:17, 33:22, 34:9, 34:13, 34:19, 34:20, 35:3, 35:15, 41:4, 51:24, 52:10, 52:21, 53:14, 53:18, 55:10, 65:25, 66:11, 67:3, 67:4, 70:6, 71:20, 75:4, 76:18, 79:11, 83:22, 84:3, 86:1, 86:15, 86:16, 86:18, 86:19
**labor"** [1] - 75:11
**land** [1] - 11:21
**language** [7] - 64:25, 66:10, 69:20, 70:13, 70:20, 70:25, 73:20
**Lapidus** [5] - 1:15, 1:16, 3:12, 18:18, 81:16
**LAPIDUS** [25] - 3:12, 8:13, 8:17, 18:16, 18:18, 20:2, 20:9, 20:11, 21:2, 21:8, 21:18, 22:18, 23:13, 23:15, 24:17, 24:24, 26:10, 26:19, 28:4, 28:7, 31:25, 81:23, 82:2, 82:16, 82:18
**large** [2] - 4:17, 12:13
**last** [2] - 46:14, 61:8
**law** [38] - 5:18, 7:17, 8:2, 16:12, 16:19, 16:23, 20:16, 21:19, 22:23, 23:18, 23:19, 27:6, 38:21, 47:19, 48:17, 49:10, 49:15, 51:10, 51:11, 52:13, 53:4, 69:12, 80:6, 80:8, 80:10, 80:12, 80:17, 80:21, 81:11, 81:12, 83:18, 83:19, 84:17, 87:13, 87:14
**Law** [4] - 1:19, 16:7, 80:15, 81:7
**lawful** [1] - 15:10
**laws** [1] - 87:5
**lawsuit** [4] - 17:3, 29:14, 35:14, 53:23

**lawsuits** [1] - 27:10
**Lawyers** [3] - 1:23, 91:14, 92:1
**lawyers** [3] - 38:1, 38:3
**lead** [3] - 9:20, 47:4, 51:24
**leased** [2] - 9:6, 11:21
**least** [4] - 27:21, 59:7, 81:11, 82:19
**leave** [3] - 19:3, 75:16, 90:21
**led** [1] - 48:10
**LEE** [1] - 1:11
**left** [2] - 52:3, 74:25
**legal** [7] - 17:14, 17:15, 41:20, 45:4, 45:8, 45:10, 68:17
**legislative** [2] - 48:23, 52:19
**length** [2] - 36:23, 50:11
**LESLi** [1] - 83:2
**less** [2] - 24:2, 32:3
**letter** [11] - 22:22, 40:20, 40:22, 53:13, 62:20, 63:5, 63:9, 63:12, 63:19, 63:24, 64:6
**letters** [4] - 40:22, 40:23, 40:25, 56:13
**level** [6] - 34:10, 34:11, 38:18, 48:21, 50:20, 50:24
**liability** [20] - 32:11, 36:19, 37:5, 38:24, 43:1, 43:4, 45:6, 46:6, 52:25, 58:16, 58:17, 59:5, 62:3, 65:8, 66:17, 69:13, 70:7, 79:23, 80:6, 86:12
**liable** [12] - 34:9, 36:1, 37:11, 43:14, 44:3, 44:11, 51:13, 58:25, 75:3, 78:1, 79:13, 79:20
**Licea** [2] - 79:5, 79:11
**lied** [1] - 33:22
**life** [1] - 17:14
**light** [2] - 4:7, 71:17
**limit** [1] - 83:21
**limitation** [1] - 28:2
**limitations** [7] - 7:18, 16:24, 17:1, 17:18, 27:8, 27:17, 27:20
**limited** [1] - 25:1
**limits** [1] - 15:5
**line** [1] - 79:21
**linking** [1] - 87:8

**list** [10] - 51:20, 74:11, 74:17, 74:18, 75:19, 76:14, 76:23, 76:25, 77:1, 86:24
**listed** [1] - 77:4
**lists** [1] - 75:19
**literally** [1] - 89:7
**litigation** [3] - 39:17, 88:6, 88:7
**lived** [1] - 61:4
**livelihood** [1] - 50:5
**lives** [2] - 50:6, 85:20
**living** [1] - 46:25
**LLC** [2] - 2:5, 11:20
**LLP** [5] - 2:2, 2:4, 2:7, 2:10, 2:15
**local** [1] - 87:13
**located** [3] - 15:23, 28:23, 28:25
**Locke** [1] - 2:10
**locked** [5] - 33:24, 62:7, 63:10, 78:12, 78:15
**look** [21] - 11:10, 12:20, 13:17, 17:21, 31:9, 35:22, 42:11, 48:23, 57:14, 57:18, 60:15, 61:23, 70:13, 70:21, 73:3, 73:7, 76:6, 84:15, 85:17, 88:16, 90:2
**looked** [6] - 38:8, 64:4, 80:11, 88:10, 88:11
**looking** [7] - 36:12, 50:19, 70:19, 83:14, 83:15, 83:18
**looks** [1] - 11:2
**Lord** [1] - 2:10
**Louisiana** [2] - 2:7, 2:15
**love** [1] - 51:2
**low** [3] - 52:21, 65:19, 86:1
**Ltd** [1] - 2:9

## M

**ma'am** [9] - 4:23, 8:17, 41:13, 42:5, 44:1, 44:18, 45:22, 88:18, 89:19
**Magnifico** [1] - 72:6
**mail** [1] - 11:22, 63:25
**main** [1] - 36:20
**maintain** [1] - 50:8
**major** [1] - 63:13
**managerial** [1] - 38:18
**manufactured** [2] - 14:4, 76:17

**manufacturer** [3] - 35:8, 57:21, 76:15
**manufacturer's** [1] - 57:3
**manufacturers** [1] - 77:6
**manufacturing** [2] - 42:13, 43:1
**March** [11] - 17:3, 17:8, 17:10, 17:24, 17:25, 33:19, 40:19, 61:2, 61:4, 63:24
**marijuana** [1] - 43:8
**Mark** [4] - 1:15, 3:3, 18:18, 39:13
**mark** [2] - 1:15, 3:12
**Mart** [2] - 37:5, 48:6
**Mason** [1] - 2:13
**masters** [1] - 51:14
**material** [1] - 82:11
**materials** [3] - 34:23, 35:23, 52:2
**matter** [4] - 5:17, 9:9, 56:11, 93:22
**matters** [1] - 88:21
**Mayer** [1] - 2:15
**McKinney** [1] - 2:2
**mean** [12] - 12:5, 20:15, 24:2, 25:20, 35:19, 41:8, 42:14, 43:14, 46:5, 51:21, 67:16, 67:17, 76:16, 91:21
**meaning** [1] - 81:2
**means** [5] - 35:2, 37:10, 44:9, 61:24, 67:14
**meant** [1] - 31:15
**mechanical** [1] - 2:24
**media** [3] - 68:11, 68:22, 69:3
**Medical** [1] - 73:18
**meet** [5] - 42:18, 47:12, 61:12, 63:3, 74:21
**meetings** [1] - 36:8
**meets** [1] - 74:11
**member** [2] - 91:14, 92:1
**members** [2] - 11:23, 79:15
**mention** [4] - 4:19, 24:15, 52:16, 73:7
**mentioned** [1] - 24:17
**mercy** [1] - 50:15
**mere** [2] - 90:15, 90:16
**merger** [1] - 91:18
**met** [1] - 58:20
**Mexico** [1] - 74:15

**mic** [1] - 56:12
**microphone** [1] - 86:7
**Middle** [1] - 30:20
**middle** [1] - 61:7
**might** [7] - 7:9, 9:20, 12:5, 20:3, 22:9, 62:5, 62:13
**Militello** [2] - 2:9, 3:20
**MILITELLO** [1] - 3:20
**million** [3] - 12:19, 12:21, 13:2
**mind** [2] - 38:11, 46:15
**mind-boggling** [1] - 38:11
**minimal** [2] - 79:14, 79:19
**minimum** [4] - 8:1, 23:8, 24:13, 25:1
**minute** [5] - 12:25, 41:3, 45:1, 50:21, 88:1
**minutely** [1] - 54:23
**minutia** [1] - 50:23
**misled** [2] - 31:14, 46:22
**Miss** [4] - 32:17, 32:20, 37:16, 75:15
**modest** [1] - 77:15
**moment** [3] - 35:21, 45:7, 48:14
**monetary** [1] - 89:23
**money** [1] - 78:14
**month** [1] - 63:10
**months** [1] - 59:16
**moot** [2] - 5:5, 5:10
**Morrison** [8] - 14:23, 15:22, 66:14, 69:21, 69:22, 69:25, 70:23, 73:10
**most** [8] - 4:11, 32:4, 32:16, 32:25, 33:20, 47:18, 63:8, 78:3
**Most** [1] - 22:4
**mostly** [1] - 88:4
**motion** [20] - 5:2, 5:19, 5:21, 6:4, 7:21, 14:14, 17:22, 22:7, 22:16, 24:22, 28:1, 34:22, 39:21, 53:21, 79:9, 82:20, 85:25, 89:1, 89:3, 92:9
**motions** [8] - 4:18, 5:4, 5:7, 5:9, 5:11, 5:13, 26:11, 47:22
**movant** [1] - 15:23
**move** [2] - 49:14, 56:6
**moved** [1] - 55:11
**moving** [1] - 58:15
**Mukasey** [1] - 73:19

**multinational** [2] - 20:15, 63:13
**must** [6] - 8:25, 34:2, 57:25, 70:12, 81:5, 85:20

## N

**name** [7] - 3:3, 3:5, 18:18, 32:14, 64:15, 88:14
**named** [1] - 64:18
**names** [1] - 83:11
**naomi** [1] - 3:10
**Naomi** [2] - 1:19, 1:22
**narrow** [2] - 33:2, 88:20
**narrower** [1] - 33:3
**national** [3] - 15:10, 73:14, 78:10
**nations** [1] - 86:12
**Nations** [1] - 16:8
**nature** [3] - 12:2, 34:3, 90:3
**necessarily** [1] - 34:3
**necessary** [1] - 17:23
**need** [9] - 20:3, 26:16, 29:19, 42:17, 51:4, 57:21, 71:24, 77:22, 86:7
**needed** [1] - 81:16
**needs** [2] - 13:15, 31:4
**negative** [1] - 38:21
**negligence** [1] - 17:1
**negotiate** [2] - 24:10, 25:17
**negotiated** [1] - 90:4
**negotiation** [1] - 50:11
**Nestle** [1] - 80:13
**network** [1] - 68:7
**never** [14] - 14:17, 30:24, 34:23, 38:4, 38:6, 38:9, 45:24, 53:22, 53:24, 54:2, 54:17, 56:24, 57:1, 57:14
**new** [4] - 34:23, 70:3, 92:13, 92:14
**New** [1] - 72:1
**news** [3] - 68:11, 68:22, 68:25
**next** [3] - 4:6, 39:16, 58:4
**Nguyen** [2] - 2:15, 17:9, 17:15
**nice** [1] - 22:21
**Nigeria** [2] - 28:24, 29:2
**Nigerian** [1] - 29:1
**NLRA** [1] - 48:24

**NO** [1] - 1:5
**non** [1] - 39:23
**non-conclusory** [1] - 39:23
**none** [7] - 11:10, 11:24, 13:21, 14:8, 15:3, 33:20, 54:20
**norm** [3] - 71:12, 86:20, 87:4
**norms** [4] - 20:20, 21:24, 46:3, 87:3
**notebooks** [1] - 89:8
**noted** [1] - 71:22
**nothing** [12] - 14:10, 17:20, 34:5, 38:7, 52:18, 53:14, 55:3, 60:21, 81:24, 83:13, 84:18, 85:22
**notice** [20] - 17:12, 41:4, 53:12, 53:17, 60:17, 60:19, 60:22, 60:23, 61:2, 61:5, 61:6, 61:8, 61:9, 63:20, 68:11, 68:12, 77:1, 89:13, 91:2
**nowhere** [2] - 24:15, 63:9
**number** [5] - 4:4, 17:7, 24:9, 32:13, 43:11
**numbers** [3] - 23:23, 82:22, 85:12
**NW** [1] - 2:5

## O

**obligation** [2] - 45:8, 83:18
**obligations** [1] - 21:15
**observation** [1] - 6:9
**obtain** [1] - 23:15
**obtained** [1] - 23:3
**obtaining** [1] - 76:9
**obviously** [6] - 6:15, 7:13, 7:23, 22:5, 48:10, 76:7, 80:20, 88:3, 91:20
**occasions** [1] - 66:1
**occupies** [1] - 71:6
**occur** [1] - 51:18
**occurred** [4] - 14:12, 17:3, 36:16, 75:20
**occurring** [1] - 6:14
**odd** [1] - 60:24
**OF** [1] - 1:1
**offender** [4] - 15:9, 15:12, 73:14, 73:16
**offered** [2] - 92:12, 92:17
**office** [1] - 9:4
**offshore** [1] - 28:22

**often** [2] - 26:23, 89:2
**old** [1] - 91:17
**omits** [1] - 73:20
**onboard** [1] - 44:9
**once** [3] - 24:4, 90:19, 92:8
**One** [1] - 5:15
**one** [44] - 5:23, 6:2, 7:6, 12:18, 16:4, 21:9, 24:7, 26:3, 26:14, 27:9, 27:21, 29:21, 33:16, 33:21, 37:21, 38:13, 40:8, 42:14, 43:7, 48:8, 49:4, 55:10, 55:23, 70:5, 71:5, 71:6, 71:24, 73:17, 73:20, 73:24, 77:21, 79:24, 86:15, 88:1, 88:10, 89:20, 90:7, 91:7, 92:5, 92:9, 93:15
**one-time** [2] - 33:16, 33:21
**ones** [6] - 5:8, 33:23, 33:24, 33:25, 55:1, 92:15
**ongoing** [1] - 33:18
**open** [2] - 4:6, 35:13
**opened** [2] - 66:17, 67:7
**opens** [1] - 66:8
**operated** [1] - 81:18
**operates** [1] - 15:5
**operation** [3] - 35:18, 81:6, 81:8
**operations** [1] - 84:18
**operative** [1] - 5:6
**opinion** [1] - 66:14
**opportunity** [9] - 14:16, 23:11, 25:14, 25:25, 26:17, 89:11, 91:4, 92:10, 92:11
**opposed** [2] - 25:10, 35:15
**opposition** [8] - 59:16, 81:17, 82:8, 83:1, 84:6, 89:2, 91:2, 92:16
**order** [4] - 51:5, 58:4, 58:12, 71:11
**orders** [2] - 35:3, 81:19
**ordinary** [1] - 33:14, 35:11, 37:8
**organizational** [1] - 5:22
**organize** [1] - 32:18
**otherwise** [1] - 37:13
**OTSI** [3] - 28:24, 29:3, 29:12

**ought** [2] - 4:7, 6:23
**ourselves** [1] - 35:17
**Outdoors** [6] - 2:10, 2:12, 3:19, 3:21, 3:23, 32:15
**output** [1] - 45:2
**outside** [1] - 88:21
**overcome** [1] - 30:24
**overlap** [1] - 4:15
**overly** [1] - 37:7
**overseas** [6] - 11:5, 14:5, 14:12, 58:25, 59:11, 70:17
**owed** [1] - 78:14
**own** [6] - 9:6, 46:4, 46:11, 47:25, 61:21
**owned** [1] - 11:21
**owner** [2] - 36:1, 36:12
**owner's** [1] - 38:16
**owners** [1] - 36:3

**P**

**Page** [6] - 40:24, 46:18, 56:20, 83:10, 84:8
**Pages** [2] - 83:9, 84:10
**paid** [3] - 33:25, 45:2, 46:24
**Panjwani** [1] - 1:23, 3:7
**PANJWANI** [7] - 3:7, 86:6, 86:8, 86:10, 86:24, 87:10, 87:17
**papers** [4] - 84:23, 84:25, 86:11, 86:25
**paperwork** [1] - 35:9, 36:7
**paragraph** [2] - 18:2, 88:10
**parent** [1] - 10:6
**parenthetical** [1] - 64:23
**part** [11] - 10:24, 10:25, 18:22, 18:23, 21:25, 56:6, 63:18, 69:5, 70:3, 78:20, 82:18
**participant** [1] - 34:8
**participate** [2] - 59:1, 68:3
**participated** [1] - 58:18
**participating** [3] - 34:13, 76:19, 76:22
**participation** [10] - 58:23, 59:3, 59:7, 64:24, 65:4, 75:9,

76:12, 76:20, 76:21, 79:12
**participation"** [2] - 75:1, 75:5
**particular** [3] - 16:10, 27:11, 73:20
**particularly** [2] - 28:10, 64:23
**particulars** [1] - 68:8
**parties** [7] - 14:13, 21:11, 30:16, 32:13, 36:2, 80:6, 93:4
**partners** [1] - 26:22
**partnership** [1] - 51:16
**party** [18] - 4:14, 5:23, 18:5, 18:6, 20:8, 32:10, 34:25, 41:24, 42:2, 49:4, 57:22, 62:23, 68:4, 81:2, 87:21
**passports** [1] - 46:21
**past** [1] - 82:20
**pattern** [1] - 49:18
**pay** [2] - 9:9, 33:8
**paycheck** [1] - 33:23
**PC** [1] - 1:17
**Pecht** [8] - 2:1, 4:1, 6:4, 6:5, 12:25, 28:9, 69:18, 72:25
**pecht** [1] - 28:13
**PECHT** [17] - 4:1, 6:5, 7:1, 7:6, 7:12, 8:20, 9:22, 13:6, 14:19, 14:21, 19:25, 28:19, 29:20, 31:20, 73:1, 73:6, 93:9
**penalties** [1] - 89:23
**pending** [2] - 4:5, 23:11
**Pennsylvania** [1] - 2:5
**people** [7] - 24:10, 35:6, 38:14, 69:6, 76:17, 77:1, 93:15
**People** [4] - 17:10, 17:13, 40:20, 53:13
**people's** [1] - 36:3
**per** [1] - 45:3
**percentage** [2] - 12:11, 12:13
**perfect** [1] - 22:6
**perform** [2] - 21:21, 35:1
**performs** [1] - 56:25
**perhaps** [4] - 32:4, 64:12, 68:9, 87:9
**period** [5] - 13:4, 24:1, 24:4, 61:4, 62:16
**peripheral** [1] - 81:8
**permanent** [3] - 15:11,

53:1, 73:15
**permit** [1] - 26:4
**permits** [1] - 50:12
**permitted** [2] - 23:15, 24:25
**perpetrator** [1] - 65:2
**person** [5] - 43:19, 58:18, 68:4, 76:8, 81:2
**person...should** [1] - 65:4
**personal** [8] - 5:20, 5:24, 6:15, 6:19, 7:20, 20:25, 22:11, 29:1
**personally** [2] - 38:13, 58:25
**personnel** [1] - 79:18
**persons** [1] - 19:8
**persuade** [1] - 56:1
**pertain** [1] - 21:16
**pertained** [1] - 65:24
**Peruvian** [1] - 23:19
**Pharmacy** [1] - 73:19
**Philippines** [1] - 74:15
**picking** [1] - 4:19
**piecemeal** [1] - 88:10
**Pilgrim** [8] - 47:25, 48:2, 49:13, 49:22, 50:7, 51:21, 52:12, 52:24
**place** [1] - 85:19
**placed** [1] - 82:22
**placing** [2] - 19:16, 63:20
**Plaintiff** [4] - 7:23, 13:14, 58:19, 79:22
**plaintiff** [2] - 29:2, 31:14
**plaintiff's** [2] - 47:4, 89:2
**plaintiffs** [2] - 6:13, 72:12
**Plaintiffs** [39] - 1:4, 1:15, 3:4, 3:6, 3:8, 3:9, 3:11, 3:12, 7:17, 8:6, 8:9, 9:1, 16:11, 17:22, 18:3, 18:19, 27:10, 28:16, 30:14, 37:19, 39:3, 39:13, 47:7, 47:12, 58:15, 59:10, 59:21, 62:24, 64:12, 64:17, 65:25, 67:2, 67:7, 67:10, 71:3, 72:18, 78:7, 84:14, 85:7
**Plaintiffs'** [12] - 4:17, 33:1, 39:15, 46:16, 60:6, 60:9, 65:12, 66:23, 70:1, 71:19,

78:22, 82:11
**plant** [1] - 44:3
**plants** [1] - 69:1
**plausible** [5] - 46:19, 47:7, 47:14, 71:22, 88:8
**play** [1] - 4:17
**played** [1] - 78:20
**plead** [1] - 31:19
**pleaded** [2] - 32:8, 37:9
**pleading** [4] - 5:6, 5:16, 47:6, 88:24
**pleadings** [7] - 5:15, 12:18, 19:13, 22:4, 29:22, 54:4, 88:22
**pled** [1] - 31:20
**plenty** [1] - 4:8
**point** [26] - 6:22, 11:16, 12:18, 12:19, 12:22, 20:2, 20:10, 35:3, 35:7, 41:1, 45:22, 57:16, 62:15, 71:24, 74:23, 75:15, 76:13, 77:11, 78:25, 79:25, 82:24, 87:15, 90:22, 90:24, 91:7, 92:7
**pointed** [3] - 34:21, 49:11, 75:6
**pointing** [2] - 6:7, 32:24
**points** [1] - 56:9
**policies** [22] - 42:1, 46:1, 46:4, 46:7, 46:9, 46:11, 50:20, 59:23, 59:24, 61:16, 61:19, 61:20, 61:21, 61:22, 61:23, 62:2, 62:3, 81:21, 81:22, 82:14
**policy** [3] - 38:22, 41:9, 77:1
**ports** [1] - 38:25
**position** [8] - 4:8, 38:22, 41:9, 44:10, 65:12, 66:23, 73:5, 93:12
**possibilities** [1] - 43:11
**possible** [2] - 62:1, 91:13
**possibly** [3] - 38:2, 55:8, 75:24
**posture** [1] - 35:24
**potential** [1] - 64:18
**power** [1] - 37:11
**PowerPoint** [2] - 57:19, 58:5
**practices** [2] - 61:25,

68:13
**pre** [2] - 66:14, 66:15
**pre-Morrison** [1] - 66:14
**precise** [2] - 40:16, 40:18
**precisely** [3] - 36:25, 60:24, 78:22
**precluded** [1] - 27:13
**predicate** [4] - 66:9, 69:12, 70:7, 71:2
**predicates** [1] - 65:8
**preempted** [1] - 7:7
**preempts** [1] - 71:6
**preference** [1] - 93:3
**prejudice** [1] - 91:3
**premature** [3] - 22:5, 22:10, 26:16
**premises** [7] - 36:1, 36:2, 36:3, 36:5, 36:12, 37:4, 38:16
**presence** [6] - 9:1, 9:2, 9:10, 11:16, 13:11, 13:13
**present** [6] - 10:10, 11:24, 13:12, 15:12, 15:13, 73:16
**presentation** [1] - 57:19
**presented** [5] - 9:2, 9:18, 35:24, 82:1, 93:18
**press** [1] - 55:6
**pressure** [1] - 55:21
**presumed** [1] - 73:22
**presumption** [1] - 15:5
**pretty** [5] - 42:7, 42:9, 43:16, 51:11, 70:17
**prevent** [3] - 35:2, 59:25, 62:1
**preventing** [1] - 17:20
**previously** [3] - 34:23, 66:25, 91:18
**Price** [1] - 78:10
**price** [10] - 51:23, 52:8, 82:5, 82:15, 82:22, 83:16, 83:21, 85:12, 85:14, 89:21
**prices** [3] - 50:8, 51:22, 86:1
**prima** [3] - 7:24, 29:23, 30:2
**primarily** [1] - 81:25
**primary** [4] - 49:4, 58:21, 77:25, 81:11
**principal** [5] - 32:12, 36:11, 43:16, 49:10, 54:1
**principles** [1] - 18:8

**private** [1] - 80:21
**probability** [1] - 47:7
**problem** [2] - 31:18, 57:15
**problems** [1] - 74:19
**procedural** [2] - 35:23, 69:24
**Procedure** [1] - 90:13
**procedures** [1] - 42:1
**proceed** [12] - 4:7, 37:13, 39:8, 71:5, 71:20, 72:2, 72:10, 72:17, 77:19, 85:5, 91:4, 92:24
**proceeding** [4] - 9:24, 31:16, 32:4, 89:24
**Proceedings** [1] - 2:24
**proceedings** [1] - 93:22
**process** [9] - 18:24, 26:11, 26:12, 35:14, 35:17, 50:1, 67:22, 90:25
**processing** [1] - 64:3
**produce** [2] - 52:1, 76:21
**produced** [2] - 2:24, 35:5
**produces** [1] - 67:22
**producing** [1] - 68:13
**product** [13] - 10:9, 10:10, 10:11, 10:17, 12:5, 12:13, 12:14, 14:4, 14:5, 14:7, 25:6, 30:19, 55:1
**production** [2] - 45:3, 50:24
**products** [6] - 10:12, 11:3, 11:5, 14:1, 68:12
**profit** [1] - 52:4
**prohibited** [1] - 27:10
**prolonged** [2] - 71:10, 84:22
**promised** [2] - 33:9, 47:1
**proof** [2] - 7:23, 88:5
**proper** [1] - 42:24
**properly** [1] - 65:12
**property** [2] - 9:6, 9:7
**proposed** [1] - 93:6
**proposition** [1] - 45:5
**prospective** [1] - 87:4
**prove** [1] - 55:23
**proven** [1] - 47:4
**provide** [7] - 19:10, 25:9, 53:17, 57:25, 58:2, 72:19, 86:22
**provided** [9] - 16:21,

23:22, 24:5, 24:19, 26:21, 64:19, 65:17, 72:7, 88:12
**provides** [6] - 15:4, 15:8, 18:8, 66:24, 68:22, 70:15
**providing** [1] - 47:10
**provision** [9] - 15:6, 15:7, 20:18, 21:9, 29:7, 34:7, 59:5, 73:8, 73:13
**provisions** [4] - 20:16, 21:14, 21:18, 23:19
**public** [1] - 55:15
**published** [2] - 69:4, 83:2
**publishes** [1] - 83:23, 84:2, 84:5
**puddle** [1] - 43:12
**pull** [1] - 56:12
**punished** [1] - 33:10
**purchase** [1] - 35:3
**purchased** [1] - 30:20
**purchases** [1] - 11:13
**purchasing** [1] - 36:22
**purely** [1] - 85:17
**purportedly** [1] - 31:12
**purpose** [3] - 43:25, 53:2, 67:17
**purposely** [1] - 73:22
**purposes** [3] - 5:22, 19:4, 59:4
**pursuing** [1] - 67:14
**put** [16] - 10:17, 11:4, 12:13, 22:19, 35:6, 35:21, 41:3, 42:19, 53:20, 55:21, 66:20, 68:11, 69:6, 77:1, 85:19, 92:20
**putting** [2] - 12:5, 13:3, 63:12, 82:25
**puzzled** [1] - 76:12
**PWC** [3] - 78:11, 78:14, 78:15

**Q**

**qualify** [1] - 38:19
**Quan** [5] - 1:22, 3:9, 91:8, 91:11, 91:15
**QUAN** [4] - 3:9, 91:10, 91:22, 91:24
**Quan's** [1] - 91:25
**quantity** [2] - 82:15, 84:5
**quasi** [1] - 32:12
**quasi-independent** [1] - 32:12
**questions** [7] - 4:5,

18:12, 37:17, 61:18, 64:10, 75:12, 85:3
**quick** [2] - 45:22, 56:9
**quite** [1] - 53:22
**quote** [8] - 56:23, 59:18, 74:24, 78:20, 81:19, 82:5, 82:9, 82:10
**quote-unquote** [1] - 59:18
**quotes** [1] - 66:10

**R**

**racial** [1] - 43:9
**racially** [1] - 43:10
**raise** [1] - 7:3
**raised** [8] - 5:24, 6:2, 28:2, 35:25, 38:10, 38:23, 41:12, 91:1
**raises** [3] - 4:18, 6:14, 40:8
**rather** [1] - 80:21
**raw** [1] - 52:2
**reach** [2] - 34:4, 34:24
**reached** [1] - 60:8
**reaches** [1] - 62:18
**reaction** [1] - 33:15
**read** [18] - 19:13, 37:25, 38:2, 38:3, 61:7, 61:8, 61:20, 63:5, 64:4, 68:6, 70:12, 73:11, 75:9, 75:10, 84:15, 85:25
**reading** [2] - 19:16, 33:4
**reads** [1] - 65:1
**real** [1] - 31:18
**realities** [3] - 49:3, 49:24, 51:8
**reality** [4] - 47:24, 48:12, 52:11, 90:1
**really** [17] - 13:12, 28:21, 31:3, 35:13, 42:18, 44:12, 45:24, 49:23, 50:11, 50:13, 51:9, 52:17, 62:22, 83:18, 85:14, 90:19, 92:18
**reason** [8] - 19:3, 41:13, 45:14, 55:20, 55:23, 60:6, 75:2, 92:12
**reasonable** [2] - 40:3, 40:8
**reasonably** [1] - 29:13
**reasoning** [4] - 37:8, 72:6, 72:7, 72:16
**reasons** [2] - 17:7, 58:21, 90:10

**recast** [1] - 72:18
**receive** [1] - 58:24
**received** [10] - 11:21, 47:22, 53:11, 53:15, 55:2, 61:2, 61:6, 61:8, 61:9, 65:14
**receives** [2] - 65:11, 67:9
**receiving** [2] - 65:3, 65:17
**recently** [3] - 9:12, 40:1, 62:24
**reclassify** [1] - 16:3
**recognized** [2] - 39:25, 86:20
**record** [6] - 24:21, 42:14, 57:17, 83:14, 91:24, 93:22
**records** [2] - 57:4, 57:21
**refer** [1] - 84:3
**reference** [5] - 29:18, 33:18, 82:13, 82:24, 85:11
**referenced** [8] - 34:23, 63:3, 84:7, 88:14, 88:24, 89:6, 89:10, 92:21
**references** [1] - 70:5
**referred** [1] - 62:21
**referring** [3] - 53:12, 57:3, 89:22
**refers** [1] - 81:21
**refugee** [1] - 17:14
**refused** [1] - 78:16
**regard** [14] - 6:11, 7:1, 12:10, 14:21, 14:25, 16:2, 16:23, 18:7, 31:7, 73:25, 85:14, 85:16, 89:21, 93:9
**registered** [2] - 9:7, 11:20
**regular** [1] - 63:25
**regulations** [1] - 35:19
**rehearsed** [1] - 92:15
**rejected** [1] - 37:22
**rejects** [1] - 38:21
**relate** [2] - 13:21, 14:1
**related** [4] - 11:14, 13:16, 13:20, 51:14
**relates** [2] - 25:10, 85:14
**relating** [3] - 18:20, 22:13, 32:5
**relationship** [9] - 6:24, 21:11, 30:25, 38:20, 49:10, 49:24, 53:2, 63:14, 66:3
**relationships** [1] - 4:5
**relatively** [1] - 77:15

**release** [1] - 78:15
**relevant** [8] - 19:9, 19:11, 22:13, 29:4, 52:17, 52:23, 80:5, 87:7
**reliance** [1] - 27:19
**relied** [1] - 71:7
**relief** [1] - 16:25
**relies** [3] - 21:6, 79:22, 83:22
**rely** [2] - 16:15, 81:12
**relying** [4] - 60:10, 74:6, 74:9, 74:21
**remainder** [1] - 84:20
**remained** [1] - 35:16
**remanded** [1] - 26:14
**remarkable** [1] - 32:25
**remedies** [3] - 71:3, 72:14, 72:20
**remedy** [5] - 64:22, 66:7, 66:8, 68:1, 68:17
**remind** [2] - 39:20, 55:7
**remove** [1] - 91:6
**render** [1] - 9:15
**repeatedly** [1] - 10:14
**replead** [1] - 93:1
**replies** [2] - 4:20, 5:13
**reply** [6] - 18:16, 28:9, 45:23, 56:20, 92:12, 93:7
**report** [4] - 45:8, 69:5, 75:17, 76:4
**reported** [10] - 2:24, 44:6, 44:12, 44:14, 45:7, 54:18, 62:8, 62:10, 62:11, 77:5
**Reporter** [1] - 2:17
**REPORTER'S** [1] - 93:21
**reporting** [2] - 38:17, 54:16
**reports** [7] - 54:19, 57:4, 57:9, 57:10, 66:20, 76:1, 76:15
**represent** [3] - 18:19, 32:15, 69:6
**representation** [1] - 31:14
**representations** [3] - 27:19, 27:23, 31:11
**represented** [1] - 9:4
**representing** [3] - 3:6, 10:7, 15:25
**represents** [2] - 32:17, 91:17
**request** [5] - 9:19, 9:23, 23:9, 29:17, 90:11

**require** [8] - 19:8, 19:9, 34:10, 34:11, 35:4, 36:6, 36:7
**required** [6] - 38:16, 40:2, 40:3, 46:24, 47:5, 88:7
**requirements** [4] - 38:17, 82:5, 83:16, 83:23
**requires** [2] - 35:8, 58:22
**reread** [2] - 63:6
**research** [1] - 66:19
**researched** [1] - 38:5
**residence** [1] - 73:15
**resident** [1] - 15:11
**residents** [3] - 11:24, 19:14, 23:21
**resoundingly** [1] - 38:21
**respect** [5] - 28:1, 86:11, 87:2, 90:5, 90:19
**respond** [3] - 39:14, 53:7, 85:10
**responded** [1] - 5:13
**response** [23] - 4:18, 10:24, 10:25, 11:8, 17:21, 18:14, 34:22, 38:1, 38:3, 39:8, 40:23, 47:19, 53:10, 53:21, 72:7, 74:5, 82:1, 85:15, 85:24, 88:12, 89:9, 89:14, 91:12
**responses** [2] - 4:20, 41:6
**responsible** [2] - 52:14, 78:11
**responsive** [1] - 64:13
**rest** [1] - 86:10
**Restatement** [1] - 44:20
**restricted** [2] - 16:9, 46:25
**restriction** [1] - 16:13
**restrictions** [2] - 15:15, 15:17
**result** [3] - 13:19, 48:11, 68:13
**results** [1] - 13:16
**retail** [4] - 35:11, 35:18, 67:20, 68:5
**retailer** [1] - 37:2
**return** [1] - 33:25
**returned** [1] - 33:11
**reveal** [1] - 40:9
**reviewed** [1] - 26:2
**revised** [1] - 34:16
**Richmond** [1] - 1:17

**RICO** [6] - 4:17, 4:22, 4:23, 5:2, 20:4, 91:6
**rid** [2] - 4:9, 46:8
**rights** [9] - 21:15, 21:21, 56:1, 57:23, 75:20, 76:1, 76:5, 76:15, 77:4
**rise** [2] - 46:19, 47:14
**Road** [1] - 2:13
**role** [1] - 4:17
**room** [2] - 60:19, 62:19
**ROSENTHAL** [1] - 1:11
**roundabout** [1] - 37:24
**route** [2] - 30:6, 30:7
**routinely** [1] - 36:4
**RPR** [2] - 2:17, 93:24
**Rule** [5] - 7:19, 19:7, 19:8, 22:19, 35:20
**rule** [1] - 24:22
**Rules** [1] - 90:13
**ruling** [1] - 23:11
**running** [1] - 35:18

## S

**s/Bruce** [1] - 93:24
**safety** [2] - 36:5, 38:17
**sales** [5] - 10:19, 10:20, 11:4, 12:12, 13:8
**San** [2] - 1:20, 1:24
**Sara** [2] - 2:4, 3:14
**sat** [1] - 64:4
**satisfied** [3] - 31:17, 49:16, 51:18
**satisfy** [1] - 71:10
**Saudi** [1] - 78:12
**saw** [7] - 44:14, 62:6, 62:10, 62:11, 89:21, 92:9, 93:16
**scant** [1] - 54:21
**scheme** [2] - 63:17, 79:11
**scope** [1] - 66:21
**searched** [1] - 38:7
**seated** [2] - 3:2
**second** [4] - 6:19, 60:6, 65:21, 74:10
**Second** [8] - 5:6, 39:15, 39:20, 46:16, 46:19, 47:2, 65:13, 72:3
**secondary** [3] - 34:3, 79:23, 80:5
**section** [5] - 73:20, 73:21, 73:24, 82:23, 83:7

**Section** [2] - 15:7, 15:20
**sector** [1] - 76:5
**secured** [1] - 79:17
**security** [2] - 79:15, 79:18
**see** [15] - 19:18, 20:3, 23:16, 23:20, 25:13, 26:17, 31:13, 38:2, 43:9, 43:11, 43:12, 45:24, 54:2, 85:15
**seeing** [1] - 70:22
**seek** [1] - 80:16
**seeking** [1] - 71:3
**sees** [2] - 56:24, 57:1
**selective** [1] - 21:5
**sell** [2] - 10:11, 14:17
**selling** [1] - 30:19
**sells** [1] - 10:8
**send** [2] - 24:10, 42:20
**sense** [5] - 32:4, 62:4, 63:11, 63:18, 85:21
**sent** [7] - 40:20, 53:13, 53:18, 54:17, 61:11, 63:25, 64:1
**separate** [1] - 72:20
**separately** [1] - 72:21
**sequence** [1] - 35:23
**serious** [2] - 6:15, 63:8
**seriously** [1] - 59:24
**serve** [2] - 18:22, 51:13
**served** [5] - 6:9, 6:10, 18:25
**Services** [1] - 28:22
**services** [1] - 76:9
**set** [17] - 22:17, 27:18, 32:5, 50:3, 50:8, 51:21, 52:8, 56:5, 65:14, 66:9, 68:1, 72:24, 77:15, 82:10, 82:15, 83:16
**sets** [3] - 65:7, 68:1, 83:21
**setting** [3] - 45:7, 48:13, 86:1
**Seventh** [2] - 16:15, 72:3
**several** [4] - 66:1, 69:11, 71:16, 77:20
**severely** [1] - 33:10
**sewed** [1] - 57:12
**shall** [1] - 81:1
**shareholder** [1] - 14:24
**shares** [1] - 14:25
**Shea** [3] - 1:16, 3:5, 64:16
**shed** [1] - 71:17

**shield** [1] - 46:6
**ship** [5] - 10:10, 24:6, 24:7, 24:9, 50:22
**shipments** [4] - 23:24, 26:20, 26:24, 27:3
**shipped** [2] - 14:5, 30:21
**shipping** [2] - 24:3, 24:4
**shirt** [8] - 67:12, 67:14, 75:3, 76:11, 76:14, 76:17, 77:3
**shirts** [1] - 67:16
**shopping** [1] - 67:15
**shops** [1] - 69:2
**short** [2] - 61:4, 62:16
**short-lived** [1] - 61:4
**shorting** [1] - 33:23
**show** [9] - 12:24, 13:15, 47:7, 50:4, 50:10, 50:12, 50:18, 87:11, 90:5
**showing** [2] - 59:9, 78:7, 90:2
**shown** [2] - 8:7, 70:11
**showroom** [1] - 35:6
**shows** [9] - 17:22, 17:24, 20:22, 21:11, 24:20, 26:21, 27:2, 50:24, 83:17
**side** [2] - 15:16, 73:13
**sign** [3] - 19:15, 24:11, 78:15
**signed** [2] - 19:16, 23:21
**significant** [5] - 33:13, 34:11, 35:12, 47:10, 54:12
**silent** [1] - 35:16
**Silk** [1] - 48:21
**similar** [4] - 16:17, 35:24, 39:4, 71:19
**similarly** [2] - 19:21, 71:21
**simple** [1] - 16:6
**simply** [24] - 10:15, 12:7, 13:10, 14:18, 15:18, 31:20, 37:7, 47:14, 58:20, 62:3, 63:18, 67:25, 70:8, 74:8, 74:16, 75:10, 75:18, 78:1, 78:7, 78:24, 79:19, 81:14, 84:15
**simultaneously** [4] - 51:12, 71:5, 71:20, 72:17
**sit** [2] - 27:12, 27:14
**site** [5] - 46:2, 79:17, 81:25, 83:3, 83:24

**sites** [2] - 42:1, 75:21

**sitting** [2] - 24:11, 60:20

**situation** [9] - 6:11, 15:24, 43:22, 43:23, 52:22, 54:16, 62:5, 62:13, 66:11

**six** [5] - 33:10, 33:19, 33:22, 62:16, 67:4

**six-week** [1] - 62:16

**six-week-long** [1] - 33:22

**size** [1] - 42:24

**slavery** [2] - 41:4, 84:22

**SLAVIN** [2] - 93:21, 93:24

**Slavin** [2] - 2:17, 93:24

**sleep** [1] - 55:3

**slips** [1] - 43:13

**Smart** [2] - 50:19, 89:23

**smoking** [1] - 43:8

**soccer** [2] - 51:25, 79:7

**social** [1] - 46:3

**society** [1] - 52:21

**sold** [1] - 30:22

**someone** [1] - 64:4

**sometimes** [1] - 35:4

**somewhat** [2] - 37:13, 73:4

**somewhere** [2] - 54:17, 88:15

**sorry** [8] - 15:10, 20:9, 26:19, 28:11, 33:5, 42:8, 62:9, 90:23

**sort** [8] - 43:16, 57:20, 66:4, 66:6, 67:20, 71:12, 76:2, 77:8

**SOS** [3] - 17:10, 17:13, 40:20

**Sosa** [2] - 16:18, 77:16

**sought** [1] - 5:1

**sounds** [3] - 40:4, 46:5, 55:17

**source** [2] - 77:4, 82:17

**sourcing** [1] - 57:4

**South** [1] - 1:19

**Southeast** [1] - 51:1

**SOUTHERN** [1] - 1:1

**sparingly** [1] - 77:17

**specific** [26] - 7:2, 7:22, 8:11, 12:24, 13:14, 13:17, 14:15, 19:4, 20:12, 22:14, 23:9, 23:23, 25:2, 25:3, 25:9, 27:5,

30:24, 32:20, 46:15, 49:5, 54:19, 56:18, 75:21, 81:6, 82:21

**specifically** [17] - 13:18, 22:20, 24:13, 46:18, 66:10, 66:24, 70:4, 71:17, 71:22, 83:11, 84:5, 88:13, 88:19, 88:24, 89:10, 89:14, 92:21

**specifications** [1] - 42:19

**specifics** [1] - 84:21

**specify** [1] - 85:17

**spent** [4] - 65:23, 66:15, 69:18, 80:6

**spirit** [1] - 90:12

**sport** [1] - 69:2

**Sports** [6] - 2:10, 2:12, 3:18, 3:21, 3:23, 32:15

**stage** [6] - 39:16, 47:5, 47:6, 47:13, 88:6, 88:7

**stand** [1] - 84:23

**standard** [26] - 8:22, 42:7, 42:9, 42:10, 42:12, 45:15, 58:20, 60:8, 61:24, 62:18, 63:3, 64:21, 65:9, 65:17, 68:9, 69:3, 74:12, 74:21, 74:22, 76:3, 80:5, 80:9, 83:20, 83:23, 84:3, 87:12

**standards** [12] - 7:20, 21:24, 39:19, 74:2, 80:16, 80:18, 81:7, 83:1, 83:15, 85:12, 85:23, 87:11

**standing** [7] - 11:14, 21:3, 60:20, 63:16, 64:6, 70:19, 87:14

**standpoint** [1] - 32:20

**stands** [1] - 67:1

**start** [3] - 49:13, 55:9, 58:13

**started** [2] - 55:11, 78:22

**state** [21] - 3:1, 7:18, 8:1, 8:3, 9:8, 11:15, 12:12, 13:12, 13:13, 16:23, 20:23, 22:20, 23:21, 26:14, 27:6, 80:20, 80:21, 81:2, 81:3, 81:4, 81:5

**State** [1] - 86:25

**State"** [1] - 80:25

**state's** [1] - 81:9

**statements** [3] -

18:10, 31:11, 81:18

**States** [38] - 8:2, 9:8, 10:11, 10:18, 10:21, 10:22, 11:6, 11:12, 12:15, 12:20, 12:21, 13:3, 13:7, 13:8, 13:22, 14:2, 14:5, 14:7, 14:9, 14:10, 14:17, 15:12, 15:14, 21:23, 23:25, 27:2, 30:21, 30:22, 30:23, 31:2, 42:16, 65:16, 70:16, 70:18, 72:12, 73:14, 73:16, 73:17

**states** [2] - 24:6, 24:7

**STATES** [1] - 1:1

**status** [7] - 4:13, 4:16, 17:14, 36:13, 38:19, 41:12, 69:24

**Statute** [10] - 58:11, 75:13, 77:13, 77:14, 77:21, 78:2, 78:5, 79:21, 80:5, 84:22

**statute** [31] - 15:1, 15:3, 15:15, 15:18, 16:17, 17:18, 27:7, 27:16, 27:20, 28:2, 58:22, 64:19, 65:15, 65:17, 66:17, 66:18, 66:21, 67:1, 67:6, 68:1, 70:11, 70:20, 70:21, 71:1, 73:11, 73:20, 74:9, 74:25, 75:4, 75:8, 75:10

**statutes** [14] - 6:16, 20:20, 32:7, 48:25, 52:18, 52:19, 58:10, 71:15, 71:23, 72:10, 72:14, 72:15, 72:19, 72:21

**statutory** [5] - 32:11, 48:18, 64:25, 68:17, 69:19

**stay** [1] - 27:21

**stemming** [1] - 48:22

**stenography** [1] - 2:24

**still** [5] - 5:16, 45:11, 55:8, 67:1, 75:23

**stipulation** [1] - 29:18

**stitching** [1] - 42:24

**stood** [1] - 29:22

**stop** [3] - 8:8, 55:10, 55:18

**stopped** [1] - 63:6

**store** [1] - 68:5

**stores** [1] - 36:22

**STR** [2] - 83:1, 83:11

**straight** [3] - 27:15, 35:5, 83:25

**stream** [11] - 9:24,

10:13, 10:17, 11:2, 11:4, 11:6, 12:6, 12:10, 12:14, 12:15, 13:10

**street** [1] - 42:17

**strenuously** [1] - 90:8

**strict** [2] - 81:19, 82:5

**strike** [5] - 33:9, 33:16, 33:22, 53:14, 53:18

**stronger** [2] - 36:17, 41:15

**struck** [2] - 81:15

**structuring** [1] - 53:1

**stuff** [1] - 68:6

**styled** [1] - 38:14

**subcontractors** [3] - 36:1, 36:4, 51:2

**subject** [4] - 36:4, 36:8, 38:24, 47:21

**subjected** [1] - 67:2

**subjects** [3] - 42:25, 43:3, 45:5

**submit** [5] - 51:8, 52:22, 53:3, 60:3, 90:9

**submitted** [1] - 49:8

**subsections** [3] - 69:13, 70:5, 70:7

**substantive** [1] - 72:13

**substantively** [3] - 71:14, 90:19, 92:8

**success** [1] - 47:8

**sue** [1] - 56:1

**sued** [4] - 20:20, 21:25, 27:1, 78:10

**suffer** [1] - 52:5

**suffice** [1] - 77:6

**sufficiency** [1] - 5:15

**sufficient** [5] - 5:16, 11:14, 12:16, 19:2, 20:25, 21:3, 24:22, 29:5, 30:17, 39:16, 41:11, 49:9

**sufficiently** [1] - 25:9

**suggested** [1] - 59:25

**suggesting** [1] - 46:8

**suing** [1] - 14:24

**suit** [1] - 21:23

**Suite** [6] - 1:17, 1:24, 2:2, 2:7, 2:10, 2:15

**summer** [2] - 93:16, 93:19

**supplier** [4] - 32:9, 41:11, 42:13, 58:25

**suppliers** [2] - 10:20, 23:4

**supply** [3] - 42:16, 42:17, 68:7

**support** [5] - 9:21, 47:11, 49:9, 82:8, 84:16

**supporting** [3] - 9:10, 23:1, 24:19

**supports** [2] - 52:13, 70:1

**supposed** [2] - 54:17, 59:11

**supposedly** [1] - 63:17

**Supreme** [9] - 4:5, 4:9, 6:24, 9:12, 15:1, 16:18, 48:20, 77:16, 77:24

**surely** [2] - 35:1, 55:25

**survive** [1] - 79:9

**suspect** [1] - 26:9

**swear** [1] - 38:6

**sworn** [1] - 10:25

**system** [1] - 19:1

**systematic** [2] - 8:21, 9:15

**T**

**table** [3] - 8:15, 55:11, 88:4

**tablecloths** [2] - 42:17, 42:18

**tag** [1] - 85:19

**Taiwan** [1] - 16:1

**Taiwanese** [2] - 6:12, 9:25

**talks** [3] - 23:17, 24:6, 81:1

**tax** [1] - 55:2

**taxes** [1] - 9:9

**team** [1] - 42:20

**Technical** [1] - 28:22

**technicalities** [2] - 90:15, 90:16

**technically** [1] - 27:21

**Tennessee** [1] - 71:18

**terms** [6] - 15:6, 19:19, 52:11, 82:11, 87:18, 91:1

**terrible** [1] - 68:7

**test** [5] - 48:12, 49:3, 51:8, 68:2, 90:1

**testified** [1] - 17:17

**testimony** [3] - 17:11, 17:24, 26:5

**tests** [1] - 36:9

**TEXAS** [1] - 1:1

**Texas** [36] - 1:18, 1:19, 1:21, 1:24, 8:4, 9:8, 9:11, 11:21, 11:22, 11:23, 13:22,

20:23, 21:22, 24:6, 24:9, 24:10, 24:12, 27:3, 28:24, 28:25, 29:3, 29:7, 29:12, 29:14, 30:15, 48:9, 48:14, 49:15, 51:10, 80:8, 81:11, 83:18, 84:17

**Thailand** [1] - 17:13

**Thang** [3] - 17:9, 17:16, 40:20

**theirs** [1] - 90:3

**themselves** [3] - 40:24, 61:19, 65:6

**theories** [2] - 32:12, 48:5

**theory** [13] - 9:23, 9:25, 34:2, 37:19, 37:23, 47:24, 52:11, 52:13, 55:7, 55:20, 61:15, 79:22, 87:7

**there'** [1] - 61:11

**therefore** [1] - 85:19

**THI** [1] - 1:3

**thick** [1] - 89:8

**third** [7] - 34:25, 36:2, 41:24, 42:2, 57:22, 68:4, 81:2

**third-party** [5] - 34:25, 41:24, 42:2, 57:22, 68:4

**thousands** [1] - 51:1

**three** [2] - 90:14, 90:18

**threshold** [2] - 65:19, 66:7

**throughout** [1] - 68:7

**thumbprint** [1] - 19:17

**THUY** [1] - 1:3

**tie** [1] - 33:21

**tied** [2] - 25:9, 52:18

**timing** [1] - 63:23

**Tindall** [1] - 91:18

**today** [8] - 7:3, 10:7, 32:22, 47:21, 52:7, 74:9, 81:13, 91:14

**together** [3] - 40:12, 69:6, 72:2

**tolerate** [1] - 34:18

**tolling** [4] - 17:5, 17:6, 27:8, 31:7

**took** [5] - 33:19, 59:18, 64:1, 64:2, 92:19

**Tort** [11] - 58:11, 75:13, 77:13, 77:14, 77:21, 78:2, 78:5, 79:4, 79:21, 80:5, 84:21

**tort** [2] - 16:12

**Torts** [1] - 44:20

**torture** [1] - 16:20

**totally** [1] - 50:15

**touches** [1] - 28:21

**tout** [2] - 42:1, 46:2

**toward** [1] - 53:13

**traded** [1] - 14:25

**trafficker** [1] - 67:1

**trafficking** [14] - 25:8, 34:19, 34:20, 41:4, 47:12, 63:17, 66:24, 69:5, 74:20, 75:18, 84:22, 86:15, 86:19, 91:22

**Trafficking** [4] - 1:20, 1:23, 91:14, 92:1

**transcript** [1] - 93:22

**transcription** [1] - 2:25

**transmission** [1] - 14:1

**travel** [2] - 11:8, 11:11

**Travis** [1] - 2:10

**treated** [1] - 22:16

**treatment** [3] - 60:17, 60:18, 60:22

**treaty** [1] - 86:25

**tried** [3] - 34:5, 34:6, 34:7

**tries** [2] - 72:5, 72:9

**trigger** [2] - 41:11, 77:7

**trips** [1] - 11:14

**true** [12] - 22:25, 24:18, 30:1, 39:22, 54:4, 54:5, 54:8, 54:20, 63:18, 74:8, 82:2, 84:14

**try** [6] - 16:11, 34:4, 34:14, 34:24, 36:24, 62:1

**trying** [6] - 18:25, 35:25, 41:2, 46:5, 60:1, 79:24

**turn** [9] - 8:9, 46:23, 51:10, 57:24, 57:25, 60:1, 64:12, 75:13, 84:3

**turnaround** [1] - 52:9

**TURNER** [2] - 3:22, 3:24

**Turner** [4] - 2:1, 2:12, 3:22, 3:24

**turning** [2] - 51:7, 77:13

**turns** [1] - 14:15

**TVPA** [1] - 16:16

**TVPRA** [36] - 6:20, 7:7, 14:21, 15:7, 16:3, 16:9, 28:14, 34:7,

45:16, 58:11, 58:13, 59:5, 59:15, 60:4, 60:7, 61:12, 64:9, 64:13, 64:16, 64:22, 65:1, 65:7, 65:25, 66:10, 66:16, 66:23, 69:13, 69:20, 70:2, 70:25, 71:4, 71:20, 72:17, 73:1, 74:7, 74:22

**two** [5] - 5:14, 11:23, 12:9, 17:2, 17:18, 17:25, 27:7, 28:2, 29:21, 37:3, 51:6, 51:12, 51:13, 56:9, 58:10, 58:20, 70:6, 71:14, 72:19, 81:15, 91:17

**two-year** [2] - 27:7, 28:2

**TX** [5] - 2:3, 2:8, 2:11, 2:13, 2:16

**type** [5] - 25:24, 48:25, 49:8, 59:25, 75:19

## U

**U.S** [17] - 9:9, 9:10, 10:12, 10:13, 11:5, 11:9, 15:10, 26:22, 26:23, 26:24, 26:25, 30:20, 30:22, 35:8, 56:24, 73:7

**UL** [2] - 83:1, 83:11

**UL-STR** [2] - 83:1, 83:11

**uncertainties** [1] - 4:12

**unclear** [3] - 4:6, 22:8, 53:16

**uncontroverted** [1] - 22:25

**under** [35] - 5:8, 12:3, 12:7, 15:15, 16:9, 16:12, 17:18, 32:7, 34:7, 45:16, 47:5, 49:10, 49:12, 52:12, 58:16, 59:15, 60:7, 71:11, 76:18, 77:20, 78:2, 79:20, 79:21, 80:5, 81:3, 81:7, 81:11, 81:19, 83:18, 84:17, 84:21, 87:11, 87:14, 88:21

**understood** [2] - 17:16, 17:17

**unfortunately** [2] - 59:2, 75:7

**uniform** [1] - 51:25

**Uniform** [2] - 2:5, 3:17

**unilaterally** [1] - 90:4

**unique** [1] - 5:23

**United** [38] - 8:2, 9:8, 10:11, 10:18, 10:21, 10:22, 11:6, 11:11, 12:14, 12:20, 12:21, 13:3, 13:7, 13:8, 13:22, 14:2, 14:5, 14:7, 14:9, 14:10, 14:17, 15:12, 15:13, 21:23, 23:25, 27:1, 30:21, 30:22, 30:23, 31:2, 42:16, 65:15, 70:16, 70:18, 72:12, 73:14, 73:16, 73:17

**UNITED** [1] - 1:1

**universally** [1] - 86:19

**unlawfully** [1] - 73:15

**unless** [8] - 18:12, 37:16, 56:24, 57:14, 64:10, 75:12, 84:23, 85:3

**unquote** [1] - 59:18

**unrecognized** [1] - 22:6

**unskilled** [1] - 90:3

**unsolicited** [1] - 53:13

**untoward** [1] - 44:10

**up** [23] - 4:19, 6:25, 12:25, 19:23, 28:13, 31:12, 32:2, 32:5, 34:17, 35:13, 43:6, 45:14, 46:4, 46:10, 46:11, 56:10, 56:12, 62:7, 63:10, 66:8, 78:12, 78:15, 89:9

**urge** [1] - 72:15

**useful** [3] - 4:11, 47:18, 83:8

**uses** [2] - 48:7, 70:4

## V

**valid** [1] - 40:7

**validity** [1] - 5:17

**value** [7] - 65:3, 65:11, 65:14, 65:18, 67:9, 75:6, 75:10

**Van** [1] - 2:15

**various** [3] - 6:16, 32:7, 36:3

**vendor** [6] - 36:23, 42:16, 50:20, 56:22, 56:23

**vendors** [5] - 10:20, 23:4, 35:18, 55:22, 85:25

**venture** [11] - 34:8, 34:12, 58:18, 58:23, 59:1, 59:4, 59:9, 59:11, 59:19, 65:4,

75:10

**venture"** [1] - 64:24

**venue** [1] - 20:17

**verdict** [1] - 47:4

**versa** [1] - 25:20

**version** [3] - 74:7, 81:12, 85:6

**versions** [1] - 5:5

**versus** [1] - 32:6

**vice** [1] - 25:20

**victim** [5] - 65:1, 66:24, 67:2, 70:16, 70:17

**Viet** [1] - 2:15

**Vietnam** [4] - 25:19, 33:7, 33:11

**Vietnamese** [4] - 10:2, 13:24, 19:14, 36:21

**view** [2] - 92:18, 92:19

**View** [1] - 10:14

**vigilant** [1] - 77:18

**violate** [1] - 71:12

**violates** [2] - 21:24

**violating** [1] - 20:19

**violation** [2] - 65:5, 67:9

**violations** [12] - 15:9, 16:8, 16:21, 56:2, 57:23, 75:20, 76:1, 76:4, 76:15, 77:5, 87:3, 89:24

**vis-à-vis** [1] - 50:2

**VN** [1] - 2:15

**void** [1] - 50:9

**Vu** [3] - 17:8, 17:12, 27:14

**VU** [1] - 1:3

**Vu's** [1] - 17:23

## W

**W&D** [16] - 1:6, 2:1, 6:9, 18:3, 18:22, 18:24, 19:22, 20:13, 20:14, 20:18, 21:12, 23:25, 25:17, 25:18, 25:23, 51:3

**Wade** [2] - 2:12, 3:22

**WADE** [1] - 3:22

**wages** [2] - 52:21, 55:2

**wait** [2] - 16:5, 87:8

**waiting** [1] - 4:9

**Wal** [2] - 37:5, 48:6

**Wal-Mart** [2] - 37:5, 48:6

**walk** [2] - 43:7, 43:9

**walking** [1] - 4:21

**wants** [2] - 54:9, 87:21

**Washington** [2] - 2:5,

11:20
**Washington-registered** [1] - 11:20
**watching** [1] - 93:16
**water** [1] - 43:12
**Waterhouse** [1] - 78:11
**ways** [3] - 29:21, 49:5, 81:10
**wealth** [2] - 32:2, 34:23
**wearing** [1] - 60:21
**web** [5] - 41:25, 46:2, 81:25, 83:3, 83:24
**week** [3] - 24:4, 33:22, 62:16
**weeks** [6] - 24:1, 24:2, 33:10, 33:19, 60:25, 67:4
**weigh** [1] - 4:10
**Wells** [1] - 51:3
**Westlaw** [1] - 38:7
**whatsoever** [2] - 13:9, 55:4
**whistles** [1] - 42:25
**whole** [6] - 22:15, 32:5, 32:8, 39:18, 50:1, 88:12
**Willbros** [5] - 28:23, 29:1, 29:2, 29:10, 29:13
**wish** [2] - 22:18, 27:7
**withholding** [1] - 55:2
**wondered** [1] - 39:2
**wonderful** [1] - 32:16
**word** [3] - 70:4, 75:1, 75:9
**words** [6] - 26:22, 57:1, 58:23, 65:6, 70:16
**worker** [7] - 45:3, 50:1, 50:2, 50:4, 51:6, 55:9, 55:16
**workers** [16] - 25:19, 33:7, 34:11, 36:21, 45:1, 50:14, 52:5, 53:2, 54:15, 54:24, 60:17, 63:10, 79:16, 79:17, 85:21, 90:3
**workmen's** [1] - 48:24
**works** [3] - 57:10, 63:22, 70:11
**world** [2] - 30:18, 37:2
**worth** [2] - 12:19, 13:3
**write** [1] - 63:19
**written** [6] - 40:6, 56:14, 62:23, 63:7, 63:12
**wrongdoer** [1] - 78:6

**wrongdoing** [6] - 54:6, 58:19, 59:21, 61:3, 63:8, 78:9
**wrongdoings** [1] - 63:9
**wrote** [1] - 47:3
**WWAI** [1] - 29:10

**Y**

**year** [7] - 4:6, 24:1, 27:7, 27:16, 27:20, 28:2
**years** [4] - 17:2, 17:18, 17:25, 24:2
**yield** [1] - 37:16
**York** [1] - 72:1

**Z**

**zero** [1] - 54:21